## APPENDIX IN SUPPORT OF SUPPLEMENTAL DECLARATION OF BRIAN FONSECA

1.  *Ukraine: Conflict at the Crossroads of Europe and Russia*, COUNCIL ON FOREIGN RELATIONS, October 11, 2022.

2.  *Conflict in Ukraine's Donbas: A Visual Explainer*, INTERNATIONAL CRISIS GROUP.

3.  *Luhansk and Donetsk are key to understanding the latest escalation in Ukraine*, NPR, February 22, 2022.

4.  *Hague court rules Russia must compensate Ukrainian investors $159 mn for Crimea losses*, EUROMAIDAN PRESS, May 10, 2018.

5.  *Everest Estate LLC et al. v. The Russian Federation*, PCA-CPA.

6.  *Russia's Sberbank says concerned by protests against Ukraine subsidiary,* REUTERS, March 13, 2017.

7.  *Russia's Sberbank 'looking for quick exit from Ukraine'*, KYIV POST, March 21, 2017.

8.  *Poroshenko sanctions 5 Russian banks*, KYIV POST, March 16, 2017.

9.  *Ukraine imposes sanctions on five Russian banks*, REFWORLD, March 16, 2017.

10. *Report: Ukrainian court freezes shares of Russian banks' local units*, S&P GLOBAL MARKET INTELLIGENCE, September 13, 2018.

11. *Appeal Court Freezes Shares Of Prominvestbank, Sberbank, VTB Bank*, UKRAINIAN NEWS, September 12, 2018.

12. *The Supreme Court lifted the ban on the compulsory sale of Prominvestbank*, FINBALANCE, November 11, 2019.

13. *VEB v. Ukraine, Partial Award on Preliminary Objections* (Case No. V2019/088), JUS MUNDI, January 31, 2021.

14. *Stockholm Arbitration Court bars Ukraine from selling shares of VEB subsidiary*, KYIV POST, August 28, 2019.

15. *Stockholm court bans Ukraine from selling Prominvestbank shares*, REUTERS, August 28, 2019.

16. *Vnesheconombank v. Ukraine - Decision of Supreme Court of Ukraine*, ITALAW, January 25, 2021.

17.  *Confiscation Of Prominvestbank: An Oversight That May Cost Ukraine Dearly*, Seeking Alpha, March 11, 2020.

18.  *Ukraine's competition watchdog approves sale of Prominvestbank to local banker*, S&P Global Market Intelligence, October 12, 2020.

19.  *Vnesheconombank v. Ukraine - Resolution of Kyiv Court of Appeal*, Italaw, September 15, 2021.

20.  *NBU receives documents from Tigipko to approve purchase of PIB*, Kyiv Post, October 12, 2020.

21.  *BVI Court charged shares owned by Ukraine in satisfaction of VEB.RF's claims*, VEB/RF, December 14, 2020.

22.  *Supreme Court lifts seizure of PIB shares, unblocks its funds*, Interfax-Ukraine, April 2, 2021.

23.  *Ukrainian regulator blocks Prominvestbank's purchase by local banker*, S&P Global Market Intelligence, February 8, 2021.

24.  *Data on final key participants in the bank ownership structure as of January 01, 2022*, National Bank of Ukraine.

25.  *Russia's Sberbank to appeal against Ukraine's move to seize its assets*, Reuters, May 12, 2022.

26.  *Russia Pushes Back On Ukraine's Move To Seize Its Assets*, Law360, May 12, 2022.

Case 6:22-cv-00990-DNH-TWD   Document 49-2   Filed 01/27/23   Page 3 of 209

# Ukraine: Conflict at the Crossroads of Europe and Russia

Ukraine's Westward drift since independence has been countered by the sometimes violent tug of Russia, felt most recently with Putin's 2022 invasion.

## Introduction

Ukraine has long played an important, yet sometimes overlooked, role in the global security order. Today, the country is on the front lines of a renewed great-power rivalry that many analysts say will dominate international relations in the decades ahead.

Russia's invasion of Ukraine in February 2022 marked a dramatic escalation of the countries' eight-year-old conflict and a historic turning point for European security. After six months, many defense and foreign policy analysts cast the war as a major strategic blunder by Russian President Vladimir Putin, and one that has put his long-time rule in jeopardy.

Many observers see little prospect for a diplomatic resolution in the months ahead and instead acknowledge the potential for a dangerous escalation, which could include Russia's use of a nuclear weapon. The war has hastened Ukraine's push to join Western political blocs, including the European Union (EU) and the North Atlantic Treaty Organization (NATO).

## Why is Ukraine a geopolitical flash point?

Ukraine was a cornerstone of the Soviet Union, the archrival of the United States during the Cold War. Behind only Russia, it was the second-most-

populous and -powerful of the fifteen Soviet republics, home to much of the union's agricultural production, defense industries, and military, including the Black Sea Fleet and some of the nuclear arsenal. Ukraine was so vital to the union that its decision to sever ties in 1991 proved to be a coup de grâce for the ailing superpower.

In its three decades of independence, Ukraine has sought to forge its own path as a sovereign state while looking to align more closely with Western institutions, including the EU and NATO. However, Kyiv struggled to balance its foreign relations and to bridge deep internal divisions. A more nationalist, Ukrainian-speaking population in western parts of the country generally supported greater integration with Europe, while a mostly Russian-speaking community in the east favored closer ties with Russia.

Case 6:22-cv-00990-DNH-TWD   Document 49-2   Filed 01/27/23   Page 5 of 209



Territory under Russian control as of Oct. 2022

Provinces annexed by Russia

UKRAINE AT A GLANCE

Area

603,550 square kilometers (largest country in Europe, excluding Russia)

Population

44 million (2021)

Religions

Orthodox Christianity, Catholicism, Protestantism

Primary languages

Ukrainian (official), Russian

Form of government

Semipresidential republic

GDP

$200 billion (2021)

GDP per capita

$4,836 (2021)

Ukraine became a battleground in 2014 when Russia annexed Crimea and began arming and abetting separatists in the Donbas region in the country's southeast. Russia's seizure of Crimea was the first time since World War II that a European state annexed the territory of another. More than fourteen thousand people died in the fighting in the Donbas between 2014 and 2021, the bloodiest conflict in Europe since the Balkan Wars of the 1990s. The hostilities marked a clear shift in the global security environment from a

Case 6:22-cv-00990-DNH-TWD   Document 49-2   Filed 01/27/23   Page 7 of 209

unipolar period of U.S. dominance to one defined by renewed competition between great powers [PDF].

In February 2022, Russia embarked on a full-scale invasion of Ukraine with the aim of toppling the Western-aligned government of Volodymyr Zelenskyy.

# What are Russia's broad interests in Ukraine?

Russia has deep cultural, economic, and political bonds with Ukraine, and in many ways Ukraine is central to Russia's identity and vision for itself in the world.

*Family ties*. Russia and Ukraine have strong familial bonds that go back centuries. Kyiv, Ukraine's capital, is sometimes referred to as "the mother of Russian cities," on par in terms of cultural influence with Moscow and St. Petersburg. It was in Kyiv in the eighth and ninth centuries that Christianity was brought from Byzantium to the Slavic peoples. And it was Christianity that served as the anchor for Kievan Rus, the early Slavic state from which modern Russians, Ukrainians, and Belarussians draw their lineage.

*Russian diaspora*. Approximately eight million ethnic Russians were living in Ukraine as of 2001, according to a census taken that year, mostly in the south and east. Moscow claimed a duty to protect these people as a pretext for its actions in Crimea and the Donbas in 2014.

*Superpower image*. After the Soviet collapse, many Russian politicians viewed the divorce with Ukraine as a mistake of history and a threat to Russia's standing as a great power. Losing a permanent hold on Ukraine, and letting it fall into the Western orbit, would be seen by many as a major blow to Russia's international prestige. In 2022, Putin cast the escalating war with Ukraine as a part of a broader struggle against Western powers he says are

intent on destroying Russia.

*Crimea*. Soviet leader Nikita Khrushchev transferred Crimea from Russia to Ukraine in 1954 to strengthen the "brotherly ties between the Ukrainian and Russian peoples." However, since the fall of the union, many Russian nationalists in both Russia and Crimea longed for a return of the peninsula. The city of Sevastopol is home port for Russia's Black Sea Fleet, the [dominant maritime force](#) in the region.

*Trade*. Russia was for a long time Ukraine's largest [trading partner](#), although this link withered dramatically in recent years. China eventually [surpassed Russia in trade](#) with Ukraine. Prior to its invasion of Crimea, Russia had hoped to pull Ukraine into its single market, the Eurasian Economic Union, which today includes Armenia, Belarus, Kazakhstan, and Kyrgyzstan.

*Energy*. Russia relied on Ukrainian pipelines to pump its gas to customers in Central and Eastern Europe for decades, and it paid Kyiv billions of dollars per year in transit fees. The flow of Russian gas through Ukraine [continued in late 2022](#) despite the hostilities between the two countries, but volumes were reduced and the pipeline remained in serious jeopardy.

*Political sway*. Russia was keen to preserve its political influence in Ukraine and throughout the former Soviet Union, particularly after its preferred candidate for Ukrainian president in 2004, Viktor Yanukovych, lost to a reformist competitor as part of the Orange Revolution popular movement. This shock to Russia's interests in Ukraine came after a similar electoral defeat for the Kremlin in Georgia in 2003, known as the Rose Revolution, and was followed by another—the Tulip Revolution—in Kyrgyzstan in 2005. Yanukovych later became president of Ukraine, in 2010, amid voter discontent with the Orange government.

# What triggered Russia's moves in Crimea and the Donbas in 2014?

It was Ukraine's ties with the EU that brought tensions to a head with Russia in 2013–14. In late 2013, President Yanukovych, acting under pressure from his supporters in Moscow, scrapped plans to formalize a closer economic relationship with the EU. Russia had at the same time been pressing Ukraine to join the not-yet-formed EAEU. Many Ukrainians perceived Yanukovych's decision as a betrayal by a deeply corrupt and incompetent government, and it ignited countrywide protests known as Euromaidan.

Putin framed the ensuing tumult of Euromaidan, which forced Yanukovych from power, as a Western-backed "fascist coup" that endangered the ethnic Russian majority in Crimea. (Western leaders dismissed this as baseless propaganda reminiscent of the Soviet era.) In response, Putin ordered a covert invasion of Crimea that he later justified as a rescue operation. "There is a limit to everything. And with Ukraine, our western partners have crossed the line," Putin said in a March 2014 address formalizing the annexation.

Putin employed a similar narrative to justify his support for separatists in southeastern Ukraine, another region home to large numbers of ethnic Russians and Russian speakers. He famously referred to the area as Novorossiya (New Russia), a term dating back to eighteenth-century imperial Russia. Armed Russian provocateurs, including some agents of Russian security services, are believed to have played a central role in stirring the anti-Euromaidan secessionist movements in the region into a rebellion. However, unlike Crimea, Russia continued to officially deny its involvement in the Donbas conflict until it launched its wider invasion of Ukraine in 2022.

# Why did Russia launch a full-scale invasion of

# Ukraine in 2022?

Some Western analysts see Russia's 2022 invasion as the culmination of the Kremlin's growing resentment toward NATO's post–Cold War expansion into the former Soviet sphere of influence. Russian leaders, including Putin, have alleged that the United States and NATO repeatedly violated pledges they made in the early 1990s to not expand the alliance into the former Soviet bloc. They view NATO's enlargement during this tumultuous period for Russia as a humiliating imposition about which they could do little but watch.

NATO's Expanding Membership



Belgium, Canada, Denmark, France, Iceland, Italy, Luxembourg, Netherlands, Norway, Portugal, United Kingdom, United States

Cold War expansion

Post–Cold War expansion

Czech Republic, Hungary, Poland

Bulgaria, Estonia, Latvia, Lithuania, Romania, Slovakia, Slovenia

Pending ratification

*German reunification in 1990 resulted in what was formerly East Germany becoming part of NATO. The map shows West and East Germany.

In the weeks leading up to NATO's 2008 summit, President Vladimir Putin warned U.S. diplomats that steps to bring Ukraine into the alliance "would be

a hostile act toward Russia." Months later, Russia went to war with Georgia, seemingly showcasing Putin's willingness to use force to secure his country's interests. (Some independent observers faulted Georgia for initiating the so-called August War but blamed Russia for escalating hostilities.)

Despite remaining a nonmember, Ukraine grew its ties with NATO in the years leading up to the 2022 invasion. Ukraine held annual military exercises with the alliance and, in 2020, became one of just six enhanced opportunity partners, a special status for the bloc's closest nonmember allies. Moreover, Kyiv affirmed its goal to eventually gain full NATO membership.

In the weeks leading up to its invasion, Russia made several major security demands of the United States and NATO, including that they cease expanding the alliance, seek Russian consent for certain NATO deployments, and remove U.S. nuclear weapons from Europe. Alliance leaders responded that they were open to new diplomacy but were unwilling to discuss shutting NATO's doors to new members.

"While in the United States we talk about a Ukraine crisis, from the Russian standpoint this is a crisis in European security architecture," CFR's Thomas Graham told *Arms Control Today* in February 2022. "And the fundamental issue they want to negotiate is the revision of European security architecture as it now stands to something that is more favorable to Russian interests."

Other experts have said that perhaps the most important motivating factor for Putin was his fear that Ukraine would continue to develop into a modern, Western-style democracy that would inevitably undermine his autocratic regime in Russia and dash his hopes of rebuilding a Russia-led sphere of influence in Eastern Europe. "[Putin] wants to destabilize Ukraine, frighten Ukraine," writes historian Anne Applebaum in the *Atlantic*. "He wants

Ukrainian democracy to fail. He wants the Ukrainian economy to collapse. He wants foreign investors to flee. He wants his neighbors—in Belarus, Kazakhstan, even Poland and Hungary—to doubt whether democracy will ever be viable, in the longer term, in their countries too."

# What are Russia's objectives in Ukraine?

Putin's Russia has been described as a revanchist power, keen to regain its former power and prestige. "It was always Putin's goal to restore Russia to the status of a great power in northern Eurasia," writes Gerard Toal, an international affairs professor at Virginia Tech, in his book Near Abroad. "The end goal was not to re-create the Soviet Union but to make Russia great again."

By seizing Crimea in 2014, Russia solidified its control of a strategic foothold on the Black Sea. With a larger and more sophisticated military presence there, Russia can project power deeper into the Mediterranean, Middle East, and North Africa, where it has traditionally had limited influence. Some analysts argue that Western powers failed to impose meaningful costs on Russia in response to its annexation of Crimea, which they say only increased Putin's willingness to use military force in pursuit of his foreign policy objectives. Until its invasion in 2022, Russia's strategic gains in the Donbas were more fragile. Supporting the separatists had, at least temporarily, increased its bargaining power vis-à-vis Ukraine.

In July 2021, Putin authored what many Western foreign policy experts viewed as an ominous article explaining his controversial views of the shared history between Russia and Ukraine. Among other remarks, Putin described Russians and Ukrainians as "one people" who effectively occupy "the same historical and spiritual space."

Throughout that year, Russia amassed tens of thousands of troops along the border with Ukraine and later into allied Belarus under the auspices of military exercises. In February 2022, Putin ordered a full-scale invasion, crossing a force of some two hundred thousand troops into Ukrainian territory from the south (Crimea), east (Russia), and north (Belarus), in an attempt to seize major cities, including the capital Kyiv, and depose the government. Putin said the broad goals were to "de-Nazify" and "de-militarize" Ukraine.

However, in the early weeks of the invasion, Ukrainian forces marshaled a stalwart resistance that succeeded in [bogging down the Russian military](#) in many areas, including in Kyiv. Many defense analysts say that Russian forces have suffered from low morale, poor logistics, and an ill-conceived military strategy that assumed Ukraine would fall quickly and easily.

In late August, Ukraine launched a major counteroffensive against Russian forces, recapturing thousands of square miles of territory in the Kharkiv and Kherson regions. The campaigns marked a stunning setback for Russia. Amid the Russian retreat, Putin ordered the mobilization of some three hundred thousand more troops, illegally annexed four more Ukrainian regions, and [threatened to use nuclear weapons](#) to defend Russia's "territorial integrity." Most security analysts see little chance for diplomacy in the months ahead, as both sides have strong motives to continue the fight.

Russia's Annexations in Eastern Ukraine



Territory under Russian control as of Oct. 2022

Kherson, Zaporizhzhia, Donetsk, and Luhansk were annexed on September 30, 2022.

Crimea was annexed in 2014.

# What have been U.S. priorities in Ukraine?

Immediately following the Soviet collapse, Washington's priority was pushing Ukraine—along with Belarus and Kazakhstan—to forfeit its nuclear arsenal so that only Russia would retain the former union's weapons. At the same time, the United States rushed to bolster the shaky democracy in Russia. Some prominent observers at the time felt that the United States was premature in this courtship with Russia, and that it should have worked more on fostering geopolitical pluralism in the rest of the former Soviet Union.

Former U.S. National Security Advisor Zbigniew Brzezinski, in *Foreign Affairs* in early 1994, described a healthy and stable Ukraine as a [critical counterweight to Russia](#) and the lynchpin of what he advocated should be the new U.S. grand strategy after the Cold War. "It cannot be stressed strongly enough that without Ukraine, Russia ceases to be an empire, but with Ukraine suborned and then subordinated, Russia automatically becomes an empire," he wrote. In the months after Brzezinski's article was published, the United States, the United Kingdom, and Russia pledged via the Budapest Referendum to respect Ukraine's independence and sovereignty in return for it becoming a nonnuclear state.

Twenty years later, as Russian forces seized Crimea, restoring and strengthening Ukraine's sovereignty reemerged as a top U.S. and EU foreign policy priority. Following the 2022 invasion, U.S. and NATO allies dramatically increased defense, economic, and humanitarian assistance to Ukraine, as well as ramped up their sanctions on Russia. However, Western leaders have been careful to avoid actions they believe will draw their countries into the war or otherwise escalate it, which could, in the extreme, pose a nuclear threat.

*timeline*

**Ukraine's Struggle for Independence in Russia's Shadow**

*1991–2022*

View timeline

# What are U.S. and EU policy in Ukraine?

The United States remains committed to the restoration of Ukraine's territorial integrity and sovereignty. It does not recognize Russia's claims to Crimea or the other regions unlawfully annexed by Russia. Prior to the 2022 invasion, the United States supported a settlement of the Donbas conflict via the Minsk agreements [PDF].

Western powers and their partners have taken many steps to increase aid to Ukraine and punish Russia for its 2022 offensive. As of October, the United States has provided Ukraine $17 billion in security assistance [PDF], including advanced rocket and missile systems, helicopters, and lethal drones. Several NATO allies are providing similar security aid.

Meanwhile, the international sanctions on Russia have vastly expanded,

covering much of its financial, energy, defense, and tech sectors and targeting the assets of wealthy oligarchs and other individuals. The U.S. and some European governments also banned some Russian banks from the Society for Worldwide Interbank Financial Telecommunication, a financial messaging system known as SWIFT; placed restrictions on Russia's ability to access its vast foreign reserves; and blacklisted Russia's central bank. Moreover, many influential Western companies have shuttered or suspended operations in Russia. The Group of Eight, now known as the Group of Seven, suspended Russia from its ranks indefinitely in 2014.

The invasion also cost Russia its long-awaited Nord Stream 2 pipeline after Germany suspended its regulatory approval in February. Many critics, including U.S. and Ukrainian officials, opposed the natural gas pipeline during its development, claiming it would give Russia greater political leverage over Ukraine and the European gas market. In August, Russia indefinitely suspended operations of Nord Stream 1, which provided the European market with as much as a third of its natural gas.

## What do Ukrainians want?

Russia's aggression in recent years has galvanized public support for Ukraine's Westward leanings. In the wake of Euromaidan, the country elected as president the billionaire businessman Petro Poroshenko, a staunch proponent of EU and NATO integration. In 2019, Zelensky defeated Poroshenko in a sign of the public's deep dissatisfaction with the political establishment and its halting battle against corruption and an oligarchic economy.

Before the 2022 offensive, polls indicated that Ukrainians held mixed views on NATO and EU membership. More than half of those surveyed (not including residents of Crimea and the contested regions in the east)

Case 6:22-cv-00990-DNH-TWD   Document 49-2   Filed 01/27/23   Page 19 of 209

supported EU membership, while 40 to 50 percent were in favor of joining NATO.

Just days after the invasion, President Zelenskyy requested that the EU put Ukraine on a fast track to membership. The country became an official candidate in June, but experts caution that the membership process could take years. In September, Zelenskyy submitted a formal application for Ukraine to join NATO, pushing for an accelerated admission process for that bloc as well. Many Western analysts say that, similar to Ukraine's EU bid, NATO membership does not seem likely in the near term.

# Conflict in Ukraine's Donbas: A Visual Explainer

**On 24 February 2022, Russia attacked Ukraine on several fronts beginning a major invasion. Ukraine's president declared martial law, vowing stiff resistance, as Western powers condemned Moscow's actions. Crisis Group will be covering this crisis in depth as it develops [see our Ukraine page]. The visual explainer below focuses not on the full-scale escalation that began on 24 February, but on fighting in the Donbas region of eastern Ukraine that began in 2014. This provides crucial background for understanding what is happening today.**

The armed conflict in Eastern Ukraine started in 2014. Between then and early 2022, it had already killed over 14,000 people. Over the course of eight years, Ukrainian government forces fought Russian-backed separatists for control over much of the two heavily industrialised regions of Donetsk and Luhansk, also known as Donbas. Fierce battles in 2014-2015 ended with one third of the regions' territory, its most urbanised part, occupied by two Russian proxy statelets, the self-described Donetsk and Luhansk People's Republics. Between September 2014 and February 2015, Russia, Ukraine, France and Germany signed several iterations of the so-called Minsk agreements, which eventually stopped the forward movement of troops and reduced fighting significantly. But the agreements were never implemented, and the fighting transformed into a trench war, with roughly 75,000 troops facing off along a 420-km-long front line cutting through densely populated areas. The war ruined the area's economy and heavy industries, forced millions to relocate and turned the conflict zone into one of the world's most mine-contaminated areas.

This visual explainer shows both the human cost of the war from 2014-early

2022 and the relationships between diplomatic efforts at de-escalation and patterns of fighting and loss of life.

# Mapping Casualties

REUTERS/Baz Ratner

Our two interactive heat maps show military fatalities and civilian casualties (deaths and injuries), broken down by month, and according to the location at which the incident occurred. Maps are centered on the combat zone – the Donetsk and Luhansk regions, divided along community boundaries. Both maps illustrate how the war's impact stretches far beyond military positions.

# Fatalities by Community (Combatants and Civilians)

Combatant & Civilian Fatalities type:

All

Date

12/31/2019 – 02/27/2022

12/31/2019

2/27/2022

12/31/2019

2/27/2022

201900002020000020210000202200002019000020200000202100002
0220000

© Mapbox © OpenStreetMap Improve this map

© Mapbox © OpenStreetMap Improve this map

Combatant & Civilian Fatalities per Community

1-8 9-16 17-25 26-33 34-41

# Civilian Casualties by Community

Civilian Casualties type:

All

Date

01/05/2020 - 02/27/2022

1/5/2020

2/27/2022

1/5/2020

2/27/2022

20200000000000000020210000000000000202200000000000000202000000
00000000020210000000000000020220000000000000

© Mapbox © OpenStreetMap Improve this map

Civilian Casualties per Community

1-10 11-20 21-31 32-41 42-51

Some months saw heavier fighting, and more deaths and injuries than others. Geographically, casualties tended to be concentrated where the sides were especially close to key infrastructure, to each other, or both. You can hover over the heat map and click on individual communities to get a sense of how casualties fluctuated over time, and where they occurred most often.

Civilian casualty data in this heat map includes those killed and injured by live fire – in artillery or mortar strikes, or by bullet wounds from rifles or heavy machine guns. It also includes victims of landmines or explosive remnants of war, as well as those who died of natural causes queuing at checkpoints to cross into or from Ukrainian government-controlled territory.

# A Breakdown of Casualties by Category and Cause

SPUTNIK/Sergey Averin

# Combatant Fatalities by Cause

# Shelling and Negotiations

Armed Forces of Ukraine/ANADOLU AGENCY/Anadolu Agency via AFP

The intensity of the fighting differs from month to month. Our way to measure it is to rely on numbers of explosions as recorded by the Special Monitoring Mission of the Organization for Security and Co-operation in Europe (OSCE SMM) on a daily basis. The SMM was the only international observer mission allowed to collect information from all sides, and its data,

while incomplete, remains the best available.

To illustrate the correlation between diplomatic efforts and the dynamics of warfare, we provide the dates of ceasefire recommitments, overlaid on this chart showing the rise and decline of explosions over time. The number of reported explosions often decreased after ceasefires, only to rise again in the absence of a durable settlement.

In 2021-22 two Russian military build-ups along the Ukrainian border foreshadowed an escalation, one in March and April 2021 and a second one in December 2021 through February 2022. Both these phases also saw an increase in reports that the OSCE Missions were denied access to the war zone by  armed formations.  This means that with the invasion drawing closer, the visibility of what was going on in the Donbas conflict zone declined. Eventually, on 24 February 2022, the day of the invasion, the OSCE announced it would evacuate its Mission. On 8 March, all of its international staff had left Ukraine. Local  Mission members will remain in administrative functions in anticipation of the Mission's revival, but the OSCE has suspended its reporting activities. https://www.osce.org/special-monitoring-mission-to-ukraine/513424

The decision of the Russian government to recognize the independence of the two separatist republics on 21 February 2022 effectively put an end to discussions of Minsk implementation. Three days later, Russia invaded Ukraine, heralding a new phase of the war with a scope of violence far beyond what is depicted here.

# Methodology & Terminology

Sergey Averin/Sputnik/Sputnik via AFP

## Methodology

Crisis Group prepared two major datasets on the conflict to support this visual explainer:

1. A dataset of casualties that includes a dozen variables (age, gender, cause of death/injury, home region, etc.);

2. The daily number of explosions in the conflict zone, as reported by the OSCE SMM;

Crisis Group sourced this data from open sources in Ukraine and Russia from 2020 onward. Sources for the Visual Explainer included:

- OSCE and UN reports;

- Ukrainian military press releases;

- Russian and Ukrainian official statements and online media;

- Statements by de facto authorities;

- Social media reports (groups on Vkontakte, Facebook, etc.).

We faced a number of limitations in tallying casualties. There was  no unified source for casualties resulting from this conflict. While international organisations provided concrete, triangulated data on civilian casualties and the Ukrainian government issued detailed statements about its reported military losses, statements from de facto officials have been patchy. In many

cases, Crisis Group has sought to triangulate data using social media posts or to gather more information through communications with private citizens.

Information about conflict victims is often politicised. It is likely that some non-combat casualties among fighters on both sides have  sometimes been reported as combat casualties, whether by officials or de facto officials, or by media. In cases where there was no information regarding location or cause of death or injury, we did not include the incident in our infographic. When  faced with conflicting accounts regarding whether a soldier's death or injury occurred in combat, we listed the cause as "other". Finally, military and de facto officials sometimes did not disclose the location and cause of military deaths. When tallying fatalities among Russian-backed armed groups, Crisis Group only included those for which we could find at least one additional source.

Sources reporting on combat casualties among the armed groups often use the word "обстрел", a broad term that is usually translated from Russian as "shelling", but which can in fact refer to artillery, small arms and light weapons fire. It is therefore possible we have overestimated the number of armed group fatalities caused by shelling. Furthermore, use of the term "обстрел" may in some cases indicate other causes of death, such as friendly fire or incidents related to unsafe handling of weapons.

Crisis Group drew on the OSCE SMM daily reports for its data on the number of explosions. While the SMM also collected data on small arms fire, we have chosen not to  include this in our graphs. Our focus has been on documenting major spikes in fighting that involved the use of larger caliber weapons. Explosions recorded by the OSCE have  also been the most reliable indicator of combat dynamics available from open sources, with the added advantage that both sides used the same indicators, counting the number of shells (mortars and artillery) fired by the other side.

# Terminology

Contact line: the 420km+ strip of land that divided the warring parties, shown on our maps as it was at the start of 2020. This has not changed much  between 2015 and February  2022.

Donbas conflict zone: the parts of the Ukrainian oblasts (regions) of Donetsk and Luhansk held by Russia-backed separatists, as well as those parts of Donetsk and Luhansk adjacent to the contact line that have been  controlled by the Ukrainian government

Civilian casualties: civilians who have been killed and injured in the conflict zone in circumstances directly resulting from the war. This includes those killed and injured by live fire, as well as those whose deaths or injuries resulted from mines or explosive remnants of war, regardless of whether they occurred near the contact line or not. It also includes those who died of health-related causes while queuing to cross the contact line. Conditions at crossing points were  often suboptimal, and civilians waiting to cross may have lacked adequate shelter, rest facilities and medical services. Our main sources for civilian casualty data are the UN Human Rights Monitoring Mission, the OSCE SMM and local media.

Military fatalities: combat fatalities, on either warring side. Our data includes only those killed by live fire, mines and explosive devices. Crisis Group has excluded data on those wounded in action due to the complex and incomplete nature of the data.

Shelling: an incident generally involving artillery or mortar fire. Crisis Group attributed casualties to this category when victims were reported to have suffered shrapnel injuries, or when other information about the circumstances of the death or injury suggested it resulted from shelling.

Small arms: a category that includes weapons ranging from rifles to heavy machine guns. Casualties were placed in this category if sources indicated that the person suffered a gunshot injury.

Drone attack: an incident typically involving an improvised combat drone, constructed by attaching ammunition or a grenade to a commercial unmanned aerial vehicle.

Notes

# Why Luhansk and Donetsk are key to understanding the latest escalation in Ukraine

Joe Hernandez    February 22, 20226:06 PM ET

Ukrainian military forces walk in front of damaged buildings on the front line with Russia-backed separatists in Mariinka in the Donetsk region on Feb. 7.

*Aleksey Filippov/AFP via Getty Images*

In the latest flare-up of the crisis in Ukraine, Russian President Vladimir Putin on Monday recognized the independence of two breakaway regions in Ukraine's east as independent and ordered military forces to deploy there.

The rebel-controlled territories, Luhansk and Donetsk, comprise a larger region called Donbas that borders Russia. The two territories have been led by pro-Russia separatists for nearly a decade.

Experts warn that Putin's order for troops to carry out what he called "peacekeeping functions" in the region — and what President Biden has now called the start of an invasion — could lay the groundwork and provide the pretext for a larger Russian military incursion into Ukraine.

To understand why Luhansk and Donetsk are playing such a central role in the conflict's most recent escalation, it's worth going back to the popular uprising that kicked off the current unrest in Ukraine, which has been simmering since 2013.

## The Maidan revolution led to a major political shift in Ukraine

In November of that year, then-Ukrainian President Viktor Yanukovych announced he would refuse to sign an agreement with the European Union to bring Ukraine into a free trade agreement, citing pressure from Russia.

Sponsor Message

The move sparked massive protests in Ukraine calling for Yanukovych to resign. In February 2014, violence between police and protesters in Kyiv's Maidan square left dozens dead; Yanukovych eventually fled to Russia and the Ukrainian parliament established a new government.

Greeting the new government and Yanukovych's ouster as a coup, Putin sent troops into Crimea, a former Soviet republic that had been part of Ukraine since 1954.

Within days, Russia annexed Crimea — despite international pressure from the U.S. and European allies — following a referendum that apparently resulted in 97% of voters choosing to join Russia, though the results are disputed.

In April 2014, fighting began northeast of Crimea across the Sea of Azov, in another pro-Russian stronghold called Donbas.

## Separatist factions in Luhansk and Donetsk emerge emboldened

Clashes soon broke out between pro-Russian rebels in Donbas and Ukrainian military forces, with about 40,000 Russian troops stationed just across the border. (In a similar warning to his more recent overtures, Putin said at the time that Russia had no intention of invading Ukraine and that it would only send troops into the country if necessary.)

Critics have accused Russia of aiding in the insurgency in eastern Ukraine, though Moscow has denied it.

By late April 2014, Ukraine's interim President Alexander Turchinov said the government had lost control of the eastern part of the country.

What followed were years of tense relations between the Ukrainian government in Kyiv and the self-described Donetsk People's Republic and Luhansk People's Republic.

A man walks past an abandoned building in the Donetsk region town of Avdiivka on Monday.
*Aleksey Filippov/AFP via Getty Images*

A 2014 referendum in the region found strong support among residents for secession from Ukraine, and a national presidential election in the spring was marred by obstruction and in some cases violence in the breakaway east, as clashes continued.

Later, Ukraine's government decided to grant the separatist regions self-rule and give the militants amnesty, though the move stopped short of declaring the regions fully independent. It was a major concession from the government, though some separatists said it didn't go far enough. On-again, off-again fighting continued even as both sides agreed on a cease-fire.

## The conflict in eastern Ukraine continues today

The violent power struggle in eastern Ukraine, though at times reduced to a low boil, never really ended.

In 2019 Ukrainian President Volodymyr Zelenskyy met with Putin for face-to-face peace talks on the continuing violence in eastern Ukraine, but the discussions didn't lead to a long-term solution.

More than 13,000 people have died as a result of the conflict and more than 1.5 million were displaced, [according to the Council on Foreign Relations](#).

Activists hold banners and shout slogans during an "Empire must die" rally outside the Russian Embassy in Kyiv on Tuesday.

*Sergei Supinsky/AFP via Getty Images*

Now the threat of major violence is looming again.

U.S. officials said that a recent warning from Denis Pushilin, the leader of the self-proclaimed Donetsk People's Republic, of an impending attack by the Ukrainian military was nothing more than [a "false flag" operation](#) meant to sow unrest. Russian state media have also accused Ukraine's military of killing civilians, though again [there is no evidence](#) to back up their claims.

Western powers say they support Ukraine's sovereignty and have provided the country with military equipment for self-defense, but they haven't sent their own troops to beat back the Russian advance.

Rather, now that Biden has called Russia's latest move an invasion, Western powers are responding with sanctions they hope will end any further escalations in Ukraine.

# Hague court rules Russia must compensate Ukrainian investors $159 mn for Crimea losses



*The Permanent Court of Arbitration. Photograph: pca-cpa.org*

The Permanent Court of Arbitration (PCA) based in The Hague has issued a unanimous judgment in the case *Everest Estate LLC et al. v. The Russian Federation*, ruling that Russia is responsible for violating the rights of Ukrainian investors and must compensate 19 Ukrainian private entities $159 mn for the losses resulting from the annexation of Crimea back in March 2014. Russian representatives did not attend the hearing and did not file any post-hearing submissions.

> *"On 2 May 2018, having deliberated, the Tribunal issued its unanimous*

Case 6:22-cv-00990-DNH-TWD   Document 49-2   Filed 01/27/23   Page 35 of 209

*Award on the Merits, addressing issues pertaining to liability and damages,"* the PCA [press release](#) reads.

Russia has to compensate [for losses from 21 March 2014](#), when Russian President Vladimir Putin signed a decree on annexation of Crimea. It is expected that the Kremlin will appeal the decision of the Tribunal.

*"The Claimants contended that, as of August 2014, the Russian Federation breached its obligations under the Ukraine-Russia BIT [1998 Bilateral Investment Treaty] by interfering with and ultimately expropriating their investments in real estate located in Crimea,"* according to the PCA.

The PCA [confirmed](#) its jurisdiction over property relations in Crimea in the summer of 2017. Russia did not recognize the award, after which it began to ignore the case. As the court reports, after the hearing on the merits in this matter was held from 5 to 6 October 2017, the Tribunal invited the parties to file post-hearing submissions by 11 December 2017. On 11 November 2017, the Tribunal posed supplementary questions on valuation to the Parties, inviting them to respond in their post-hearing submissions. The Russian Federation did not file any post-hearing submissions. On 23 March 2018, the Tribunal declared the hearings in this arbitration closed.

The litigation [concerns](#) a number of residential and commercial properties in Russian-occupied Crimea, including hotels, apartment buildings, and individual residential apartments.

*"The text of the judgment and the procedure remain confidential,"* [wrote](#) Deputy Foreign Minister **Olena Zerkal** on her Facebook page, *"We can inform that judges have recognized that:*

*a) Russia is responsible for its actions in Crimea based on the Bilateral*

> *Investment Treaty.*
> *b) The so-called nationalization by the occupation authorities is a violation of the investment treaty.*
> *c) Russia must compensate the affected companies $159 million, as well as compensate the litigation expenses."*

This is the first judgment, according to which Russia is obliged to pay compensation as a result of the annexation of a Ukrainian territory.

## "Nationalization"

Illegal authorities of Crimea started the so-called "nationalization" of the Ukrainian-owned assets in April 2014 as Russia had just annexed the Ukrainian peninsula, and officially finished the seizure on the 1 March 2015.

The active stage of the wholesale confiscations began in August 2014, when the State Council of Crimea (its parliament) granted the local government the right to take property to maintain "vital activity."

*"Nothing was confiscated,"* stated Vladimir Konstantinov, chairman of the State Council, when asked about the issue. *"There is a procedure of forced redemption."*

The Ukrainian state-run organizations were forcibly moved forwards under the ownership of the "Republic," and the assets of private companies were confiscated to include them into a list of the region-owned properties. Some of the owners sued the Crimean authorities in local courts, already Russian-run at the moment, but almost all rulings were in favor of the perpetrator of illegal seizures.

*In total, Crimean authorities seized the assets of some 250 Ukrainian enterprises and organizations, according to RBC.*

The latest ruling of the Permanent Court of Arbitration concerns only 18 Ukrainian companies and 1 private investor whose assets were seized in the occupied Crimea.

# Russian-Ukrainian legal war in international courts

Infographic: Radio Svoboda (2017)

Ukraine continues to file lawsuits against Russia with international courts. Litigations between Kyiv and Moscow are expected to drag on for many years. Here are some examples of the cases being tried.

**Read also:** [Legal war: Ukraine vs. Russia in international courts](#)

**Permanent Court of Arbitration, The Hague**

In January 2016, Oschadbank filed a lawsuit against Russia to the PCA with respect to the loss of property in Crimea; similar appeals were submitted by Privatbank, Ukrnafta, Belbek Airport, the Stabil Company, and Everest Estate. And Russia has already lost the latter case as it has been mentioned above.

Last February, Ukraine filed its memorandum in arbitration proceedings against Russia under the UN Convention on the Sea Law, accusing it in violating Ukraine's sovereign rights in the Black and Azov Seas and the Kerch Strait. The first results could be expected as early as 2019, according to Ukrainian Deputy Foreign Minister Olena Zerkal.

## European Court of Human Rights, Strasbourg

Ukraine filed its first complaint with the European Court of Human Rights against Russia due to multiple human rights violations in the Crimea back in March 2014 in the course of the annexation of the Crimea, later it supplemented it with information on further violations in Crimea and in the Donbas.

For now, the ECHR is considering five lawsuits filed by Ukraine against Russia for the annexation of the Crimea and aggression in the Donbas. The European Court of Human Rights (ECHR) Chamber dealing with four inter-State applications by Ukraine against Russia has decided to relinquish jurisdiction over the cases in favor of the Grand Chamber on 9 May.

Meanwhile, 4226 applications submitted in the ECHR by private persons are linked to the Crimean and Donbas developments. Though only 257 were filed against Russia, 908 against both Russia and Ukraine, and almost 3,000 against Ukraine, Deputy Minister of Justice Ivan Lishchyna told.

***Read also: European Court of Human Rights hints Russia responsible for Donbas damages***

## UN International Court of Justice, The Hague

In January 2017, Ukraine filed a lawsuit against Russia with the ICJ, accusing Russia of terrorism and discrimination during its illegal aggression against Ukraine. However, in March 2017, the Court rejected Ukraine's call to impose provisional measures against Russia for its support of terrorists in the Donbas but acknowledged that Kyiv has a case against Moscow for discrimination in Russia-annexed Crimea.

A few days ago, the Security Service of Ukraine publicized a video

containing parts of the multiple intercepted phone conversations between several direct participants of the rocket attack on the Donbas city of Mariupol in 2015, including a major-general in active service with the Russian Armed Forces. The findings of the investigation are being submitted to the International Court of Justice (ICJ) to support the case on Russia's terrorism support.

## High Court of London

In February 2016, Russia sued Ukraine in the High Court in London demanding the return of $3 bn Eurobonds that were credited two months before Viktor Yanukovych's escape from Ukraine. The Court began considering Russia's claim in January 2017 and later approved an expedited consideration of the Russian lawsuit. In June 2016, Ukraine submitted the necessary documents to the Court of Appeal to challenge that decision. At the conclusion of the hearing last January, the judges of the Court of Appeal "reserved their judgment until a later date."

## Stockholm Arbitration Court

In June 2014, Ukrainian oil and gas Naftogaz and Russian Gazprom sued one another in the Arbitration Institute of the Stockholm Chamber of Commerce, Ukraine demanded fair market price for gas, Russia expected compensation for gas arrears in 2014.

In May 2017, the Court has granted a full victory to Naftogaz in the case of the "take or pay" clause forced on Ukraine under the gas supply contract with Russia's Gazprom.

Last February,  the Stockholm Court obliged Russia's Gazprom to pay $2.56 bn to Naftogaz's in the final stage of a long-running legal battle. The ruling caused another Russian "gas war" against Ukraine, which lasted only a few

days.

***Read more:***

- [Russia's March–2018 gas war attempt against Ukraine, explained](#)
- [Renewed Naftogaz-Gazprom tensions after Stockholm arbitration](#)
- [Stockholm court hands Ukraine victory over Gazprom's "take or pay" claim: 5 things to know](#)
- [What Ukraine won and lost at the International Court of Justice](#)
- [Ukraine vs. Russia in The Hague](#)
- [European Court of Human Rights ruled Russia responsible for actions of Transnistria](#)
- [Ukraine must push its case about human losses in Crimea before the Hague ICC](#)
- [How much will Crimea cost Russians?](#)
- [Little green men: the annexation of Crimea as an emblem of pro-Kremlin disinformation](#)
- [Russia methodically destroys and removes cultural treasures from occupied Crimea](#)
- [Russia brags about "Russian" Crimea in DPRK atlas where South Korea "annexed" by North](#)
- [Stages of Russian occupation in a nutshell](#)
- [What assets did Russia's puppet republics seize from Ukraine? Full list](#)
- [Military base instead of a resort: Crimea four years after the occupation](#)
- [Four years after annexation: Ukraine still connected with occupied Crimea, albeit weakly](#)
- [Three years later: Russia's suicide by Crimea](#)
- [Three years later, Crimea abandoned by both Ukraine and Russia](#)
- [Two years after Russia's takeover, no Crimean spring](#)
- [Chronology of the annexation of Crimea](#)

Hague court rules Russia must compensate Ukrainian investors $159 mln for Crimea losses - Euromaidan Press                    1/25/23, 1:41 PM

- [How it all happened – The Annexation of Crimea](#)
- [Ukraine may seek compensation for property losses in Crimea](#)
- [Russia seizes oligarch assets in Crimea](#)
- [Ukraine will sue Russia for losses in Crimea](#)
- [Russians seize Ukrainian Red Cross property in Crimea](#)

**Ukraine needs independent journalism. And we need you.** Join our community on Patreon and help us better connect Ukraine to the world. We'll use your contribution to attract new authors, upgrade our website, and optimize its SEO. For as little as the cost of one cup of coffee a month, you can help build bridges between Ukraine and the rest of the world, plus become a co-creator and vote for topics we should cover next. **[Become a patron](#)** or see other ways to [support](#).

Tags: [Court hearings](#), [Crimea](#), [Crimea annexation](#), [International](#), [investors](#), [nationalization](#), [News](#), [Permanent Court of Arbitration](#), [Russia](#), [Ukraine](#)

FRANÇAIS    ENGLISH    OTHER ▾    f  in  ᵗ

HOME    ABOUT US    DISPUTE RESOLUTION SERVICES    CASES    RESOURCES    GLOBAL COOPERATION

# Everest Estate LLC et al. v. The Russian Federation

The PCA provides administrative support in this arbitration, which is being conducted under the UNCITRAL Arbitration Rules 1976 pursuant to the Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments dated 27 November 1998.

### Search in cases

Search in case information

### Search in documents

Full text document search

Advanced search                     Search

## Case information

| | |
|---|---|
| NAME(S) OF CLAIMANT(S) | Everest Estate LLC (Private entity ) |
| | Edelveis-2000 PE (Private entity ) |
| | Fortuna CJSC (Private entity ) |
| | Ubk-Invest CJSC (Private entity ) |
| | Niva-Tour LLC (Private entity ) |
| | IMME LLC (Private entity ) |
| | Planeta PE (Private entity ) |
| | Krim Development LLC (Private entity ) |
| | Aerobud PJSC (Private entity ) |
| | Privatoffice LLC (Private entity ) |
| | Dayris LLC (Private entity ) |
| | Diline Ltd LLC (Private entity ) |
| | Broadcasting Company Zhisa LLC (Private entity ) |
| | Privatland LLC (Private entity ) |
| | Dan-Panorama LLC (Private entity ) |
| | Sanatorium Energetic LLC (Private entity ) |
| | AMC Finansovyy Kapital LLC (Private entity ) |
| | AMC Financial Vector LLC (Private entity ) |
| | Mr. Alexander Valerievich Dubilet (Private entity ) |
| NAME(S) OF RESPONDENT(S) | The Russian Federation (State) |
| NAMES OF PARTIES | - |
| CASE NUMBER | 2015-36 |
| ADMINISTERING INSTITUTION | Permanent Court of Arbitration (PCA) |
| CASE STATUS | |

Concluded

| | |
|---|---|
| TYPE OF CASE | Investment arbitration |
| SUBJECT MATTER OR ECONOMIC SECTOR | Real estate |
| RULES USED IN ARBITRAL PROCEEDINGS | UNCITRAL Arbitration Rules 1976 |
| TREATY OR CONTRACT UNDER WHICH PROCEEDINGS WERE COMMENCED | [Bilateral treaty]<br>Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments dated 27 November 1998<br>Country A: Russian Federation<br>Country B: Ukraine |
| LANGUAGE OF PROCEEDING | English |
| SEAT OF ARBITRATION (BY COUNTRY) | Netherlands |
| ARBITRATOR(S) | Dr. Andrés Rigo Sureda (Presiding Arbitrator)<br>Professor W. Michael Reisman<br>Professor Dr. Rolf Knieper |
| REPRESENTATIVES OF THE CLAIMANT(S) | Mr. John M. Townsend<br>Mr. James H. Boykin<br>Mr. Vitaly Morozov<br>HUGHES HUBBARD & REED LLP<br>(Washington, D.C., United States)<br><br>Mr. Marc-Olivier Langlois<br>Mr. Leon Ioannou<br>HUGHES HUBBARD & REED LLP<br>(Paris, France) |
| REPRESENTATIVES OF THE RESPONDENT(S) | Russia has not appointed an agent. In a letter to the PCA dated 15 September 2015 attaching correspondence dated 12 August 2015, Russia stated it "does not recognize the jurisdiction of an international tribunal at the Permanent Court of Arbitration in settlement of the abovementioned claims." |
| REPRESENTATIVES OF THE PARTIES | |
| NUMBER OF ARBITRATORS IN CASE | 3 |
| DATE OF COMMENCEMENT OF PROCEEDING | 19 June 2015 |
| DATE OF ISSUE OF FINAL AWARD | 02 May 2018 |
| LENGTH OF PROCEEDINGS | 2-3 years |
| ADDITIONAL NOTES | - |

## Documents

▶  Press Release

Navigation

› Home

› About us

› Dispute Resolution Services

› Cases

› Resources

› External relations

› FAQ

› Employment

› Contracting Parties Login

Contact

Permanent Court of Arbitration
Peace Palace
Carnegieplein 2
2517 KJ The Hague
The Netherlands

**T:** +31 70 302 4165
**F:** +31 70 302 4167
**E-mail:** bureau@pca-cpa.org

Contact us

Follow Us

TERMS OF USE        COPYRIGHT 2023 - PERMANENT COURT OF ARBITRATION - ALL RIGHTS RESERVED

# Russia's Sberbank says concerned by protests against Ukraine subsidiary

KIEV, March 13 (Reuters) - Russian lender Sberbank said on Monday it was deeply concerned by protests against its Ukrainian subsidiary, which included a nationalist group walling up the entrance to one of its branches in Kiev with masonry and cement.

Periodic protests have been held against Kremlin-owned banks operating in Ukraine since bilateral ties broke down in 2014 after Russia annexed Crimea and gave its support to the pro-Russian separatists in eastern Ukraine.

Sberbank's announcement last Tuesday that it would heed a call from President Vladimir Putin to recognise passports issued by separatists in eastern Ukraine has fuelled greater discontent.

On Monday, a few dozen members of a new activist group called National Corp blocked off the entrance to Sberbank's main branch in central Kiev. The branch temporarily suspended operations and appealed to the police.

"Sberbank is highly concerned about the situation in Ukraine linked to the actions of representatives of nationalist groups," the bank said in a statement.

"Our subsidiary has already appealed to law enforcement bodies and we hope that all necessary steps will be swiftly taken to ensure the safety of our workers and clients and protect property."

It said over the past week it had recorded over 26 acts of vandalism against

Sberbank Ukraine's branches and bank machines.

Last week, the central bank said it could recommend the introduction of sanctions on Sberbank's subsidiary for its recognition of separatists' identity documents.

Five Russian state-owned banks are present in Ukraine, including three in the top 20, and they hold a combined market share of 8.6 percent.

The central bank has been seeking to cut that following the souring of relations between the one-time allies.

It is not yet clear how the other Kremlin-owned banks operating in Ukraine are handling Putin's order to recognise separatist documents.

Reporting by Margaryta Cornokondratenko in Kiev and Alexander Winning in Moscow; Writing by Alessandra Prentice

# Russia's Sberbank 'looking for quick exit from Ukraine'

[Oksana Grytsenko](Oksana Grytsenko)    Published March 21, 2017. Updated March 21 at 7:02 pm



Under pressure from Ukrainian activists and Ukraine's authorities Sberbank, Russia's biggest bank, is looking for a fast route out of the Ukrainian market, its head said on March 21.

"We're considering the options for the fastest possible exit from the Ukrainian market," Sberbank CEO Herman Gref told journalists after a bank supervisory council meeting, several Russian media reported.

He added that the bank was deciding whether to sell its Ukrainian business or simply close it.

On March 15, Ukrainian President Petro Poroshenko approved sanctions against Sberbank and four other Russian banks at the recommendation of Ukraine's National Security and Defense Council. Apart from Sberbank, the sanctioned Russian banks are Vneshekonombank, BM Bank, Prominvestbank and VS Bank.

The sanctions banned the five banks from taking money out of Ukraine.

Ukraine took the decision to impose sanctions after the Russian banks said they were ready to start servicing the bearers of passports issued by the pseudo-authorities in the parts of Donetsk and Luhansk oblast, where Russian-backed forces have seized control.

Earlier, on Feb. 18, Russian President Vladimir Putin signed a decree to recognize documents, including passports, issued by the separatists.

In response to the Russian banks' decision to service the separatist-issued documents, activists from the the National Corps Party, a nationalist group affiliated with the Azov volunteer battalion, last week bricked up the frontage of the main office of Sberbank in Kyiv, demanding the bank's closure.

Later, activists from the Organization of Ukrainian Nationalists volunteer battalion tried to set fire to the entrance door of a branch of Russia's Alfa-Bank.

Kateryna Rozhkova, the deputy head of the National Bank of Ukraine, said in an interview with Ukraine's Inter TV channel on March 19 that all of the Russian banks in Ukraine are now in talks on selling their Ukrainian businesses.

Sergey Gorkov, the CEO of Vneshekonombank, said on March 21 that Hungary's OTP group was interested in purchasing his bank's Ukrainian

network.

Timothy Ash, a London-based analyst with Blueberry Asset Management, wrote: "It is interesting that a couple of years back at the outset of the crisis in Ukraine, when Russian banks had a $20-$25 billion loan book in Ukraine, the assumption was that through these state-owned banks Russia had leverage over Ukraine – if they pulled out, they could cause major macroeconomic and financial instability. However, rapidly that leverage has disappeared as the asset quality of these operations drained away, the deposit base dwindled.

"Russian banks played ball, re-committed capital to keep the lights on – and keys in Russian pockets. But I think they are increasingly recognizing that these operations are just not sustainable. The problem is that giving the keys back, risks the Ukrainian authorities will be very reluctant in the future to register Russian bank entities in Ukraine – further reducing economic/financial links and leverage for Russia over Ukraine.

"Over time, trade, energy, banking links between Russia and Ukraine are eroding – pushing Ukraine even further outside Russia's orbit – actually the opposite of what I think Russia was hoping to achieve. I guess the only leverage left are political ties/military options. Political ties are also evaporating fast – ties to Moscow are now only a vulnerability for Ukrainian politicians. And I guess with the re-arming/retraining of the Ukrainian military, even military options are narrowing, or at least potential costs of military intervention in Ukraine stepping up quite significantly."

# Poroshenko sanctions 5 Russian banks

[Maria Romanenko](#)    Published March 16, 2017. Updated March 16 at 7:59 pm



Ukrainian President Petro Poroshenko sanctioned five Russian banks in Ukraine, forbidding them to transfer funds outside the country. The banks affected are Sberbank, VTB Bank, Prominvestbank, VS Bank and BM Bank.

Poroshenko ratified the March 15 decision of the National Security and Defense Council of Ukraine, which also imposed a trade blockade on Russian-occupied territories in eastern Ukraine

These sanctions come amid numerous attacks on banks with Russian capital in Ukraine.

Starting Jan. 30, activists from the National Corps Party of Ukraine, which wants to sever ties with Russia, began its campaign to picket and vandalize with graffiti the Russian banks.

On March 13, representatives of National Corps Party bricked up an entrance of a Sberbank branch on Volodymyrska Street. This vandalism came after Sberbank decided to accept identifications issued by the Kremlin-backed separatists in the Donbas.

Ukraine's Sberbank then introduced a limit of Hr 30,000 ($1,112) on cash withdrawals, blaming "disruption of cash collection schedules" because of the protests.

On Feb. 3, Ukrainian news site Hyser quoted National Bank of Ukraine Governor Valeria Gontareva as saying that banks with Russian capital would not "have a bright future in Ukraine."

She earlier told the Kyiv Post she doesn't see a problem with Russian-owned banks operating in Ukraine, but would obey an order from the National Security and Defense Council to shut them down.

# Ukraine imposes sanctions on five Russian banks

| Publisher | Radio Free Europe/Radio Liberty |
|---|---|
| Publication Date | 16 March 2017 |
| Cite as | Radio Free Europe/Radio Liberty, *Ukraine imposes sanctions on five Russian banks*, 16 March 2017, available at: https://www.refworld.org/docid/5975a662a.html [accessed 25 January 2023] |
| Disclaimer | This is not a UNHCR publication. UNHCR is not responsible for, nor does it necessarily endorse, its content. Any views expressed are solely those of the author or publisher and do not necessarily reflect those of UNHCR, the United Nations or its Member States. |

## March 16, 2017

Ukrainian President Petro Poroshenko has imposed sanctions on five banks with Russian capital functioning in Ukraine.



Ukrainian President Petro Poroshenko

A statement on the presidential website on March 16 said that Poroshenko signed a decree introducing sanctions on Sberbank, VS Bank, Prominvestbank, VTB Bank, and BM Bank for a one-year period.

The proposal to introduce sanctions was made by the National Security and Defense Council on March 15.

Poroshenko's decree ordered the Foreign Ministry to inform European Union and the United States about the sanctions and ask them to introduce similar

measures against the banks.

The sanctions come after several days of protests across Ukraine against Sberbank and other Russia banks, which began after Sberbank said it would comply with Russian President Vladimir Putin's February 18 decree ordering Russian authorities to recognize identity documents issued by separatists who hold parts of Ukraine's Donetsk and Luhansk regions.

Sberbank on March 9 retracted its earlier statement and said it would not recognize separatist-issued documents.

[Link to original story on RFE/RL website](Link to original story on RFE/RL website)

Copyright notice: Copyright (c) 2007-2009. RFE/RL, Inc. Reprinted with the permission of Radio Free Europe/Radio Liberty, 1201 Connecticut Ave., N.W. Washington DC 20036

# Report: Ukrainian court freezes shares of Russian banks' local units

The Kyiv Court of Appeal ordered to freeze the shares of three Ukrainian lenders controlled by Russian state banks VTB Bank PJSC, PAO Sberbank of Russia and Vnesheconombank and prohibited liquidation, restructuring or any actions aimed at selling property owned by the financial institutions, the Ukrainian News Agency reported.

The share freeze, affecting Sberbank JSC, JSC VTB BANK and PSC Prominvestbank, follows lawsuits launched by companies linked to Ukrainian businessman and former JSC CB PRIVATBANK owner Ihor Kolomoiskyi. The companies filed the lawsuits following the May 2018 ruling of the Hague Arbitration Court, which stated that the Russian Federation should compensate them for real estate seized in Crimea following the annexation of the peninsula by Russia, and ordered to collect $139 million from the Russian state.

Both VTB and Sberbank of Russia said they plan to take action against the asset freeze ruling, while also noting that the court decision will not affect the operations of the Ukrainian units, news agency RBK said.

Vnesheconombank, Sberbank of Russia and VTB Bank decided to divest their Ukrainian subsidiaries after authorities in that country imposed sanctions on the units in 2017. Due to problems with gaining regulatory approvals, VEB and VTB recently abandoned the sale plans and were preparing to liquidate their Ukrainian units.

Meanwhile, Belarusian lender OJSC Paritetbank submitted a request with the Ukrainian central bank in June to purchase Sberbank Ukraine, but the

deputy head of the central bank, Kateryna Rozhkova, said in August that the regulator sees no possibility of approving the transaction because Paritetbank does not meet regulatory requirements for a deal. Paritetbank's first request to cquire Sberbank Ukraine was rejected by the Ukrainian regulator in March.

# Appeal Court Freezes Shares Of Prominvestbank, Sberbank, VTB Bank



**Salic UK (the United Kingdom), which is a subsidiary of the Saudi Agricultural & Livestock Investment Co (Salic, Saudi Arabia) has agreed with the Mriya agro-holding (Ternopil region) to buy its agricultural assets it Ukraine.**

This follows from the press service of Mriya agro-holding, Ukrainian News Agency reports.

"Mriya Farming PLC (the United Kingdom) and Salic UK Ltd (Saudi Agricultural and Livestock Investment Company, the United Kingdom) have today announced an agreement on purchase of the farm assets of the Mriya agro-holding, including all infrastructure facilities, technical park, as well as the companies have the right to lease the land bank," the statement says.

The deal value and its conditions are confidential.

According to the report, the deal will be completed after receiving respective permit from the Antimonopoly Committee.

After the deal is done, Mriya agro-holding will continue its operating activity in Ukraine along with a subsidiary of Salic - Continental Farmers Group (CFG).

Rothschild & Co along with the ICU group (being local partners) were the advisers of the Mriya agro-holding during the preparation of the deal.

As Ukrainian News Agency earlier reported, President Petro Poroshenko has welcomed the decision of Saudi Agricultural & Livestock Investment Co (Saudi Arabia) to acquire the Mriya agro-holding (Ternopil region).

He also added that the said contract was the biggest in the agricultural sector for the whole period of Ukraine's independence.

Besides, Poroshenko noted that the agreement did not envision acquisition of Ukrainian lands, but the acquisition of assets.

The British division of the Saudi Agricultural & Livestock Investment Co. (Salic) is close to buying the Mriya Agro Holding company (Ternopil region).

According to the sources, the acquisition would take the Salic-operated farming area in Ukraine to just over 200,000 hectares.

According to Bloomberg, officials at Salic's headquarters in Riyadh could not be reached for comment and Mriya Chief Executive Officer Simon Cherniavsky declined to comment.

Salic already manages about 45,000 hectares adjacent to the farms run by Mriya, Bloomberg wrote.

In addition, according to Bloomberg, the Saudi firm it joined U.S. agribusiness giant Bunge Ltd. to buy a majority stake in the former Canadian Wheat Board to create G3 Global Grain Group in 2015.

According to the website of Salic, the company has been operating in the area of investment in agriculture, livestock, and supplies since 2012.

The company's shareholder is Saudi Arabia's State Investment Fund.

Mriya Agro Holding successfully completed the restructuring of its debt on August 21.

As a result of the debt restructuring, Mriya's total debt burden reduced from USD 1.1 billion to USD 309.5 million, including USD 49.3 million in restructured secured debt, USD 208.1 million in restructured unsecured debt, USD 46 million in working-capital notes, and USD 6.1 million in new equipment leasing.

Under the terms of the debt restructuring, all of the assets of Mriya Agro Holding were sold to a new holding company called Mriya Farming PLC (Britain).

Previously, Mriya Agro Holding said that it intended to convert USD 1.098 billion in unsecured debt into securities.

Mriya Agro Holding planned to complete the debt restructuring by mid-July.

Mriya completed negotiations with creditors on restructuring debts totaling almost USD 1.1 billion in September 2016.

The Interior Affairs Ministry issued an arrest warrant for Mriya's co-owner Mykola Huta in January 2015.

Interpol later issued a red notice for Huta.

Huta is accused of fraudulent misappropriation of more than USD 100 million in funds from European investment funds.

The East Caribbean Supreme Court (British Virgin Islands) began liquidating HF Assets Management Company Limited, which owns a controlling stake in Mriya Agro Holding PLC (Cyprus), which is the holding company of the Mriya Agro Holding company, in December 2014.

Representatives of the agricultural holding met with representatives of the committee of its bondholders and representatives of its creditors on December 16, 2014, to address the issue of restructuring the agricultural holding's debt.

Before then, the agricultural holding's creditors appealed to the Ukrainian authorities to investigate Mriya's operations, claiming that the agricultural holding was refusing to fulfill its debt obligations and unwilling to enter into dialogue with creditors on possible debt restructuring.

The agricultural holding delayed a debt payment of USD 129 million in August 2014.

The total debt, including guarantees, was later estimated at USD 1.3 billion.

Mriya grows wheat, corn, sunflower, barley, canola, buckwheat, potatoes, soybeans, and other crops.

The agricultural holding's enterprises cultivate land in Ternopil, Khmelnytskyi, Ivano-Frankivsk, Rivne, Lviv, and Chernivtsi regions.

Верховний Суд зняв заборону на примусовий продаж Промінвестбанку | FINBALANCE    1/25/23, 1:47 PM

# The Supreme Court lifted the ban on the compulsory sale of Prominvestbank



11.11.2019, 09:00

On November 6, the Supreme Court refused to satisfy the cassation appeals of the Russian state-owned corporation VEB.RF (Vnesheconombank) and its Ukrainian subsidiary (Prominvestbank) and upheld the ruling of the Kyiv Court of Appeal dd. 27.08.2019 (in case No. 757/36346/19-ц), which - at the request of Teleradiokompaniia Zhysa LLC (related to Ihor Kolomoiskyi) - lifted the ban on the State Executive Service of Ukraine to perform any actions on the sale of 99.77% of Prominvestbank shares.

The corresponding ban on the sale of Prominvestbank`s shares was imposed by a resolution of the Pechersk district court of Kyiv dated

24.07.2019 at the request of the VEB.RF as part of its claim on lifting the arrest of 99.77% of Prominvestbank`s shares.

This arrest was imposed by a decree of the State Executive Officer in May 2019 as part of the execution of the decision of the the Permanent Court of Arbitration (Hague, the Netherlands)  dated 02.05.2018 on the recovery from Russia in the person of the Ministry of Justice of the Russian Federation in favor of a number of companies, related to former Privatbank`s owners, USD 139 million (plus USD 20 million of interest) as compensation for real estate expropriated in Crimea after its annexation by Russia.

It should be noted that on 20.09.2019, the PFTS exchange planned to reopen the auction for the sale of 99.77% of Prominvestbank`s foreclosed shares. The initial value of the block of securities amounted to UAH 399.1 million. The guarantee fee is UAH 79.8 million (20% of the initial price of the lot).

The first auction, which was planned for 28.08.2019 with the initial price of UAH 532 million, also did not take place. The PFTS exchange stated that it did not receive any bids for the acquisition of Prominvestbank. At the time, the VEB.RF assured that the Arbitration Institute of the Stockholm Chamber of Commerce had banned Ukraine from selling Prominvestbank's shares (while the VEB. RF requests the Ukrainian courts to recognize the abovementioned arbitration decision.

On September 20, 2019, VEB.RF stated that the Supreme Court of Ukraine banned the forced sale of Prominvestbank shares. VEB.RF also noted that after the Supreme Court`s decision, a new auction of Prominvestbank's shares "cannot be held legally until the dispute is considered on its merits" (quote).

It should be understood that the Russian state corporation meant the

Верховний Суд зняв заборону на примусовий продаж Промінвестбанку · FINBALANCE                    1/25/23, 1:47 PM

decision of the Supreme Court dated 16.09.2019, which stopped the effect of the abovementioned resolution of the Kyiv Court of Appeal dated 27.08.2019 and thus renewed the ban on the sale of 99.77% of Prominvestbank's shares, which was imposed by the resolution of the Pechersk District Court of Kyiv dated 24.07.2019.

At the same time, the Supreme Court, by its resolution dd. 06.11.2019, renewed the resolution of the Kyiv Court of Appeal dd. 27.08.2019 and thus lifted the ban on sale of 99.77% of Prominvestbank shares.

JUS MUNDI (/en/)   (/en/)   ⌕   ◎   ⋮  EN  Product  ⊞  Why Jus Mundi? ∨  Pricing (/en/pricing)  About ∨  EN ∨  SIGN UP (/EN/REGISTER/REG  Log In

🔔 Add to Alerts NEW     📁 Save to folder     ⊡ Copy the reference     ⁇ Give us feedback     ▷ Tutorial video

# VEB v. Ukraine

**State Development Corporation "VEB.RF" v. Ukraine, SCC Case No. 2019/113 and V2019/088**

**Nature of the proceedings:** International

**Type of case:** Investor-State

**Economic sector:**
**Financial and insurance activities**
    Financial service activities, except insurance and pension funding

**Date of introduction:** 21 Aug 2019

**Status of the case:** Pending

**Claimant's country of origin:** Russia (/en/d/profile/state/ru)

**Respondent:** Ukraine (/en/d/profile/state/ua)

**Institution:** SCC (Stockholm Chamber of Commerce) (/en/d/profile/institution/en-scc-stockholm-chamber-of-commerce)

**Rules of arbitration:**
SCC Arbitration Rules 2017 (/en/document/rule/en-arbitration-rules-of-the-arbitration-institute-of-the-stockholm-chamber-of-commerce-2017-scc-rules-2017-sunday-1st-january-2017)

**Seat of arbitration:** Stockholm

**Applicable treaties:**
Russia - Ukraine BIT (199... (/en/document/treaty/en-agreement-between-the-governement-of-the-russian-federation-and-the-cabinet-of-ministers-of-the-ukraine-on-the-encouragement-and-mutual-protection-of-investments-russian-federation-ukraine-bit-1998-friday-27th-november-1998)

## Documents of the case

| Emergency Arbitrator Decision on Interim Measures (Case No. 2019/113) - 28 Aug 2019 (/en/document/decision/en-vnesheconombank-veb-v-ukraine-emergency-arbitrator-decision-tuesday-27th-august-2019#decision_5482)

| Decision of the Kyiv Court of Appeal - 15 Sept 2020 (/en/document/decision/en-vnesheconombank-veb-v-ukraine-resolution-of-kyiv-court-of-appeal-tuesday-15th-september-2020#decision_12420)

| Judgment of the Supreme Court of Ukraine - 14 Jan 2021 (/en/document/decision/en-vnesheconombank-veb-v-ukraine-ruling-of-the-supreme-court-of-ukraine-thursday-14th-january-2021#decision_14654)

| Partial Award on Preliminary Objections (Case No. V2019/088) - 31 Jan 2021 (/en/document/decision/en-vnesheconombank-veb-v-ukraine-original-proceedings-wednesday-21st-august-2019#decision_12421)

👤 **Constantine Partasides** (/en/p/constantine-partasides)  —  President

👤 **Loretta Malintoppi** (/en/p/loretta-malintoppi)  —  Appointed by the State

👤 **Paolo Michele Patocchi** (/en/p/paolo-michele-patocchi)  —  Appointed by the investor

## Lawyers, other representatives, expert(s), tribunal's secretary ∨

EN 📄 🔖 (/en/document/decision/pdf/en-vnesheconombank-veb-v-ukraine-original-proceedings-wednesday-21st-august-2019) 📄 *Request the PDF*

▼ I. INTRODUCTION
  A. The Parties and their r…
  B. The Tribunal
▼ II. PROCEDURAL HISTORY
  A. Request for Arbitration
  B. Seat of the Arbitration
  C. Language of the Arbit…
  D. Constitution of the Tri…
  E. Bifurcation of proceed…
  F. Hearing on preliminar…
  III. BACKGROUND FACTS

# Partial Award on Preliminary Objections
# (Case No. V2019/088)

# I. INTRODUCTION

VEB v. Ukraine
Partial Award on Prelimi…

**Subsequent citations of this document as a whole:**

 0

 Add to Alerts New

IV. CAN THE CLAIMANT ...
  A. The Respondent's pos...
  B. The Claimant's position
▶ C. The Tribunal's analysis
▼ V. DID THE CLAIMANT F...
  A. The Respondent's pos...
  B. The Claimant's position
▶ C. The Tribunal's analysis
▼ VI. THE SCOPE OF THE T...
  A. The Claimant's position
  B. The Respondent's posi...
  C. The Tribunal 's analysis
  VII. DISPOSITION


Save to folder


Copy the reference

Click on the text to select an element

1.     This Partial Award on Preliminary Objections is rendered in accordance with the 2017 Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce **("SCC Rules")**.

# A. The Parties and their representatives

## 1. The Claimant

2.     The Claimant in this Arbitration is the State Development Corporation "VEB.RF" **("Claimant"** or **"VEB")**, a State Corporation organised under the laws of the Russian Federation, with its address at:
Akademika Sakharova Prospect, 9

Moscow, 107996, Russia

3.     The Claimant is represented in this arbitration by:

Mr Kirill Udovichenko
Mr Dmitry Andreev
Ms Anna Kostina
Ms Maria Petrenko
Ms Nataliia Soldatenkova
Monastyrsky, Zyuba, Stepanov & Partners **("MZS")**
Novinsky Boulevard, 3/1, 8th floor
Moscow, 121099, Russia
Tel: +7 495 231 42 22
Email: udovichenko@mzs.ru
andreev@mzs.ru
kostina@mzs.ru
petrenko@mzs.ru
soldatenkova@mzs.ru

Mr Johan Sidklev
Ms Shirin Saif
Mr Andreas Hallbeck
Ms Lotta Näätsaari
Roschier Advokatbyra AB **("Roschier")**
Brunkebergstorg 2
P.O. Box 7358
SE-103 90 Stockholm, Sweden
Tel: +46 8 553 190 01
Email: johan.sidklev@roschier.com
shirin.saif@roschier.com
andreas.hallbeck@roschier.com
lotta.naatsaari@roschier.com

## 2. The Respondent

4.     The Respondent in this Arbitration is the State of Ukraine **("Respondent"** or **"Ukraine")**.

5.      The Respondent is represented by:

Mr Michael Siroyezhko
Ms Yuliia Dikhtiievska
Ministry of Justice of Ukraine
13, Horodetskogo Arkhitektora St.
Kyiv, 01001, Ukraine
Tel: +380 (044) 364 2393
Email: legal@minjust.gov.ua
m.siroyezhko@minjust.gov.ua; m.siroyezhko@yahoo.com
yu.dikhtiievska@minjust.gov.ua

Professor Emmanuel Gaillard
Ms Jennifer Younan
Mr Nils Eliasson
Mr Marc Jacob
Ms Anna Guillard Sazhko
Mr Andrei Solin
Shearman & Sterling LLP
7, rue Jacques Bingen
75017 Paris, France
Tel: +33 1 5389 7000
Email: egaillard@shearman.com
jennifer.younan@shearman.com
nils.eliasson@shearman.com
marc.jacob@shearman.com
anna.guillardsazhko@sheannan.com
andrei.solin@shearman.com

6.      The Claimant and the Respondent are individually referred to below as a **"Party,"**
and jointly as the **"Parties".**

## B. The Tribunal

7.      The Members of the Tribunal are:

Mr Paolo Michele Patocchi
Patocchi & Marzolini
Rue Pedro-Meylan 5
CH - 1208 Geneva, Switzerland
Tel: +41 22 718 3312
Email: patocchi@patocchimarzolini.com

Ms Loretta Malintoppi
39 Essex Chambers
28 Maxwell Road
Maxwell Chambers Suites
Singapore 069120
Tel: +65 6320 9272
Email: Loretta.Malintoppi@39essex.com

Mr Constantine Partasides QC
Three Crowns LLP
New Fetter Place
8-10 New Fetter Lane
London EC4A 1AZ
United Kingdom
Tel: +44 20 3530 7960
Email: constantine.partasides@threecrownsllp.com

8.    Pursuant to Article 24 of the SCC Rules, and with the Parties' agreement, the Tribunal engaged Ms Ruimin Gao as Administrative Secretary (the **"Administrative Secretary"**). Her details are as follows:
Ms Ruimin Gao
Three Crowns LLP
New Fetter Place
8-10 New Fetter Lane
London EC4A 1AZ
United Kingdom
Tel: +44 20 3530 7973
Email: ruimin.gao@threecrownsllp.com


## II. PROCEDURAL HISTORY


## A. Request for Arbitration


9.    On 20 June 2019, the Claimant filed a Request for Arbitration **("Request for Arbitration"),** together with accompanying exhibits and legal authorities, with the Arbitration Institute of the Stockholm Chamber of Commerce **("SCC"),** seeking to institute arbitral proceedings under the Agreement between the Government of the Russian Federation and the Cabinet of Ministers of the Ukraine on the Encouragement and Mutual Protection of Investments, concluded in Moscow on 27 November 1998 **("Russia-Ukraine BIT"** or **"Treaty").**

10.    According to the Request for Arbitration, the Claimant seeks relief for alleged breaches by the Respondent of its obligations under the Treaty in relation to:

(i) legal protection of investments (Article 2(2) of the Treaty);

(ii) national regime, most favoured nation ("MFN") treatment and prohibition on discriminatory measures (Article 3(1) of the Treaty);

(iii) ban on unlawful direct and indirect expropriation (Article 5(1) of the Treaty); and

(iv) free transfer of payments (Article 7(1) of the Treaty).

11.    In addition, the Claimant alleges in the Request for Arbitration that the Respondent failed to comply with standards of protection extended by Ukraine to other foreign investors, for example, under the bilateral investment treaty between the United Kingdom and Ukraine for:
(i) fair and equitable treatment **("FET");**

(ii) full protection and security **("FPS");** and

(iii) observance of obligations (i.e. an "umbrella" clause).

12.    On 20 June 2019, the SCC acknowledged receipt of the Request for Arbitration and payment of the registration fee.

13.    On 24 June 2019, the SCC notified the Respondent of the Request for Arbitration, enclosing a copy of the Request for Arbitration, together with accompanying exhibits and legal authorities. The SCC informed the Respondent that according to Article 9 of the SCC Rules, the Respondent was requested to submit its Answer to

the Request for Arbitration **("Answer")** by 8 July 2019.

14.     Pursuant to the Respondent's request, by letter dated 5 July 2019, the SCC granted the Respondent an extension of time to submit its Answer until 15 July 2019.

15.     On 15 July 2019, the Respondent submitted its Answer, together with accompanying exhibits, in which it contends that the dispute falls outside of the Tribunal's jurisdiction or, alternatively, that the Claimant's claims are not admissible. The Respondent further denies the claims in respect of alleged violations of the Treaty, arguing that even if the losses alleged to have been suffered by the Claimant were caused by the Respondent's conduct which the Claimant has yet to prove the allegations are in any event without merit.

16.     On 21 August 2019, the Claimant submitted an application for the appointment of an emergency arbitrator to the SCC in accordance with Article 37 and Appendix II of the SCC Rules. An emergency arbitrator, Mr Joe Tirado, was appointed by the SCC Board on 22 August 2019. Mr Tirado rendered an Award on Interim Measures on 28 August 2019 **("Emergency Award"),** which granted interim conservatory measures sought by the Claimant in respect of its investment in Ukraine.

## B. Seat of the Arbitration

17.     In the Request for Arbitration, the Claimant noted that the Treaty does not provide for the seat of arbitration and requested that, if the Parties did not agree, the SCC Board should determine pursuant to Article 25(1) of the SCC Rules for Stockholm, Sweden to be the seat of the Arbitration.[1]

18.     In its Answer, the Respondent counter-proposed for London to be the seat of the Arbitration. In the event that the Claimant did not agree and the SCC Board was called upon to determine the matter pursuant to Article 25(1) of the SCC Rules, the Respondent requested for the SCC Board to choose a "respectable European arbitration hub other than Stockholm or London".[2]

19.     Both Parties maintained their positions with respect to the seat of the Arbitration in subsequent communications to the SCC, from the Claimant dated 23 July 2019 and from the Respondent dated 31 July 2019. On 14 August 2019, the SCC notified the Parties that the SCC Board had determined the seat of the Arbitration is Stockholm, Sweden.

## C. Language of the Arbitration

20.     Noting the absence of any provisions in the Treaty regarding the language of the Arbitration, the Claimant proposed in its Request for Arbitration that the language of the Arbitration shall be English.[3]

21.     In its Answer, Ukraine agreed that English shall be the language of the present proceedings.[4]

## D. Constitution of the Tribunal

22.   In the Request for Arbitration, the Claimant proposed that the Tribunal shall consist of three arbitrators,[5] and nominated Mr Paolo Michele Patocchi as Co-Arbitrator.

23.   In its Answer, the Respondent agreed that the Tribunal shall consist of three arbitrators,[6] and nominated Ms Loretta Malintoppi as Co-Arbitrator.

24.   On 17 July 2019, the SCC notified the Parties of the Co-Arbitrators' confirmation of acceptance of their appointments and provided a copy of each Co-Arbitrator's *curriculum vitae*.

25.   On 22 and 29 July 2019, the Claimant sought additional disclosures from Ms Malintoppi, which were provided on 29 July 2019. The Claimant confirmed in a letter to the SCC on 5 August 2019 that it did not intend to challenge Ms Malintoppi at that time, whilst reserving its rights in the event that any new facts should give rise to doubts about Ms Malintoppi's impartiality or independence.

26.   Following the Parties' completion of an agreed list procedure method for the appointment of the Presiding Arbitrator, the SCC notified the Parties on 10 September 2019 that Mr Constantine Partasides QC had been appointed as Presiding Arbitrator.

27.   A case management conference was held on 18 October 2019 by teleconference with the Tribunal and Parties in attendance. On 25 October 2019, the Tribunal issued Procedural Order No. 1, together with the procedural timetable at Annex A **("Procedural Timetable")**.

28.   The Procedural Timetable provided for the Parties to submit two rounds of written submissions each in respect of four preliminary requests:

(i) The Respondent's request for the bifurcation of the proceedings and early determination of its preliminary objections raised in its Answer to the Request for Arbitration. The procedural history and outcome of this request are detailed in Section II.E below.

(ii) The Claimant's request for a separate award for the Respondent to reimburse the Claimant for the payment of the Respondent's share of the advance on costs determined by the SCC in the present proceedings. On 10 April 2020, the Tribunal issued a separate award in accordance with Article 51(5) of the SCC Rules, ordering the Respondent to reimburse the Claimant for the former's share of the advance on costs and to pay the Claimant's reasonable legal expenses incurred in making its request.

(iii) The Respondent's request to set aside the Emergency Award rendered on 28 August 2019. On 2 March 2020, the Tribunal issued Procedural Order No. 3, which detailed the procedural history and outcome of the emergency arbitration proceedings, and set out the Tribunal's reasons for dismissing the Respondent's request to set aside the Emergency Award at that time.

(iv) The Claimant's request for a separate award on the assessment of its reasonable legal expenses of the emergency arbitration proceedings. On 10 April 2020, the Tribunal issued a separate award in accordance with Article 44 of the SCC Rules, ordering the Respondent to pay forthwith to the Claimant the reasonable legal expenses incurred by the Claimant in connection with the emergency arbitration proceedings.

# E. Bifurcation of proceedings

29.    As stated above, the Procedural Timetable provided, *inter alia*, for written submissions in order for the Tribunal to determine a preliminary request by the Respondent to bifurcate the proceedings.

30.    On 2 March 2020, following receipt of two rounds of written submissions from each Party, the Tribunal issued Procedural Order No. 2 granting the Respondent's request for bifurcation of the Respondent's preliminary objections with the following directions:

(i) confirming that the Respondent's preliminary objections are stated as follows:

(a) that the Tribunal has no jurisdiction *ratione personae;* and

(b) that pre-conditions for access to arbitration set forth in Article 9 of the Treaty have not been met; and

(ii) ordering the Respondent to raise any other preliminary objections it has as to jurisdiction or admissibility in the bifurcated first phase.

31.    On 18 April 2020, the Respondent filed its Memorial on Preliminary Objections and Request for Production of Documents dated 17 April 2020 **("Memorial"),** together with the expert report of Professor Eyal Benvenisti dated 17 April 2020 **("Expert Report of Professor Benvenisti")** and accompanying exhibits and legal authorities.

32.    The Respondent's Memorial raised the following preliminary objections for the first time:
(i) "The Claimant has not alleged facts sufficient to make a *prima facie* showing of a denial of justice";[7] and

(ii) "The Claimant's attempt to import other standards of treatment through the most-favoured-nation clause is unavailing".[8]

33.    On 20 April 2020, by way of a letter to the Tribunal, the Claimant sought directions from the Tribunal, *inter alia,* that: (i) the new preliminary objections raised by the Respondent should be considered in the merits phase of the proceedings rather than in the bifurcated first phase of the proceedings; and (ii) no requests for document production be allowed in the bifurcated first phase of the proceedings.

34.    On 4 May 2020, having considered submissions and observations from both Parties, the Tribunal issued Procedural Order No. 4, allowing for an additional objection raised by the Respondent in Section III.D.l of its Memorial to be addressed in the bifurcated first phase of this Arbitration, namely the Respondent's objection that "the MFN clause in Article 3(1) of the BIT cannot import the FET, FPS and 'umbrella' clauses from the UK-Ukraine BIT". In ordering for the remaining new preliminary objections raised by the Respondent to be addressed in the next phase of this Arbitration (if it should occur), the Tribunal had regard to the nature of those objections which would involve evidential considerations that could not be adequately accommodated within the Procedural Timetable for the first phase of the proceedings that had already been fixed.

35.    The Tribunal also made provision for document production in the bifurcated first phase of the proceedings in accordance with the timetable at Annex A of Procedural Order No. 4 **("Additional DPR Timetable").** By way of a letter to the Parties on 6 May 2020, the Tribunal issued a revised Additional DPR Timetable.

36.    Pursuant to the Additional DPR Timetable (as amended), on 18 May 2020, the Respondent submitted its requests for document production in the form of a Redfern Schedule to the Tribunal for determination. On 22 May 2020, the Tribunal

issued Procedural Order No. 5 on the disputed requests for document production, in which it ordered the production of some of the disputed production requests, but rejected others. The Tribunal directed the Claimant to produce the requested documents as agreed or as directed by the Tribunal by 2 June 2020.

37.     On 2 June 2020, the Claimant filed its Counter-Memorial on Preliminary Objections **("Counter-Memorial")**, together with:

(i) the witness statement of Mr Igor Krasnov **("Witness Statement of Mr Krasnov")**;

(ii) the expert report of Professor Anton Asoskov **("Expert Report of Professor Asoskov")**;

(iii) the expert report of Dr Ursula Kriebaum **("Expert Report of Dr Kriebaum")**; and

(iv) accompanying exhibits and legal authorities.

38.     Pursuant to the Additional DPR Timetable (as amended), on 16 June 2020, the Claimant also submitted its requests for document production in the form of a Redfern Schedule to the Tribunal for determination. On 24 June 2020, the Tribunal issued Procedural Order No. 6 on the disputed requests for document production, in which it ordered the production of some of the disputed production requests, but rejected others. The Tribunal directed the Respondent to produce the requested documents as agreed or as directed by the Tribunal by 6 July 2020.

39.     On 6 July 2020, the Respondent filed its Reply on Preliminary Objections **("Reply")**, together with the Second Expert Opinion of Professor Eyal Benvenisti **("Second Expert Report of Professor Benvenisti")** and accompanying exhibits and legal authorities.

40.     On 17 August 2020, the Claimant filed its Rejoinder on Preliminary Objections **("Rejoinder")**, together with accompanying exhibits and legal authorities.

## F. Hearing on preliminary objections

41.     On 25 November 2019, the Tribunal notified the Parties that the hearing dates for bifurcated proceedings were fixed for 9 to 11 September 2020 **("September 2020 Hearing")**. On 7 April 2020, the Tribunal wrote to the Parties inviting them to give early consideration to the arrangements for the September 2020 Hearing, in view of the COVID-19 outbreak and its likely impact on the availability of hearing venues.

42.     The Claimant responded by way of a letter on 11 April 2020, proposing for the hearing to be held in the Stockholm office of the Claimant's counsel, Roschier, or, alternatively, at the Stockholm International Hearing Centre.

43.     By way of email on 21 April 2020, the Respondent indicated that its preference was for the hearing to be held in a neutral forum, such as the Stockholm International Hearing Centre, given the highly political nature of this dispute. The Respondent further expressed concerns that the hearing may not proceed as originally planned given that restrictions and measures in place due to the COVID-19 pandemic may still be in place or have been re-introduced by September 2020, and that travel restrictions may make travel to Stockholm impossible. The Respondent noted that its strong preference was for an in-person hearing but, should that not prove possible, it recognised that video conferencing may need to be considered to allow

the hearing to take place without undue delay.

44. On 22 April 2020, the Tribunal responded to the Parties by email and invited them to make efforts to reserve a neutral hearing venue in Stockholm, in order that the Tribunal and the Parties can evaluate the viability of an in-person hearing as circumstances develop. Subsequently, on 18 May 2020, the Respondent informed the Tribunal that a preliminary reservation for the September 2020 Hearing had been made at the Stockholm International Hearing Centre.

45. On 2 July 2020, the Tribunal contacted the Parties again by email to advise that, in view of the ongoing COVID-19 pandemic and the travel and other governmental restrictions introduced to address it, it had become apparent that one or more members of the Tribunal would not be able to travel to Stockholm to attend the September 2020 Hearing in person. Anticipating that similar constraints may exist for some or all of the Parties, their counsel and/or their witnesses/experts, the Tribunal invited the Parties' views on the possibility of the hearing taking place entirely or partially by means of a virtual platform.

46. The Parties each responded by email on 10 July 2020, as follows:
(i) The Claimant proposed a partially remote hearing to take place at the Stockholm International Hearing Centre, with all attendees invited to attend in person but with the necessary arrangements being made for a virtual hearing for any person who wished to participate remotely. Whilst it was of the view that a partially remote hearing would be more efficient than an entirely remote hearing, the Claimant noted that it wished to be guided by the convenience of the Tribunal and that "[i]f the Tribunal prefers to hold the hearing entirely remotely, the Claimant would agree to such a format as well. It is essential for the Claimant that the existing travel restrictions do not delay the arbitral process."

(ii) The Respondent confirmed that similar constraints as faced by one or more members of the Tribunal applied to the Respondent's team in respect to travel to Stockholm to attend the hearing in person. Accordingly, the Respondent advised it would be willing to proceed with an entirely remote hearing but did not agree to a partially remote hearing because the latter option "cannot be reconciled with the fundamental principles of equality of arms and due process. There would not be a fair balance between the opportunities afforded to the parties involved in this arbitration in a situation where the ability to attend is uneven or not all party-appointed arbitrators can be present in person."

47. In response to a follow-up query from the Tribunal as to which members of each Parties' legal team, their witnesses or experts were unlikely to be able to travel to Stockholm for an in-person hearing in September 2020, the Parties indicated separately by email on 16 July 2020 that:
(i) The Claimant's legal team, witnesses and experts were likely to be able to travel to Stockholm for an in-person hearing. However, the Claimant's legal experts, Dr Kriebaum and Professor Asoskov had expressed a strong preference to give evidence via video link.

(ii) The Respondent's counsel and its representatives from the Ministry of Justice of Ukraine were affected by travel constraints that would prevent them from attending an in-person hearing in Stockholm. Additionally, the Respondent's expert, Professor Benvenisti, would be subject to a quarantine regime upon his return to Israel and, in the circumstances, expressed a strong preference for his evidence to be given via video link. The Respondent was thus of the view that "a fully remote hearing appears to be the only safe, fair and efficient option".

48. On 21 July 2020, the Tribunal notified the Parties that in the interests of equality the September 2020 Hearing would take place entirely by means of a virtual platform rather than physically in person, taking into account both Parties'

indications on the ability of their representatives and witnesses to travel to Stockholm for an in-person hearing, and considering the constraints that would impact one or more members of the Tribunal.

49. In its email to the Tribunal of 10 July 2020, the Claimant also requested that the Tribunal direct an authorised representative of the Respondent to consent to the selected procedure for the September 2020 Hearing, noting that the power of attorney provided to the Respondent's counsel, Shearman & Sterling,[9] had expired on 31 December 2019. Upon the Tribunal's invitation for its comments, the Respondent responded on 16 July 2020 that no question arises as to the Respondent's consent to any steps in the Arbitration given the continuous participation of the Ministry of Justice of Ukraine, representatives of which have been copied on correspondence and appeared as a co-signatory to the Respondent's written submissions throughout.

50. On 17 July 2020, the Claimant requested that the Tribunal direct the Ministry of Justice to provide confirmation of (i) of its participation in these proceedings; (ii) its agreement to the September 2020 Hearing being held remotely via video conference, as proposed by Shearman & Sterling; and (iii) its authorisation for Shearman & Sterling to appear on its behalf at the pre-hearing conference and at the September 2020 Hearing in these proceedings.

51. On 31 July 2020, having received further responses from both Parties with respect to the Claimant's request, the Tribunal issued Procedural Order No. 7, directing the Ministry of Justice of Ukraine to provide either a power of attorney, or another official letter signed by an authorised official and addressed to the Tribunal, confirming that:
(i) the Ministry of Justice of Ukraine confirms and adheres to the content of all of the submissions and other communications made by Shearman & Sterling LLP on the Respondent's behalf in the proceedings since 31 December 2019; and

(ii) the Ministry of Justice of Ukraine authorises Shearman & Sterling LLP to appear on behalf of Ukraine at the pre-hearing conference and at the hearing on 9 to 11 September 2020.

52. By way of a letter to the Tribunal dated 3 August 2020, the Ministry of Justice of Ukraine provided the relevant confirmations pursuant to the Tribunal's directions in Procedural Order No. 7.

53. A pre-hearing conference was held on 12 August 2020 by teleconference **("Pre-Hearing Conference")** to discuss issues pertaining to the organisation of the September 2020 Hearing. In addition to the members of the Tribunal and the Administrative Secretary, the following persons attended the hearing:
(i) the Claimant's counsel: Mr Kirill Udovichenko, Mr Dmitry Andreev (MZS); Mr Johan Sidklev, Ms Shirin Saif and Mr Andreas Hallbeck (Roschier);

(ii) the Respondent's counsel: Professor Emmanuel Gaillard, Ms Jennifer Younan, Mr Marc Jacob (Shearman & Sterling); and

(iii) the Respondent's representative: Mr Michael Siroyezhko (Ministry of Justice of Ukraine).

54. Following the Pre-Hearing Conference, the Tribunal issued Procedural Order No. 8 on 17 August 2020, setting out the Tribunal's directions concerning the conduct of the September 2020 Hearing and annexing a draft Virtual Hearing Protocol for the Parties' consideration. The Virtual Hearing Protocol was issued by the Tribunal in final form to the Parties on 25 August 2020.

55.    On 2 September 2020, pursuant to the Procedural Timetable, the Parties exchanged their skeleton arguments.

56.    Following receipt of the Claimant's skeleton argument, the Respondent raised an objection, by way of a letter to the Tribunal on 3 September 2020, that the Claimant had attempted to introduce new exhibits and legal authorities into the record in breach of the Tribunal's directions. Upon invitation from the Tribunal, the Claimant provided its response to the objection on 3 September 2020.

57.    On 4 September 2020, the Tribunal notified the Parties of its decision in relation to the new exhibits and legal authorities submitted by the Claimant with its skeleton argument on 2 September 2020, as follows:
(i) the Tribunal did not admit the new Exhibits C-129 and C-130; and

(ii) the Tribunal admitted the new legal authorities CLA-241 to CLA-247, all of which were in any event in the public domain, but only for the purpose of the cross-examination of Professor Benvenisti.

58.    On 7 September 2020, pursuant to the Tribunal's directions in Procedural Order No. 8, the Parties exchanged their visual aids for the opening statements at the September 2020 Hearing.

59.    The September 2020 Hearing commenced, as scheduled, on 9 September 2020 and concluded the following day on 10 September 2020. In addition to the members of the Tribunal and the Administrative Secretary, the following persons attended the September 2020 Hearing:
(i) the Claimant's counsel: Mr Kirill Udovichenko, Mr Dmitry Andreev, Ms Anna Kostina, Ms Maria Petrenko and Ms Nataliia Soldatenkova (MZS); Mr Johan Sidklev, Ms Shirin Saif, Mr Andreas Hallbeck and Ms Lotta Naatsaari (Roschier);

(ii) the Claimant's representatives: Mr Daniil Yarnykh, Mr Mikhail Demin and Ms Asiyat Kurbanova;

(iii) the Claimant's witness: Mr Igor Krasnov;

(iv) the Respondent's counsel: Professor Emmanuel Gaillard, Ms Jennifer Younan, Mr Marc Jacob, Ms Anna Guillard Sazhko and Mr Andrei Solin (Shearman & Sterling);

(v) the Respondent's representatives: Mr Michael Siroyezhko and Ms Yuliia Dikhtiievska (Ministry of Justice of Ukraine);

(vi) the Respondent's expert: Professor Eyal Benvenisti; and

(vii) the court reporter and virtual platform host.

60.    Prior to the conclusion of the September 2020 Hearing, on 10 September 2020, the Tribunal raised with the Parties the question of whether posthearing briefs would be required. Both Parties' representatives having confirmed that they were of the view that no post-hearing briefs would be necessary, the Tribunal dispensed with the need for post-hearing briefs, save as might be necessary to respond to any questions that the Tribunal may have for the Parties during its deliberations.[10] The Tribunal raised no such further questions.

61.    Counsel for the Respondent further made an oral application to the Tribunal pursuant to Article 31(3) of the SCC Rules that the Tribunal exercise its discretion to order Mr Vladimir Dmitriev (former Chairman of VEB) to give evidence in the proceedings.[11] The Tribunal heard brief oral submissions from both Parties and provided directions for the Respondent's request and the Claimant's response to be made in written form.[12] On 11 September 2020, the Tribunal issued Procedural Order No. 9, memorialising its directions.

62.     The Respondent submitted its written request on 14 September 2020 pursuant to the Tribunal's directions in Procedural Order No. 9. The Respondent's position was that the timing of its request was driven by a "sudden change in the Claimant's position" following a concession by the Claimant's witness, Mr Krasnov, during cross-examination that Mr Dmitriev was in fact able to testify. According to the Respondent, given his former role as the Claimant's chairman, Mr Dmitriev has personal knowledge of key facts relevant to the Respondent's objection that the Tribunal has no jurisdiction under Article 9 of the Treaty.

63.     In its written response on 18 September 2020, the Claimant opposed the Respondent's request on the basis that it was untimely and constituted an abuse of process, being in violation of Article 33(1) of the SCC Rules and the Procedural Timetable which require the Parties to identify in advance the witnesses they would like to examine at a hearing. The Claimant further submitted that Mr Dmitriev's testimony would be irrelevant and immaterial to the Respondent's preliminary objections and that, in any event, it was the Respondent's responsibility to make Mr Dmitriev available to testify.

64.     By way of a letter to the Parties dated 29 September 2020, the Tribunal directed for the Claimant to make best efforts to make Mr Dmitriev available for examination in this phase of the arbitration proceedings. The Parties subsequently made the following communications to the Tribunal in turn:
        (i) On 6 October 2020, the Claimant informed the Tribunal that Mr Dmitriev had agreed to give evidence via video conference and would be available on 15 October 2020. The Claimant further requested the Tribunal's permission to submit a witness statement from Mr Dmitriev by 8 October 2020 and to share the hearing bundle with Mr Dmitriev.

        (ii) On 8 October 2020, the Respondent confirmed its availability to examine Mr Dmitriev on 15 October 2020 by video conference and requested that the Claimant make the necessary arrangements, given that the arrangements for the September 2020 Hearing had been made by the Claimant.

        (iii) On 8 October 2020, the Claimant requested that the Respondent make the arrangements for the examination of Mr Dmitriev given that, *inter alia*, the further hearing session had been convened at the Respondent's request.

65.     The Tribunal informed the Parties by way of an email on 8 October 2020 that it would revert the following day with its further directions in respect of the examination of Mr Dmitriev on 15 October 2020.

66.     On 9 October 2020, the Tribunal directed that:
        (i) The examination of Mr Dmitriev be fixed to take place on 15 October 2020 between 9.30 am and 12.00 noon Stockholm time.

        (ii) The Respondent arrange and pay for a virtual platform for the hearing on 15 October 2020.

        (iii) The Claimant submit Mr Dmitriev's witness statement by close of business that day, 9 October 2020.

        (iv) The Claimant make a copy of the hearing bundle available to Mr Dmitriev on a confidential basis but desist from providing Mr Dmitriev with a copy of the transcript of the September 2020 Hearing or otherwise to discuss the submissions or evidence evinced at that hearing with Mr Dmitriev.

67.     In accordance with the Tribunal's directions, the Claimant submitted Mr Dmitriev's witness statement on 9 October 2020.

68.     The examination of Mr Dmitriev proceeded, as scheduled, on 15 October 2020. In

addition to the members of the Tribunal and the Administrative Secretary, the following persons attended the hearing:

(i) the Claimant's counsel: Mr Kirill Udovichenko, Mr Dmitry Andreev, Ms Anna Kostina and Ms Maria Petrenko (MZS); Mr Johan Sidklev and Ms Shirin Saif (Roschier);

(ii) the Claimant's representatives: Mr Daniil Yarnykh and Mr Mikhail Demin;

(iii) the Claimant's witness: Mr Igor Krasnov;

(iv) the Claimant's translator: Ms Olga Korneeva;

(v) the Respondent's counsel: Ms Jennifer Younan, Mr Marc Jacob, Ms Anna Guillard Sazhko and Mr Andrei Solin (Shearman & Sterling);

(vi) the Respondent's representatives: Mr Michael Siroyezhko (Ministry of Justice of Ukraine); and

(vii) the court reporter and representatives from the IT Department of the Respondent's counsel.

# III. BACKGROUND FACTS

69.    The backdrop to this Arbitration is the long-running political tension that has characterised the relationship between Ukraine and the Russian Federation following the collapse of the USSR and Ukraine's declaration of independence in 1991.

70.    Prominvestbank **("PIB")** is the lender to a number of State-owned and strategic private entities in Ukraine. At the onset of the global financial crisis in 2008, PIB's financial position was precarious, and the National Bank of Ukraine **("NBU")** introduced provisional administration, appointed a provisional administrator and granted an emergency liquidity line to PIB. For a longer-term solution to PIB's financial position, the Ukrainian Government considered either the nationalisation of the bank, or selling it to a private investor.

71.    On 30 December 2008, and in circumstances that Ukraine describes as obscure,[13] the provisional administrator appointed to PIB by the NBU approved the acquisition by VEB of a significant majority equity stake in PIB.

72.    VEB describes itself as a non-profit development institution *(Institut Razvitiya)*. It is established pursuant to a Russian federal law, Federal Law No. 82-FZ dated 17 May 2007 (as amended on 28 November 2018) "On State Development Corporation 'VEB.RF'" (the **"VEB Law")**. It is organised in the form of a State Corporation *(Gosudarstvennaya Korporaciyd),* and is registered as such in the Russian Unified State Register of Legal Entities. As its counsel has submitted,[14] the Russian Government is the founder and ultimate controller of VEB, and its business purpose and functions are described in the VEB Law as follows:
**Article 3. Business Purposes and Functions of VEB.RF**

1. VEB.RF shall act to facilitate the long-term socio-economic development of the Russian Federation, create the conditions for sustained economic growth, improve investment efficiency and expand investment in the Russian economy by implementing projects domestically and abroad, including inward investment projects aimed at developing infrastructure, industrial production, innovation and special economic zones, protecting the natural environment, enhancing energy efficiency, promoting exports and helping Russian industrial products (goods, work, services) to expand into foreign markets and by carrying out other projects and/or transactions as part of investment, foreign economic, advisory and other activities provided for by this Federal Law (VEB.RF's projects).

2. VEB.RF may engage in entrepreneurial activities only to the extent that such activities serve and fulfil the purposes specified in Article 3(1) hereof. VEB.RF's profits generated by its activities shall be transferred to VEB.RF's funds and used solely for the purposes specified in Article 3(1) hereof.[15]

73.  Following on from Articles 3.1 and 3.2, Articles 3.3 and 3.4 of the VEB Law list the financial and other investment activities that VEB can perform to fulfil the purpose set out in Article 3.1 of the VEB Law.

74.  The measures complained of by the Claimant in this Arbitration followed the onset of the military crisis that has gripped Ukraine since early 2014, and which has resulted in allegations of invasion, annexation of Crimea and establishment of the allegedly independent 'People's Republics' in Donetsk and Luhansk in Eastern Ukraine. It is not for this Tribunal to address such political matters; nevertheless, the Tribunal observes that this military crisis has been declared by multilateral bodies and institutions such as the UN, the OSCE and the EU's European Council as illegal attacks on the territorial integrity of Ukraine by the Russian Federation, and has resulted in the imposition of US and EU sanctions against the Russian Federation and individuals and entities associated with it.

75.  The Claimant's claims in this Arbitration pertain to the measures taken against it in Ukraine against the backdrop of Ukraine's political dispute with the Russian Federation. In particular, the Claimant alleges that throughout the period 2015 to 2019, Ukraine took various deliberate and successive steps to oust it from the country and put an end to its business there.[16] The Claimant alleges that these steps breached the standards of treatment to which it was entitled under the Treaty, and included: revoking PIB's licences to engage in various financial and investment activities; prohibiting Ukrainian State and State-owned entities from doing business with PIB by way of a Sanctions Law adopted by the Ukrainian parliament; imposing restrictions on the amounts of deposits that PIB could hold; compelling the closure of branches in Eastern Ukraine; using criminal investigation powers to harass PIB and its employees; banning transfer of all funds from PIB to VEB; frustrating, through its courts, attempts to enforce loans against State-owned borrowers; supporting a smear campaign against PIB in the Ukrainian media; and failing, through its law enforcement function, to protect PIB from violent acts of vandalism that damaged its property.

76.  The Respondent denies the Claimant's allegations of breach of the Treaty, and argues that the measures the Claimant complains of must be evaluated taking into account that, even if the losses the Claimant alleges it suffered were caused by acts or omissions of the Respondent, they were taken in response to ongoing breaches by the Russian Federation of its international obligations owed to Ukraine.[17] Accordingly, the Respondent contends that the measures were thus taken for valid cause, were temporary in nature, and proportional to the injury caused by the Russian Federation, which excludes any responsibility of Ukraine under international law.

77.  The merits of the Claimant's substantive claims and the Respondent's defences are not addressed in the present Partial Award because the Respondent has raised a number of preliminary objections, some of which, pursuant to its Procedural Orders No. 2 and No. 4, the Tribunal has directed be determined in a bifurcated preliminary phase of this arbitration.

78.  The preliminary objections that are to be determined in this phase of the Arbitration comprise the following:[18]
(i) that the Claimant, being an organ or agent of the Russian Federation, cannot bring an arbitration under Article 9 of the Treaty;

(ii) that the Claimant did not observe the necessary pre-arbitral steps enshrined in Article 9 of the Treaty, thereby making its claims inadmissible; and

(iii) that the Claimant's attempt to import other standards of treatment through the MFN clause in the Treaty is unavailing.

79.    The Tribunal proceeds to consider and determine each of these bifurcated preliminary objections in turn below. In so doing, it summarises the Parties' respective arguments before proceeding to analyse and determine the issue itself. In summarising the Parties' respective arguments, the Tribunal confirms that it has reviewed and considered all of the arguments and evidence presented by the Parties, whether or not they are mentioned in the summaries of the Parties' positions that follow.

# IV. CAN THE CLAIMANT BRING AN ARBITRATION UNDER ARTICLE 9 OF THE TREATY

## A. The Respondent's position

80.    The Respondent's position is that the Claimant's claims cannot be brought pursuant to the dispute resolution mechanism in Article 9 of the Treaty. In support of this objection, the Respondent argues that (i) Ukraine's consent under Article 9 of the Treaty does not extend to arbitrations initiated by States, and (ii) the present dispute is an inter-State dispute because the Claimant is part of the Russian State.[19]

81.    As an alternative argument, the Respondent contends that if the Tribunal were to find that the Claimant is not part of the Russian State, Article 9 of the Treaty is not open to the Claimant because it is an agent of the Russian State or exercises essentially governmental functions.[20]

82.    *First,* the Respondent submits that Article 9 of the Treaty is not a State-to-State arbitration clause. The translation of Article 9 relied on by the Respondent provides relevantly as follows:

1. In case of any dispute between either Contracting Party and the investor of the other Contracting Party, which may arise in connection with the investments, including disputes, which concern the amount, terms of and procedure for payment of compensation provided for in Article 5 hereof or with the procedure for effecting a transfer of payments provided for in Article 7 hereof, a notification in writing shall be handed in, accompanied with detailed comments which the investor shall forward to the Contracting Party involved in the dispute. The parties to the dispute shall exert their best efforts to settle that dispute by way of negotiations.

2. In the event the dispute cannot be resolved through negotiations within six months as of the date of the written notification as mentioned in Item 1 hereof above, then the dispute shall be passed over for consideration to:

a) a competent court or an arbitration court of the Contracting Party, on whose territory the investments were carried out;

b) the Arbitration Institute of the Chamber of Commerce in Stockholm,

c) an "ad hoc" arbitration tribunal, in conformity with the Arbitration Regulations of the United Nations Commission for International Trade Law (UNCITRAL).

[...][21]

83.    The Respondent's position is that the proper interpretation of Article 9 of the Treaty, in accordance with the Vienna Convention on the Law of Treaties **("VCLT")**, is that the provision concerns disputes between States and non-State investors for the following reasons:

(i) The heading and text of Article 9 provides for the resolution of disputes between a "Contracting Party and the investor of the other Contracting Party". The Treaty is further characterised by a division and asymmetry between Contracting Parties and investors, as can be seen from virtually all substantive provisions in the Treaty which differentiate between States, as the obligors, and non-States, as the obligees, of treaty protection (e.g. Articles 2 to 8 of the Treaty).[22]

(ii) Article 9 contrasts with Article 10, which concerns "Disputes Between the Contracting Parties". The latter provides a distinct mechanism that caters for the resolution of disputes between the Contracting Parties. The existence of a bespoke State-to-State arbitration clause in Article 10 affirms that the procedure in Article 9 is not intended to apply to disputes between the two signatory States. As opined by the Respondent's expert, Professor Benvenisti, "[i]ncluding public actors among the private investors would render meaningless the fundamental difference between the two dispute settlement mechanisms that the Treaty envisions."[23]

(iii) In relation to the object and purpose of the Treaty, investment arbitration exists to reduce the level of sovereign risk faced by non-State foreigners, and not foreign nations. As distinct from the regime of diplomatic protection, the home State of the investor has no legal interest in the settlement of investment disputes between the investor and the host State. According to Professor Benvenisti, "the [Treaty] departs from the traditional regime of international law of diplomatic protection, whereby the state party has discretion whether or not to protect its national who had been injured by the other state, and offer the national direct rights vis-à-vis the host state" and the "object and purpose [of the Treaty] is meaningless if the injured party is the state party itself".[24]

(iv) As a matter of principle and policy, foreign governments pressuring States through investment claims aggravates international conflicts. Furthermore, permitting parallel proceedings by States under both Articles 9 and 10 of the Treaty would be "inefficient, vexatious and a recipe for procedural chaos".[25] Moreover, Article 10 provides for State-to-State arbitration and there is also the possibility of domestic litigation, which ensures that any claims of the Russian State would not fall into a "legal black hole".[26]

84.    According to the Respondent, the definition of "Investor of a Contracting Party" in Article 1(2) of the Treaty does not change the analysis above, but rather only adds further qualifications regarding the non-State investor. In the Respondent's submission, Article 1(2) therefore imposes further preconditions within the overarching scheme of Article 9 that a putative non-State claimant must meet.

85.    The Respondent further argues that Article 1(2) of the Treaty does not include, and deliberately excludes, "States" as a category of qualifying investors, in addition to natural and juridical persons.[27] This is in contrast to the precursor treaty, the Agreement on Cooperation in the Field of Investment Activities among the members of the Commonwealth of Independent States of 24 December 1993 (the **"CIS Investment Agreement")**, which is referred to in the preamble of the Treaty.

86.    The CIS Investment Agreement expressly provided for a third category of investor in addition to natural and legal persons as follows:
Investors of each Party in other States participating in this Agreement (hereinafter -"investors of the Parties"), are: juridical persons established in accordance with the legislation of one of the Parties and authorised to make investments;

natural persons - nationals of the Parties and permanently residing in their territory nationals of other States as well as stateless persons;

States - participants of this Agreement as well as state and administrative units located within their territory as represented by juridical persons and natural persons authorized by them in accordance with the legislation of the Parties. [28]

87.   *Second,* the Respondent contends that VEB is an organ of the Russian State, and not an autonomous entity.

88.   In this regard, the Respondent submits that whether VEB is tantamount to the Russian Federation is a question of international law which depends on the substance of its relation to the Russian State and not its form according to domestic law. Professor Benvenisti further opines that international law is cautious and stringent in ensuring that States "do not trespass the fundamental distinction between the public and the private and do not mask their sovereign acts by putting on a false private appearance". [29] He notes, for instance, that international law doctrines permit the lifting of the corporate veil to treat a company like its owner in appropriate cases. [30]

89.   Accordingly, with reference to principles of international law, including the rules of attribution for State responsibility, the Respondent argues that whether VEB is a State organ according to principles of international law is a factual matter of the degree of VEB's attachment to, dependence on, or control by the Russian State. [31]

90.   In the Respondent's submission, VEB is an organ of Russia and indistinguishable from the Russian State based on its structural, financial and functional characteristics, which include, *inter alia,* that:
(i) Russia set up VEB under a *sui generis* legal regime that ensures exclusive State control in all relevant respects at all times. [32]

(ii) VEB has no shareholders or participants, and only the Russian Federation can control it or benefit from its activities or acquisitions;

(iii) VEB's Supervisory Board, which makes all important operational and other decisions, is made up of senior Russian Government officials. It is chaired by the Russian Prime Minister, and the Russian Government appoints and dismisses all members. [33] The Supervisory Board also controls the Management Board of VEB, with the chairman of the Management Board being appointed and dismissed by the Russian President. [34] The three former chairmen of VEB have held long State careers or been reported to have close ties with the Russian President. [35]

(iv) VEB is a non-commercial, non-profit governmental entity that pursues State goals relating to the socio-economic development of the Russian Federation. [36] The Russian Government approves VEB's Memorandum on Financial Policies, which governs VEB's operations and main objectives, and also establishes the procedure for preparing this Memorandum. [37]

(v) VEB performs public activities of the Russian Federation, including acting as:

(a) the financial crisis manager, international creditor negotiator, foreign debt manager and State pension manager of the Russian Federation; [38] and

(b) the State financier for political prestige projects such as the 2014 Sochi Winter Olympics. [39]

(vi) VEB has reportedly been involved in matters of Russia's foreign affairs, including:

(a) granting USD 8 billion in loans to Russian companies to finance the acquisition of two big Ukrainian steel producers, the Industrial Union of Donbass and Zaporizhstal; [40]

(b) supporting the financially stricken (and subsequently insolvent) flag carrier of Hungary, Malev Hungarian Airlines between 2007 and 2010; [41] and

(c) providing financial support to the Syrian Government in 2013 to acquire missile batteries, notwithstanding international sanctions imposed on Syria. [42]

(vii) VEB does not develop competitive banking products or services offered by commercial banks, such as opening accounts for the public.

(viii) As a *sui generis* governmental entity, VEB enjoys special privileges and immunities, including:

(a) being exempt from important banking regulations, including as regards information disclosure and financial stability; [43]

(b) not requiring a banking licence, nor a licence for other regulated activities; [44]

(c) not being subject to liquidation provisions but only being able to be reorganised by federal legislation which would also determine the distribution of the remaining assets base; [45] and

(d) being exempt from paying profit tax or VAT as concerns any banking operations. [46]

(ix) VEB is dependent on funding from the Russian State, including drawing on extraordinary public funds and deposits such as from the Russian Central Bank and National Wealth Fund. [47]

91.  According to the Respondent, in view of the above, "VEB veers between being a second budget for the Russian Federation and a slush fund for President Putin's projects." [48]

92.  Moreover, according to the Respondent, that VEB is "not a bank but a limb of the Kremlin is an open secret that has been widely reported". [49] The Respondent also notes that PIB's annual reports state that it "is ultimately controlled by Russian Federation Government" [50] and that "[t]he Russian Federation, acting through the Russian Government, controls the Parent bank [i.e. VEB]". [51]

93.  The Respondent further contends that VEB is not unique in its legal personality and registration status; in Russia, all federal executive bodies (other than the Government acting as such) are distinct legal persons and registered in the Unified State Register of Legal Entities, including the Ministry of Internal Affairs, the Ministry of Finance and the Central Bank of Russia.

94.  *Third,* at the September 2020 Hearing, the Respondent developed a further argument in the alternative that the Claimant is not an investor for the purposes of the Treaty because it is an agent of the Russian State or exercises essentially governmental functions. In this regard, the Respondent relies on the test formulated by Aron Broches, the first Secretary-General of ICSID, in the early 1970s:
[I]n today's world the classical distinction between private and public investment, based on the source of the capital, is no longer meaningful, if not outdated. There are many companies which combine capital from private and governmental sources and corporations all of whose shares are owned by the government, but who are practically indistinguishable from the completely privately owned enterprise both in their legal characteristics and in their activities. It would seem, therefore, that for purposes of the Convention a mixed economy company or government-owned corporation should not be disqualified as a 'national of another Contracting State' unless it is acting as an agent for the government or is discharging an essentially governmental function. [52]

95.  The Respondent claims that the Claimant is an agent of the Russian State or exercises essentially governmental functions because: [53]

(i) the Claimant has no shareholders and only the Russian State could ever control it or benefit from its activities;

(ii) the Russian State set up the Claimant under a bespoke domestic law whereby senior Russian ministers make up the supervisory board, chaired by the Russian Prime Minister, which takes all important decisions and appoints the management board (whose chairman is appointed by the Russian President);

(iii) the Claimant is allocated and wholly dependent on State funds;

(iv) the Claimant is a non-profit, non-commercial *sui generis* entity tasked with effectuating the public, political and social objectives set by the Russian Government;

(v) the Claimant enjoys numerous special privileges and legal exemptions, including with respect to taxation, liquidation and banking regulations; and

(vi) there was no commercial dimension to the "financially disastrous" PIB transaction, which was instructed by Mr Putin to increase Russia's leverage over Ukraine.

96.     Additionally, the Respondent alleges that the Claimant has withheld from production a number of documents relating to the acquisition of PIB that are relevant and material to its first objection.[54] On this basis, the Respondent invites the Tribunal to draw the adverse inference that the acquisition of PIB was "at the behest of the Russian Government and a political transaction bereft of any business sense".[55]

97.     For the above reasons, the Respondent submits that the Claimant cannot avail itself of the dispute resolution mechanism in Article 9 of the Treaty and, therefore, the Tribunal does not have jurisdiction over the Claimant's claims.

## B. The Claimant's position

98.     The Claimant argues that the Tribunal has jurisdiction *ratione personae* based on the following three alternative arguments:[56]
(i) any legal entities, irrespective of their affiliation with the State, are investors protected by the BIT;

(ii) the Claimant is not part of the Russian Government; and

(iii) the principles of good faith and estoppel prevent the Respondent from arguing the opposite in this Arbitration.

99.     *First,* the Claimant submits that it is a protected investor according to the definition in Article 1 (2)(b) of the Treaty. The translation of Article l(2)(b) relied on by the Claimant provides as follows:

2. "Investor of a Contracting Party" means:

[...]

b) any body corporate created in accordance with the legislation in force within the territory of this Contracting Party, provided that that the said body corporate has legal capacity under the legislation of its Contracting Party to make investments within the territory of the other Contracting Party.[57]

100.    The Claimant submits that Article 1(2)(b) of the Treaty lists two conditions that an investor must meet: (i) incorporation in the home State, and (ii) legal capacity to invest in the host State. The Claimant's position, as supported by its international

law expert, Dr Kriebaum,[58] is that the two conditions are exhaustive and there is no additional requirement in the Treaty for an investor to be a private, non-State entity.

101.   According to the Claimant, its position is consistent with the application of the VCLT rules of treaty interpretation as follows:

(i) The plain meaning of Article 1(2)(b) of the Treaty is clear: it includes any legal entity irrespective of its ownership, control or affiliation with the State. In this regard, international tribunals consistently adopt the plain meaning of the word "any" and reject attempts to limit a treaty's terms by imposing extraneous criteria.[59]

(ii) Article 10 of the Treaty does not provide any relevant context for the interpretation of Article 9, as the former concerns disputes where the Contracting Parties act *iure imperii*, for example, diplomatic protection claims, claims seeking a binding interpretation of a term in the BIT, or requests for declaratory relief. Therefore, Article 10 does not apply to individual claims brought by State-affiliated investors. However, the treatment of a specific investment could become the basis for both an investor-State arbitration under Article 9, as well as an inter-State arbitration under Article 10.

(iii) The object and purpose of the Treaty support the protection of State-affiliated investors. The BIT would not serve its purpose "to create favourable conditions for the expansion of economic cooperation between the Contracting Parties"[60] if it failed to protect investments made by entities affiliated with the Contracting Parties. By contrast, Dr Kriebaum notes that there are only three investment treaties in existence that expressly exclude State-owned entities from the scope of protection, all of which expressly refer in the respective Preambles to the purpose of encouraging *private* investments.[61]

(iv) Nor does the CIS Investment Agreement provide any relevant context, as the Contracting Parties neither ratified this treaty nor relied on it in the drafting of the Treaty. There is thus no basis to suggest that the Contracting Parties deliberately removed States from the Treaty's definition of investor.

(v) The object of investor-State dispute settlement as a means to depoliticise disputes is best served if the broadest group of investors, including State-affiliated entities, have access to the dispute resolution mechanism under Article 9 of the Treaty, contrary to the Respondent's position that State-affiliated entities should be excluded on this basis.

102.   In the Claimant's submission, Article l(2)(b) of the Treaty applies as *lex specialis* and should not be supplemented with concepts found in general international law, such as attribution of conduct to States or piercing of the corporate veil. The Claimant also submits that international tribunals and courts have consistently treated State-affiliated entities, including State organs and publicly funded institutions, as protected investors.[62]

103.   Based on its interpretation of Article l(2)(b) of the Treaty, the Claimant argues that it meets all of the conditions to qualify as a protected investor, given that the Respondent does not deny and the Claimant's expert in Russian law, Professor Asoskov, has confirmed that:
(i) the Claimant is a legal entity registered in the Russian register of legal entities;[63] and

(ii) the Claimant has legal capacity to invest into the territory of any foreign country, including in Ukraine.[64]

104.   *Second*, the Claimant argues that, even if the Treaty excluded sovereign investments from protection, it would nonetheless qualify as an investor because it is not part of the Russian State. The Claimant submits that the Respondent's

characterisation of the Claimant is flawed, including in respect of the application of Russian law. The Claimant submits that it is fundamentally different to a Russian State organ for the following reasons;

(i) The Claimant is not part of the system of Russia's State organs and does not have any sovereign power or protection that a State organ would have. [65] The Claimant does not exercise any governmental functions, except in providing limited services to the Russian Government as an agent or fiduciary manager on the basis of civil law contracts or powers of attorney. [66]

(ii) The Claimant is a State Corporation, which is a generic and not *sui generis* type of legal entity used in the public sector of the Russian economy. The Claimant's assets and liabilities are separate to those of Russia. [67]

(iii) The Claimant's corporate governance is similar to that of joint stock companies and includes a Supervisory Council, Management Board and Chairman (the CEO). [68] All of the Claimant's managers have a fiduciary duty to act in good faith and reasonably in the interest of the Claimant rather than in the interests of Russia. [69]

(iv) There is no basis to pierce the corporate veil and treat the Claimant as part of Russia. The Claimant has consistently disclosed that Russia is its ultimate controller and has never used its separate corporate identity for fraud or abuse.

105.     Additionally, and in response to the Respondent's alternative argument developed in the September 2020 Hearing, the Claimant maintains that it did not exercise any governmental function when investing in PIB. [REDACTED]

106.     [REDACTED]

107.     The Claimant objects to the Respondent's reliance on media reports in respect of the Claimant's activities, on the basis that media reports are not sufficient or reliable evidence to discharge a party's burden of proof as they "often contain a third party's opinion, speculation or prediction that is difficult to identify or sever from the facts." [73]

108.     The Claimant further denies that there are any grounds for the Tribunal to draw adverse inferences as to the nature of the Claimant's acquisition of PIB. [74] The Claimant contends that it undertook diligent efforts to locate documents responsive to the Respondent's requests but has reasonable grounds to believe the documents have been lost. [75]

109.     *Third*, the Claimant argues that the Respondent's attempt to equate the Claimant to Russia is contrary to the principles of good faith and estoppel. [76]

110.     In this regard, the Claimant submits that the Respondent's authorities have consistently treated the Claimant as a legal entity rather than a Russian State organ, including in the following situations:
(i) Ukrainian regulators designated the Claimant as a legal entity in the list of PIB's shareholders and imposed tax on the Claimant's profits as a business entity rather than as a State organ under the Russia-Ukraine Double Tax Treaty; [77]

(ii) Ukrainian courts refused to equate the Claimant to Russia in domestic proceedings prior to this dispute; and [78]

(iii) when the present dispute arose, the Respondent instructed its Ministry of Justice, which is responsible for disputes with private persons, to liaise with the Claimant. [79]

111.

Additionally, the Claimant submits that the Respondent cannot argue in good faith that Article l(2)(b) of the Treaty excludes State organs or State-affiliated entities given the Respondent has itself pursued investment claims against Russia through its own State entities, which had essentially the same characteristics that would make them State organs according to the Respondent's arguments.[80]

## C. The Tribunal's analysis

112.   To examine the Respondent's first objection, the Tribunal begins with the terms of Article 9 of the Treaty, which provide as follows:

1. In case of any dispute between either Contracting Party and the investor of the other Contracting Party, which may arise in connection with the investments, including disputes, which concern the amount, terms of and procedure for payment of compensation provided for in Article 5 hereof or with the procedure for effecting a transfer of payments provided for in Article 7 hereof, a notification in writing shall be handed in, accompanied with detailed comments which the investor shall forward to the Contracting Party involved in the dispute. The parties to the dispute shall exert their best efforts to settle that dispute by way of negotiations.

2. In the event the dispute cannot be resolved through negotiations within six months as of the date of the written notification as mentioned in Item 1 hereof above, then the dispute shall be passed over for consideration to:

a) a competent court or an arbitration court of the Contracting Party, on whose territory the investments were carried out;

b) the Arbitration Institute of the Chamber of Commerce in Stockholm,

c) an "ad hoc" arbitration tribunal, in conformity with the Arbitration Regulations of the United Nations Commission for International Trade Law (UNCITRAL).

3. The award of arbitration shall be final and binding upon both parties to the dispute. Each Contracting Party shall undertake to execute such an award in conformity with its respective legislation.[81]

113.   Although the Parties have submitted different translations of the Treaty, which appear respectively at Exhibit C-001 (submitted by the Claimant) and Exhibit RL-82 (submitted by the Respondent), the differences in translation do not appear to be material to the first of the Respondent's objections. The Tribunal has considered both translations but quotes in this section from the Respondent's RL-82.

114.   In interpreting those terms of Article 9, the Tribunal has regard to Article 31 of the VCLT, which provides as follows:
1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

(b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

[...][82]

115.    In accordance with Article 31 of the VCLT, the starting point, though not necessarily the end point, of an interpretation of Article 9 will be the ordinary meaning of its terms. Article 31 of the VCLT does not entitle the Tribunal, much less require it, to ignore that ordinary meaning, and the Tribunal cannot adopt the Respondent's submission that there is no such thing as an inherent or dictionary meaning to the BIT[83] if it is being offered to suggest that the Tribunal can ignore the ordinary meaning of the Treaty. In the words of the Respondent itself in another context: "we should all start with the text when we want to interpret a treaty".[84]

# 1. The "ordinary meaning" of Article 9

116.    The terms of Article 9 do have an ordinary meaning, and these require us to ascertain the meaning of an "investor of the other Contracting Party", which in turn leads us to the definitions contained at Article 1(2) of the Treaty.

117.    Article 1(2)(b) provides that an "Investor of a Contracting Party" can be:
[A]ny legal entity, set up or instituted in conformity with the legislation prevailing on the territory of the given Contracting Party, under the condition that the said legal entity is legally capable, under the legislation of its respective Contracting Party, to carry out investments on the territory of the other Contracting Party.[85]

118.    Thus, the definition of investor contains two express qualifying requirements, namely that: (i) it be a legal entity incorporated in accordance with the law of its home State; and (ii) it have the legal capacity, again pursuant to the laws of its home State, to carry out investments in the territory of the host State of the investment.

119.    It is plain that the Claimant fulfils those two express requirements. In this regard, the Claimant has relied on evidence of (i) its incorporation and registration as a Russian legal entity, namely as a State Corporation,[86] and (ii) its legal capacity according to Russian law to invest in projects in Russia and abroad, including in the territory of Ukraine.[87] The Respondent has not directly contested that the Claimant fulfils these two express requirements.[88]

120.    The express terms of Article 1(2)(b) do not go further. They do not impose any requirement or restriction in respect of the ownership or control of any legal entity that otherwise satisfies the two conditions set out therein. Nor is there an adequate basis to read in such requirements or restrictions by reference to the earlier CIS Investment Agreement, which specifically referred to "States" within its definition of "Investors of each Party". In particular, to recall, Article 2 of the CIS Investment Agreement provided as follows:

Investors of each Party in other States participating in this Agreement (hereinafter -"investors of the Parties"), are:

juridical persons established in accordance with the legislation of one of the Parties and authorised to make investments;

natural persons - nationals of the Parties and permanently residing in their territory nationals of other States as well as stateless persons;

States - participants of this Agreement as well as state and administrative units located within their territory as represented by juridical persons and natural persons authorized by them in accordance with the legislation of the Parties.[89]

121.     The Tribunal does not, however, consider the text of the CIS Investment Agreement to be of any material assistance in interpreting the clear terms of the Treaty. Although it is referred to briefly in the recitals of the Treaty, the CIS Investment Agreement was not ratified, and it is not apparent whether and how it was used in the drafting of the Treaty.

122.     Moreover, in comparing the express terms of the CIS Investment Agreement's definition of investor, and the definition of investor in the Treaty, a variety of potential explanations exist for the differences that emerge. It is true that the exclusion of any express language that would include a reference to States could be interpreted as evincing an intention to exclude States from the definition of investor. Equally, however, it could be said that the express reference to States became unnecessary in the Treaty because the Treaty introduced a reference to "*any* legal entity" that otherwise fulfils the requirements of the definition, whereas the CIS Investment Agreement did not include the word "any" in its reference to "juridical persons".

123.     In short, the Tribunal would expect exceptions to jurisdiction to be spelt out explicitly in the terms of a Treaty. In the absence of such exceptions within the provisions of Article 1(2)(b), the Tribunal does not consider it can read such an exception into the language of the Treaty by reference to the prior, unratified, CIS Investment Agreement.

124.     The Tribunal next considers whether the ordinary meaning of the terms of Articles 9 and 1(2)(b) should be interpreted differently in context.

## 2. The meaning of Article 9 in "context"

125.     In considering the context of Article 9, attention needs to be given to its relationship with the State-to-State arbitration mechanism that appears at Article 10 of the Treaty.

126.     Article 10 provides as follows:

1. Disputes between the Contracting Parties as to the interpretation and application of this Agreement, shall be resolved by way of negotiations.

2. In the event a dispute cannot be resolved through negotiations within six months as of the notification in writing of the origin of a dispute, then at the request of either Contracting Party, it shall be passed over for consideration, to the arbitration tribunal.

[...] [90]

127.     This leads to the following question: does the existence and terms of Article 10 impact the interpretation of Article 9, and if so how?

128.     In this regard, the Respondent's position is not that the Claimant has wrongly invoked Article 9 to commence arbitration where it would not otherwise be able to bring an arbitration under the Treaty. Rather, the Respondent's position is that the Claimant could have done so under Article 10, although the Respondent noted that the type of claim that could be brought would typically relate to diplomatic protection claims, claims for an interpretation of a provision in the BIT, or an application for declaratory relief. [91]

129. In particular, the Respondent made the following submission at the September 2020 Hearing:

THE CHAIRMAN: Does that mean, on your submission, that a state could bring a claim under article 10 in connection with an investment?

MS YOUNAN: It could, Mr President. Obviously how you frame that claim would be slightly different. So it could bring it if it was bringing a diplomatic protection claim on behalf of the investor. It could bring a claim in relation to the investment for an interpretation of a particular provision of the treaty, or an application, but obviously the state would have to be able to frame some kind of damage to be able to claim relief in that instance. [92]

130. Accordingly, on the Respondent's case, the type of claims that the Claimant, as a State, could bring under Article 10 would be different from the claims that could be brought under Article 9. And such a difference appears to be borne out both by the terms of Article 10, and the case law and commentary that exists on such State-to-State arbitration clauses that has been submitted in these proceedings. [93]

131. The terms of Article 10 refer specifically to disputes "between the Contracting Parties as to the interpretation and application" of the Treaty, without reference to such a dispute arising "in connection with" an investment as provided for in Article 9. This goes to the heart of the delineation between Article 9 and 10: the former is stated to relate to disputes "in connection with" a particular investment; the latter is not. In other words, on the terms of Articles 9 and 10 of the Treaty, the delineation could be about the subject matter of a claim as much as it could be about the identity of the claimant - i.e. the delineation, in the circumstances of this case, could be about *what* rather than *who*. Such a delineation, which is faithful to the language of both provisions, gives meaning, and a different role, to each.

132. The case law and commentary on State-to-State arbitration supports such a delineation. Thus, State-to-State arbitrations such as *Peru* v. *Chile*, and *Ecuador v. United States* are examples of State parties to a treaty seeking a pure interpretation of their treaty at the same time as a national of one of the State parties was bringing an investor-State arbitration seeking compensation in respect of a particular investment. [94] Similarly, such a delineation is well illustrated by the series of arbitrations that arose under the NAFTA in the *Cross-Border Trucking Services* case, and the differences in relief that were sought in the different State-to-State and investor-State arbitrations respectively that took place in relation to that same dispute. [95] In particular, Mexico brought a State-to-State arbitration seeking a declaration that the United States had breached its national and MFN treatment obligations with respect to Mexico and potential Mexican investors by failing to lift a moratorium on processing applications by Mexican-owned trucking firms. Subsequently, following the outcome of the State-to-State arbitration in which Mexico obtained a declaration of breach, and in the face of the United States failing to lift the moratorium, the National Chamber of Cargo Transporters then brought an investor-State claim on behalf of various Mexican trucking companies seeking compensation in relation to individual investments.

133. Case law and commentary indicate that a State party to a treaty could also bring a diplomatic protection claim for a treaty violation under Article 10 on behalf of a particular national and its investment. An example of such a claim is Italy's State-to-State arbitration claim against Cuba, which it purported to bring on behalf of itself and several Italian investors (i.e. it contended that it had "double standing"). [96] The tribunal in that case accepted that such a diplomatic protection claim could be brought notwithstanding the existence of a separate investor-State arbitration clause, although it ultimately decided against Italy on the merits of that claim. [97] Nevertheless, it would follow from the Respondent's own objection in this Arbitration that a diplomatic protection claim would not be available in relation to the Claimant's claim here given the identity between the Russian Federation as a

contracting State and VEB that the Respondent asserts: in short, on the Respondent's case, such a claim would be an impermissible attempt at diplomatic protection by the Russian Federation of itself. Indeed, if in the Respondent's view the Claimant could bring the same claim for compensation in relation to its specific investment under Article 10, then it is difficult to see what purpose is served by its present preliminary objection.

134.    Thus, it appears to be the Respondent's own position that the role of Article 10, and the type of claims that could be brought under it, are quite different from those that could be brought under Article 9. Accordingly, in considering the context of Article 9, and in particular the different role of Article 10, the Tribunal sees no reason to alter its interpretation of the ordinary meaning of the terms at Article 9, which on their face entitle "any" entity authorised by its own law to invest in the other contracting State to bring a claim thereunder "in connection with" its investments.

135.    The Tribunal moves on to consider next whether such an interpretation of Article 9 is inconsistent with the object and purpose of the Treaty.

## 3. The meaning of Article 9 taking into account the "object and purpose" of the Treaty

136.    It is the Respondent's submission that:
[...] BIT protection and investment arbitration exist to reduce the level of sovereign risk faced by non-State foreigners. Departing from the diplomatic protection regime, the home State has no legal interest in the outcome of the dispute.[98]

137.    In this way, the Respondent suggests that it is of the nature of investment arbitration under a BIT that a claim can only be brought by a non-State foreign investor.

138.    However, this statement of principle is not borne out either by State practice generally, or by the indications of the object and purpose of this Treaty in particular.

139.    As a matter of State practice generally, both Parties' experts on public international law have referred to the OECD study that screened 1,813 investment treaties, and that found that only three of them explicitly exclude State-owned enterprises from the definition of qualifying investor.[99] Both the fact that almost all BITs do not distinguish between investors on the basis of ownership (State or otherwise), and that a small number of contracting States did consider it necessary explicitly to exclude State-owned enterprises, suggests that there is no evidence of a general investment treaty principle limiting protection to non-State foreign investors. Furthermore, in each of the three treaties that do explicitly exclude State-owned entities from their protection, the preambles of those BITs similarly refer explicitly to the purpose of those respective treaties as only stimulating "private" investments. As discussed below, there is no similar limitation expressed in the preamble of the Treaty.[100]

140.    Moreover, Dr Kriebaum has referred to the State practice of the Swiss Government, as reflected in an official opinion of the Swiss Federal Department of Foreign Affairs, which specifically considered the question of whether States and public entities qualify as protected investors under Swiss BITs, and opined that Swiss BITs *do* protect States and State entities investing abroad except when they act iu*re imperii* and therefore enjoy State immunity.[101] While the meaning and

interpretation of Swiss investment treaties cannot directly assist us in the interpretation of the Treaty, they do indicate that there is no general State practice that would implicitly exclude State-owned and controlled entities from the protection of investment treaties.

141.    The possibility of foreign investors who have a State affiliation benefitting from investment treaty protections is not surprising. Foreign investments by entities owned and controlled by States are commonplace around the world, particularly in those regions in which mixed economies - featuring significant State participation in economic activity - prevail. There is no inherent reason why investment treaties in those regions of the world that are designed to encourage both private and public investment would implicitly (rather than explicitly) exclude some of those investments from their ambit and protections.

142.    This brings us to the object and purpose of our present Treaty, which was concluded by two contracting States in which State participation in economic activity was and continues to occur regularly. Against this backdrop, and unlike other conventions and treaties that refer specifically to the encouragement of "private" investment, the Treaty does not. Rather, and notably, it refers to the "intention to create and maintain favorable conditions for mutual investments" and "the desire to create favorable conditions for the expansion of economic cooperation between the Contracting Parties".[102]

143.    Thus, the preamble to the Treaty at issue in this Arbitration gives no basis upon which to conclude that its object and purpose is exclusively to encourage *private* economic cooperation and exclude State-sponsored investment. In this respect, the preamble to the Treaty can be contrasted with the preamble to the ICSID Convention, which does refer specifically to private investment in the following terms:
    **Considering** the need for international cooperation for economic development, and the role of *private* international investment therein;

144.    Notwithstanding this difference, as noted above, an eminent commentator on the ICSID Convention, Aron Broches, has stated that: "for the purposes of the Convention a mixed economy company or government-owned corporation should not be disqualified as a 'national of another Contracting State' *unless it is acting as an agent for the government or is discharging an essentially governmental function."[103]*

145.    As this commentary pertains only to the ICSID Convention which is not at issue here, there is no basis upon which to enquire as to the capacity in which a State-owned and/or controlled entity is acting for the purposes of determining whether it is a qualifying investor in these proceedings. Moreover, the Tribunal notes that the application of what has been referred to elsewhere as the "Broches test" appears to have been limited to only a small number of ICSID cases.[104] Indeed, in one of the few cases in which the "Broches test" has been applied, *CSOB v. Slovakia*,[105] the application of the test appears not to assist the Respondent in its preliminary objection in this case. In that case, the Tribunal had to consider whether CSOB, a Czech State-owned bank, was acting as an agent of the Czech Republic, and was discharging essentially governmental functions in respect of events that were alleged to be relevant to the dispute. The tribunal in that case emphasised that the term "juridical persons" as employed in Article 25 of the ICSID Convention was "not intended to be limited to privately-owned companies, but to embrace also wholly or partially government-owned companies". In doing so, the tribunal clarified that the critical element under the "Broches test" was the *nature* of the entity's activities, not their *purpose.* In so clarifying, the tribunal found that even though CSOB had been an agent for the Czech State "for much of its existence" and that it was indeed "promoting the governmental policies or purposes of the

State", the transactions at issue in the arbitration - namely loan receivables - were "commercial or private" rather than governmental *in nature*.[106] On that basis, the tribunal dismissed Slovakia's objection in that case.

146.   Although this Arbitration does not implicate the ICSID Convention at all, and although the Treaty here is not stated to have as its object and purpose the promotion and protection of *private* investment, the decision in *CSOB v. Slovakia* is nevertheless noteworthy. If CSOB's right to bring a claim under the ICSID Convention was not undermined by a finding that it *was* a government agent and *was* indeed promoting government policies because the transactions - in that case loan receivables were commercial *in nature*, then *a fortiori* that would be the case in relation to the purchase of a shareholding in a bank as is the case here, whether or not in furtherance of government policy - under a treaty that is not stated to promote and protect only private investment.

147.   More generally, the Tribunal observes that neither the Respondent nor its public international law expert were able to point to examples of an investment treaty tribunal denying jurisdiction in an investor-State case that did not implicate Article 25 of the ICSID Convention because the Claimant investor was characterised as an organ or agent of a State party or otherwise exercising essentially governmental functions.

148.   For his part, the Respondent's expert of public international law, Professor Benvenisti, referred extensively in his reports to case law in which the International Law Commission's Articles on State Responsibility have been relied upon by arbitral tribunals for the purposes of determining whether the acts of a particular entity should be attributed to a State party to a treaty. However, these cases all apply the Articles on State Responsibility to the question of whether a *State respondent* should be held responsible for the actions of an entity that may or may not attract State responsibility. No examples have been referred to of the Articles on State Responsibility being invoked to deny a *claimant* jurisdiction to bring an investor-State claim because it is a State party. This absence was acknowledged by Professor Benvenisti, who described it as a "certain discrepancy",[107] and the Tribunal finds this to be notable. For it suggests that there is no overriding practice to the effect that any entity whose actions can be attributed to those of the State cannot bring an investor-State treaty arbitration.

149.   Put simply, an evaluation of the object and purpose of the Treaty does not alter the Tribunal's view as to the ordinary meaning of Articles 9 and 1(2)(b) of the Treaty. It follows that the Tribunal's interpretation of Article 9, talcing into account the ordinary meaning of its terms, evaluated in context, and in the light of the object and purpose of the Treaty, is that it accommodates a claimant's claims in connection with its investments, whether or not that claimant is owned and controlled by the State, is an "arm" of the State,[108] an agent of the State or is otherwise exercising essentially governmental functions. For these reasons, the Tribunal dismisses the Respondent's first preliminary objection.

150.   In the light of its interpretation of Article 9 of the Treaty, the Tribunal does not need to address the issue of the status and role of the Claimant at this stage of the proceedings. This notwithstanding, as the Parties have made extensive submissions on the issue, and as it may be relevant at a later stage in these proceedings, the Tribunal considers that it would be helpful and transparent for the Tribunal to offer certain observations on the status and role of the Claimant on the basis of its consideration of the evidence presented to the Tribunal so far.

151.   To recall, the Parties' positions can be summarised as follows:

(i) It is the Respondent's position that the Claimant is an arm of the Russian State, and further or alternatively, an agent of the Russian State and/or an entity that exercises essentially governmental functions.

(ii) It is the Claimant's position that, although the Russian Government is its founder and ultimate controller,[109] the Claimant is not included within the system of Russia's State organs, and does not exercise any governmental function except in the limited cases when the Ministry of Finance engages the Claimant as a financial agent on the basis of a commercial agreement.

152.  In considering these contrasting positions at this stage of the arbitration, the Tribunal considers that whether or not the Claimant should be characterised as an organ of the Russian Federation is a question of international law, not Russian law, though the Claimant's features under Russian law may be relevant to that determination under international law. In this regard, the Tribunal accepts the opinion of Professor Benvenisti, and notes the case law on which his opinion relies in this regard.[110]

153.  This conclusion is also reflected in the International Law Commission's Articles on State Responsibility.[111] Article 4 of the Articles on State Responsibility provides as follows:

1. The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.

2. An organ *includes* any person or entity which has that status in accordance with the internal law of the State.[112]

154.  As the commentary on paragraph 2 of Article 4 confirms:
Where the law of a State characterizes an entity as an organ, no difficulty will arise. On the other hand, *it is not sufficient to refer to internal law for the status of State organs*. In some systems the status and functions of various entities are determined not only by law but also by practice, and reference exclusively to internal law would be misleading.[113]

155.  It follows from the evidence of Professor Benvenisti, the case law he relies on, and the Articles on State Responsibility, that the internal law of the Russian Federation may be relevant in the characterisation of the Claimant as a matter of international law, but it will not be determinative of that characterisation. With this in mind, the Tribunal proceeds to consider not only the legal form taken by the Claimant as a matter of Russian law, but also other factors that may be relevant to understanding its status and role. These include the present evidence on the extent to which the Claimant is controlled by the Government of the Russian Federation, and the extent to which the Claimant can be said to fulfil a governmental function. Furthermore, the Tribunal considers the present evidence on the record of this Arbitration as to why the Claimant made the investment that is the subject matter of this Arbitration.

156.  On the first of these issues, there appears to be little room for debate as to the Claimant's legal form, although the Parties have debated whether that form is *sui generis* or not. The Claimant is a State Corporation that is established under a Special Federal Law, which replaces its corporate charter and other constituted documents.[114] As such, it is a non-profit legal entity, that features the State as its founder throughout its existence, and that has no shareholders or other interested stakeholders.

157.   The Claimant is registered as a State Corporation on the Unified State Register of Legal Entities, and has featured thereon since June 2007, when it was established as a legal entity by way of reorganisation of its legal predecessor, the USSR Bank for Foreign Economic Affairs.[115] As such a State Corporation, it owns its own assets, whether contributed to its authorised capital by its founder (the Russian Federation) or acquired otherwise.[116] In addition, the Claimant may be a party to any transactions governed by civil law, and itself act as a claimant or defendant in court proceedings. In particular, Article 3 of the Law on VEB lists the numerous types of commercial transactions governed by civil law to which the Claimant may be a party, and these include sale and purchase agreements, loan agreements, guarantees, assignments of claims and service agreements.[117]

158.   The Claimant is one of six such State Corporations, with the others being the State Corporation for the Promotion of the Development, Manufacture and Export of HighTech Products Rostec, the State Corporation for Space Activities Roscosmos, the Support Fund for the Reform of the Housing and Utilities Sector, the State Atomic Energy Corporation Rosatom, and the Deposit Insurance Agency.[118]

159.   According to Professor Asoskov, the Claimant has never been part of the structure of federal executive organs that are organised into the following three categories: federal ministries; federal services (e.g. the Federal Tax Service or the Federal Customs Service), which are responsible for governmental control and supervision; and federal agencies (such as the Federal State Property Management Agency), which are responsible for providing public services and managing federal property. In presenting the structure of federal executive organs, Professor Asoskov has relied in particular on clauses 3, 4 and 5 of Russian Federation Presidential Decree No. 314 of 9 March 2004 "On the System and Structure of Federal Executive Organs",[119] and this presentation of Russian law has not been contested by the Respondent.

160.   Moreover, Professor Asoskov opines that the goals and functions of State organs are inseparably linked with the concept of State power under Russian law, and that the Claimant's key functions are listed in the Law on VEB as the entry into commercial transactions, rather than the exercise of any coercive state power.[120] Professor Asoskov opines further that the only function as an agent of the Government of the Russian Federation performed by the Claimant is pursuant to a civil law contract, specifically an agency agreement, which is discrete and limited and to which it is remunerated for specific services such as repayment of foreign national debt owed by the former USSR, repayment of state loans to the Russian Federation, the issuance and performance of state guarantees and the management of accumulated pensions and payment funds.[121] In performing these specific functions as an agent of the Russian Federation, Professor Asoskov opines that the Claimant may not exercise any coercive governmental powers (for example, issuing any binding regulations in respect of specific individuals or legal entities to take or refrain from taking any actions), with those coercive powers to be exercised by Russian State organs. Rather, its functions are those of only an agent, i.e. to hold negotiations, enter into civil- law contracts on behalf of its principal, or bring an action in court.[122] Again, the Respondent has not taken issue with much of Professor Asoskov's presentation on matters of Russian law.

161.   Looking beyond the Claimant's legal form under Russian law, there can be no reasonable doubt, on the basis of the evidence submitted to date, that the government exerts comprehensive control over it, both as a matter of law and fact.

162.   With no other shareholders or participants that are stakeholders in the Claimant, there is no other participant - other than the government - that can control its activities. Indeed, it appears that the legal form of a State Corporation was chosen in order to ensure State control over its activities. Thus, the Explanatory Note to the Draft VEB Law stated in explicit terms that:

[...] it is suggested to establish this type of a State financial development institution in the form of a state corporation, *ensuring control* over its activity by the Government of the Russian Federation and other state authorities.

[...]

The Development Bank will be established using the assets of the Russian Federation and will be *fully controlled* by the state at all stages of its formation and operation.[123]

163.    This "ensur[ed]" and "full[]" control is reflected in the organisational structure of the Claimant. According to the VEB Law, the Claimant's Supervisory Board is its "supreme governing body",[124] which determines the main areas of the Claimant's activities, takes decisions to approve transactions involving the Claimant and appoints and dismisses the members of the Claimant's management board.[125]

164.    The Chairman of the Supervisory Board must be the Prime Minister of the Russian Federation as a matter of law,[126] and as a matter of fact the other members of the supervisory board are senior Government officials, including Deputy Prime Ministers and Ministers. Indeed, the only member of the Supervisory Board that is neither a Prime Minister, Deputy Prime Minister or Minister is the Chairman of the Management Board of VEB, who in turn is appointed and dismissed by the President of the Russian Federation.[127]

165.    As for the Management Board, in addition to its members being appointed and dismissed by the Supervisory Board, its powers comprise preparing and submitting for consideration by the Supervisory Board any proposals in respect of VEB's key business areas and the scope of its investment and financing activities.[128]

166.    In this way, all key decisions made by the Claimant are taken by senior members of the Government of the Russian Federation, and those appointed by them. Furthermore, the Claimant's assets and funds feature contributions by the Russian Federation and its Federal Budget,[129] and this State funding has been reflected by government resolutions by which it allocates State funds to the Claimant.[130]

167.    This structural and financial governmental control appears to reflect the policy function of VEB as a "State financial development institution", to quote the Explanatory Note to the Draft VEB Law.[131] Although Article 6(1) of the VEB Law states that government authorities "may not interfere in VEB.RF's activities aimed at achieving its business purposes specified in this Federal Law unless otherwise provided for by this Federal Law or any other federal laws", the policy function of VEB as a development bank appears - on the basis of the evidence presently before the Tribunal - to be closely aligned with Russian Government policy.

168.    This is reflected in Article 3(1) of the VEB Law, which has been referred to above but bears repeating again at this stage of the analysis. Entitled "Business Purposes and Functions of VEB.RF", Article 3(1) provides that:
VEB.RF shall act to facilitate the long-term socio-economic development of the Russian Federation, create the conditions for sustained economic growth, improve investment efficiency and expand investment in the Russian economy by implementing projects domestically and abroad, including inward investment projects aimed at developing infrastructure, industrial production, innovation and special economic zones, protecting the natural environment, enhancing energy efficiency, promoting exports and helping Russian industrial products (goods, work, services) to expand into foreign markets and by carrying out other projects and/or transactions as part of investment, foreign economic, advisory and other activities provided for by this Federal Law (VEB.RF's projects).[132]

169.    This policy function appears, as a matter of fact, to be determined by the Russian Government. Thus, pursuant to Article 4(6) of the VEB Law, the Government approves the Memorandum on the Financial Policies of VEB, which governs its operations.[133] Furthermore, as a matter of fact, in 2018 the Supervisory Board of VEB approved a two-page "VEB.RF's Business Model 2024", which on its face appears to indicate that VEB is to carry out the goals determined by decree of the Russian President, and which was itself entitled "National goals and strategic objectives of development of the Russian Federation for the period until 2024".[134] Moreover, this apparent alignment of the policy goals of the Russian Federation and VEB appears to have existed throughout the relevant period. Thus, in 2008, the Russian Federal Law "On Additional Measures for Supporting the Financial System of the Russian Federation" indicated that the Claimant was to act as "a key instrument of the state crisis management policy" to refinance Russian corporates' foreign debts incurred prior to the end of December 2008.[135] In the years that followed, the Claimant described itself as the Government's "tool in the implementation of anti-crisis measures".[136] More recently, the Claimant has described itself as a "key instrument" of Russian Government policy whose activities are strategically important for the national economy, and that it "accomplish[es] the objectives formulated by the Russian President and Government".[137]

170.    The function of the Claimant as a "key instrument" for "accomplish[ing]" Russian Government policy has also been confirmed by contemporaneous statements made by Mr Vladimir Dmitriev, the former Chairman of its Management Board, as well as by his testimony in these proceedings. Thus, in interviews given by Mr Dmitriev to the Russian media in June 2009, he described by way of example how the Claimant's acquisition of a bigger stake in its Belarussian affiliate in 2007 was designed to "ensure the synergy to the Russian-Belarusian relations".[138] In an interview he gave a year later, in June 2010, he stated the following in relation to the Claimant's ownership interest in both Belarussian and Ukrainian banks: "VEB is tightly woven into the fabric of interstate relations in the SCO [Shanghai Cooperation Organisation] space."[139] [REDACTED] [140] [141]

171.    The Claimant's role as a "key instrument" to "accomplish" government policy appears to explain the privileged position and immunities that it benefits from as a matter of Russian law. Both the VEB Law itself, and the Russian Federal Law "on Securities Market", set out various significant exemptions for the Claimant from laws on banks and banking activities in related financial and securities market regulations.[142] VEB is also exempt from paying profit tax and from paying VAT in relation to any banking operations.[143] Similarly, the VEB Law stipulates that Russian insolvency and bankruptcy laws do not apply to VEB.[144] Moreover, the Criminal Code of the Russian Federation identifies employees of VEB as "public officials" with the result that they can incur liability in respect of "crimes against a power and interest of the State Service".[145]

172.    Against this general background, it remains to evaluate the evidence that has been presented in these proceedings to date as to why the Claimant purchased an equity stake in PIB.

173.    [REDACTED]

174.    [REDACTED]

175.    [REDACTED]

176.    [REDACTED]

177.    [REDACTED] [153] In the light of these facts, the Tribunal finds that it would be unrealistic to conclude that Russian governmental policy considerations did not form part of the decision to acquire a significant shareholding in PIB. In arriving at this observation on the basis of the record to date, the Tribunal considers that it is unnecessary to draw the adverse inferences that the Respondent has called for at this stage of the Arbitration, as the present record as it stands has provided adequate indication of the governmental policy considerations involved in the Claimant's acquisition of its investment.

178.    Having made these observations as to the status, role and purpose of the Claimant in making the investment that is the subject matter of the present claim on the basis of the evidence presently before it, the Tribunal notes that it remains to be seen whether and how they may be relevant to the merits of this dispute. Those questions do not arise at this stage of the Arbitration, and the Tribunal does not pre-judge the answer to them.

# V. DID THE CLAIMANT FULFIL THE PRECONDITIONS TO THE LAUNCH OF ARBITRAL PROCEEDINGS UNDER ARTICLE 9 OF THE TREATY

## A. The Respondent's position

179.    The Respondent argues that the Claimant is precluded from recourse to arbitration as a result of its failure to comply with the mandatory pre-conditions for recourse to arbitration (in some of its submissions, the Respondent has referred to this failure as a "refusal" by the Claimant to comply). [154]

180.    Based on the terms of Article 9 of the Treaty, the Respondent submits that it only consented to arbitrate disputes under Article 9 of the Treaty if three cumulative steps were fulfilled:

(i) the Claimant must notify the Respondent in writing that an investment treaty dispute exists and provide detailed comments;

(ii) the Claimant must try to settle the investment dispute amicably as far as possible through negotiations; and

(iii) at least six months must have passed with the dispute yet to be resolved.

181.    In particular, the Respondent submits that the Claimant should have, after properly notifying the dispute, attempted to settle that dispute through negotiations for at least six months before commencing contentious proceedings. The Respondent relies on the decisions of various investment tribunals to argue that States can limit their consent as they see fit, including by way of "obligatory procedural prerequisites demanding amicable settlement efforts before contentious proceedings can be commenced"; [155] that what is required is "a genuine effort at pursuing negotiations with a view to a mutually agreeable solution"; [156] and that "unilateral protestations, advocacy or the mere passage of time are insufficient". [157]

182.    The Respondent claims that the Claimant has failed to comply with the pre-arbitral requirements of Article 9 of the Treaty in two respects.

183.    *First*, the Respondent submits that the Claimant refused to present a valid

notification of dispute, even after Ukraine drew its attention to the requirement.

184.    The Respondent denies that the Claimant's letter to various Ukrainian Government officials dated 14 September 2018 **("Notice of Dispute")**[158] constituted a valid dispute notice for the purposes of Article 9 of the Treaty. The Respondent argues that the power of attorney for Mr Krasnov, who signed the Notice of Dispute and purported to act on the Claimant's behalf, was "expressly limited to representing the Claimant in 'foreign state courts and other dispute resolution bodies'", but "did not purport to extend to out-of-court settlements, negotiated agreements or general interest representation vis-à-vis governments and the executive branch."[159]

185.    According to the Respondent, the Ministry of Justice of Ukraine in its response to the Notice of Dispute "pointed out that the supposed notification was deficient because it did not appear that Mr Krasnov was authorised to liaise with Ukraine".[160] However, the Claimant decided not to furnish any authorisation to conduct negotiations and sign settlement agreements with its response to the Minishy of Justice of Ukraine.[161]

186.    Whilst Mr Krasnov's power of attorney expressly covered "foreign state courts and other dispute resolution bodies", the Respondent argues that his Ukrainian counterparts were neither courts nor dispute resolution bodies, and nor did Mr Krasnov's authority purport to cover negotiating and concluding settlements with foreign governments. Similarly, the Respondent claims Mr Krasnov had no apparent authority to represent and bind a Russian State organ that requires Supervisory Board approval for important issues and is controlled by the most senior Russian State officials.

187.    The Respondent denies that its objection in this regard is "formalistic", as characterised by the Claimant.[162] The Respondent points to requirements in the Russian Civil Procedure Code and the Russian Commercial Procedure that a representative's authorisation must specifically refer to the power to reach an amicable settlement, and notes that Russian courts dismiss claims for want of a valid written authorisation if such document fails to explicitly state the specific powers claimed to be within the scope of a representative's power of attorney. The Respondent also refers to the position taken by the Russian Federation in international fora to the effect that procedural preconditions must be taken seriously and are strict and obligatory.[163]

188.    *Second*, the Respondent argues that the Claimant merely paid lip service to the negotiation prerequisite and had no genuine interest in resolving its claims by negotiation. To recall, the English translation of Article 9 of the Treaty relied on by the Respondent provides as follows:

1. [...] The parties to the dispute shall exert their best efforts to settle that dispute by way of negotiations.

2. In the event the dispute cannot be resolved through negotiations within six months as of the date of the written notification as mentioned in Item 1 hereof above, then the dispute shall be passed over for consideration to:

a) a competent court or an arbitration court of the Contracting Party, on whose territory the investments were earned out;

b) the Arbitration Institute of the Chamber of Commerce in Stockholm,

c) an "ad hoc" arbitration tribunal, in conformity with the Arbitration Regulations of the United Nations Commission for International Trade Law (UNCITRAL).

[...][164]

189.    In submitting that this requirement was not satisfied, the Respondent points to the fact that no negotiations took place between the Parties with respect to the

Claimant's claims. The Respondent argues that "it would defeat the purpose of an amicable settlement requirement if it did not require at least a sincere effort to settle amicably."[165]

190.   The Respondent further contends that the Claimant failed to show that it attempted to defuse the matter insofar as possible and that any negotiations were futile. Instead, the Claimant's efforts to negotiate were limited to sending two letters in which it set out its allegations but did not substantively engage with the concern expressed by Ukraine regarding the scope of authorisation of Mr Krasnov's power of attorney. The Respondent emphasises that the Claimant's second letter ignored the problem identified by the Ministry of Justice of Ukraine in its reply, following which the Claimant filed for arbitration without waiting for a further response.

191.   In the Respondent's submission, established case law confirms that protestations and advocacy are not negotiations, and nor can an amicable settlement requirement be satisfied by the mere passage of the negotiation timeframe after "firing off a self-serving letter".[166]

192.   Accordingly, the Respondent submits that the Claimant chose to disregard the mandatory pre-requisites for launching arbitration under Article 9 of the Treaty.

# B. The Claimant's position

193.   As a preliminary observation, the Claimant submits that, according to Swedish law which is applicable to procedural matters in this arbitration, the Respondent's Second Objection concerns an issue of admissibility rather than jurisdiction.[167]

194.   The Claimant submits that it has satisfied the admissibility pre-requisites of Article 9(1) of the Treaty by: (i) notifying the Respondent of the dispute; and (ii) attempting negotiations with the Respondent.[168]

195.   *First*, the Claimant refers to its Notice of Dispute dated 14 September 2018, which - as the terms of Article 9(1) require - was "accompanied with detailed comments" that set out the basis of its claims.[169]

196.   Furthermore, the Notice attached a power of attorney authorising Mr Krasnov to represent the Claimant "in any ... bodies for resolution of disputes", "do any other legal actions and formalities" and "sign ... and submit documents of any kind". According to the Claimant, Mr Krasnov had the requisite authorisation to act for the Claimant in any foreign legal disputes, as he had both:
(i) express authority based on the power of attorney which covered any alternative dispute resolution, including arbitration, negotiations and any pre-action correspondence with the parties to a legal dispute, such as sending the Request for Arbitration to the Respondent; and

(ii) apparent authority based on his position as Senior Vice-President and the head of the Claimant's legal department, which made him the key person to represent the Claimant in any legal affairs, including in pre-action correspondence with the counter-party to any legal dispute.

197.   The Claimant argues that there was no reasonable basis for the Respondent to doubt that the Claimant had authorised the Notice of Dispute, particularly given that it was issued on the Claimant's official letterhead and was the subject of a press release by the Claimant which was widely covered by the Ukrainian

media. [170]

198.     The Claimant argues further that the provisions of Russian codes of procedure relied on by the Respondent are, in the Claimant's submission, irrelevant as they do not apply in the present circumstances. [171] Moreover, the Claimant notes that international tribunals have consistently rejected attempts by respondent States to contest the validity of notices based on alleged defects in the signatory's authority. [172]

199.     The Claimant also submits that the response from the Ministry of Justice of Ukraine dated 22 February 2019 merely alleged that "a document confirming the authority of [Mr Krasnov] … is not attached to such Notice", [173] which appeared to indicate that a copy of Mr Krasnov's power of attorney was somehow not received at all, rather than that the version received was somehow inadequate. In any event, the Claimant then re-attached Mr Krasnov's power of attorney in its subsequent correspondence of 28 March 2019. [174]

200.     *Second*, the Claimant submits that it satisfied the requirements of Article 9(1) of the Treaty, which it argues does not contain an obligation to hold negotiations over the dispute but rather requires that the Parties "should merely attempt to settle the dispute by negotiations, and only where it is at all possible." [175]

201.     In this regard, the Claimant contests the English translation of Article 9 relied on by the Respondent. The translation that the Claimant relies on differs from the Respondent's in the following respects:
1. [...] The parties to the dispute shall ~~exert their best efforts~~ __attempt__ to settle __resolve__ that dispute __where possible__ by way of negotiations.

2. In the event __that__ the dispute ~~cannot be~~ __is not__ resolved ~~through negotiations~~ —within six months as-of the date of the written notification ~~as mentioned in Item 1 hereof above~~ __referred to in point 1 of this Article__, ~~then t~~he dispute shall be ~~passed over for consideration to~~ __referred to be considered by__:

[...]

202.     In particular, the Claimant submits that the authentic texts of Article 9 in Russian and Ukrainian do not feature the phrases "exert their best efforts" or "through negotiations" but do include the phrase "where possible" which is absent in the Respondent's translation.

203.     According to the Claimant, the requirement in Article 9(1) of the Treaty is to "attempt" negotiations "where possible" but not to pursue negotiations for the entire duration of the "cooling-off" period or until a deadlock is reached. [176] In the Claimant's submission, even based on the stricter language according to the Respondent's translation, it would be sufficient if one Party invites the other Party to negotiations, even though the latter declines the invitation or chooses not to respond.

204.     The Claimant refers to its offers to the Respondent on two occasions to engage in settlement discussions, both of which were ignored. Accordingly, the Claimant asserts that it was entitled to proceed to arbitration following the expiry of the "cooling-off' period.

205.     Furthermore, the Claimant contends that any further attempts to negotiate would have been futile. The Claimant notes that the Respondent waited for almost six months after receipt of the Notice of Dispute before its Ministry of Justice issued a response dated 22 February 2019 which raised, for the first time, a concern with Mr Krasnov's power of attorney. [177]

206.     Accordingly, the Claimant submits that it was clear that the Respondent did not wish to engage in good faith negotiations and the Claimant was not obliged to make any further attempts to settle the dispute amicably before commencing the present Arbitration.

# C. The Tribunal's analysis

207.     To examine the Respondent's second objection, the Tribunal begins again with the terms of Article 9 of the Treaty. In the Tribunal's view, the differences in the Parties' respective translations of the Treaty do not appear to be material to the Respondent's second objection. The Respondent has confirmed this,[178] and the Tribunal has considered both translations but quotes in this section from the Respondent's translation at Exhibit RL-82, which provides as follows:

1. In case of any dispute between either Contracting Party and the investor of the other Contracting Party, which may arise in connection with the investments, including disputes, which concern the amount, terms of and procedure for payment of compensation provided for in Article 5 hereof or with the procedure for effecting a transfer of payments provided for in Article 7 hereof, a notification in writing shall be handed in, accompanied with detailed comments which the investor shall forward to the Contracting Party involved in the dispute. The parties to the dispute shall exert their best efforts to settle that dispute by way of negotiations.

2. In the event the dispute cannot be resolved through negotiations within six months as of the date of the written notification as mentioned in Item 1 hereof above, then the dispute shall be passed over for consideration to:

a) a competent court or an arbitration court of the Contracting Party, on whose territory the investments were carried out;

b) the Arbitration Institute of the Chamber of Commerce in Stockholm,

c) an "ad hoc" arbitration tribunal, in conformity with the Arbitration Regulations of the United Nations Commission for International Trade Law (UNCITRAL).

[...][179]

208.     Accordingly, the Treaty imposes two pre-conditions to the launch of arbitration proceedings, namely:
(i) The sending of "a notification in writing" of a dispute, which is "accompanied with detailed comments" on the dispute; and

(ii) "The parties" then "exert[ing] their best efforts to settle that dispute by way of negotiations", with the right to arbitrate only arising in the event that dispute "cannot be resolved through negotiations within six months as of the date of the written notification".

209.     As with other terms of the Treaty, the Tribunal finds that these provisions are to be interpreted by reference to international law, and in particular Article 31 of the VCLT, i.e. by reference to the "ordinary meaning" of the terms, interpreted in "context", and taking into account the "object and purpose" of the Treaty.

210.     The Tribunal sees no reason why the contracting States would have intended the substantive interpretation of Article 9 to be governed by a different legal framework. Although Article 9 contains the arbitration clause, which is understood to be separable, it does not follow that the interpretation of its terms, contained as they are in an international treaty, should be governed other than by international law.

211.  In any event, while the Claimant has submitted that Swedish law should govern the interpretation of the procedural preconditions to arbitration, it has not demonstrated that such application of Swedish law would lead to a different outcome. In this regard, the Claimant placed reliance on a judgment of the Swedish Supreme Court addressing a partial annulment application in one of the early Energy Charter Treaty arbitrations, *Petrobart v Kyrgyzstan*, in which the seat of the arbitration was Stockholm. In that judgment, the Swedish Supreme Court held that: "the relevant arbitration proceedings are governed by Swedish law" and thus "procedural issues shall be resolved under Swedish law, although the arbitration proceedings involve foreign law".[180] In so holding, however, there was nothing in the Supreme Court's decision that suggested that an application of Swedish law to the interpretation of a notice or negotiating precondition to the right to invoke arbitration would differ materially from an application of the VCLT.[181]

212.  Applying the tenets of treaty interpretation that are derived from the VCLT to the two preconditions to arbitration set out in Article 9, the Tribunal considers that the terms interpreted in context and in the light of the object and purpose of a treaty are intended broadly to ensure that a State respondent party is reasonably informed of the existence and subject-matter of a dispute, so that it is pre-warned of the prospect and scope of an international arbitration against it. Furthermore, the purpose of a 6-month negotiating period, often referred to as a "cooling-off' period, is intended to afford both parties a mutual opportunity to avoid the prospect of future arbitration.

213.  Having made these broad introductory observations as to the meaning and purpose of these pre-conditions to arbitration, the Tribunal proceeds to consider whether those pre-conditions were fulfilled in this case by reference to:
(i) The relevant facts, i.e. the steps taken by, and the conduct of, both Parties prior to the launch by the Claimant of these proceedings; and

(ii) An evaluation of whether those facts adequately fulfil these preconditions.

214.  The relevant facts can be summarised as follows:
(i) On 14 September 2018, the Claimant sent a notice of dispute to various Government officials of Ukraine, including the President and Prime Minister of Ukraine, which was signed by Mr Igor Krasnov in his capacity as the "Senior Vice President, Head of the Legal Directorate of Vnesheconombank" **("Notice of Dispute").**[182] The Notice of Dispute included:

(a) an enclosed detailed statement regarding the dispute between the Parties;

(b) an enclosed notarised copy of the power of attorney of Mr Igor Krasnov dated 7 June 2017; and

(c) an invitation to "contact [the Claimant] forthwith and start the negotiations on the amicable settlement of the dispute in accordance with article 9(1) of the 1998 Agreement."

(ii) The Ministry of Justice of Ukraine responded by way of a letter dated 22 February 2019, which was received by the Claimant on 12 March 2019:[183]

(a) acknowledging that it received the Notice of Dispute on 1 October 2018;

(b) advising that "the Ministry of Justice of Ukraine is the body representing the state of Ukraine during the settlement of investment disputes that arise between the State of Ukraine and foreign persons"; and

(c) stating that there are no grounds to believe that the Claimant had notified Ukraine of a dispute under Article 9 of the Treaty "since a document confirming the authority of [Mr Krasnov] to sign and deliver the Notice of a dispute between [the Claimant] and Ukraine is not attached to such Notice".

(iii) On 28 March 2019, in a response from the Claimant to the Ministry of Justice of Ukraine co-signed by Mr Krasnov and the Vice President of Legal Assistance Department, V.M. Golosov, the Claimant stated that: [184]

(a) according the text of the power of attorney enclosed with the Notice of Dispute, Mr Krasnov is "authorised to represent the interests of the Bank in all foreign state courts and other dispute resolution bodies and has the right to carry out all procedural actions on behalf of the Bank and to exercise the powers of party to a dispute, as well as to sign, receive and transmit documents of various kinds, which are necessary for the performance and/or documentation of the respective actions";

(b) neither the BIT nor other applicable sources of international law contain any requirements as to the form of a power of attorney for a representative of an investor signing a notice or other document notifying the commencement an investment dispute;

(c) "the Ministry of Justice of Ukrain e has no grounds to assume that [Mr] Krasnov was not authorised to act on behalf of the Bank or to sign the Notice, or that, having signed the Notice, [Mr] Krasnov exceeded the powers granted to him under the Power of Attorney"; and

(d) the Claimant, without prejudice to its rights, was "still ready to consider proposals for the peaceful settlement of this dispute, if any will come from Ukraine", although this letter "does not grant to Ukraine the right to additional time for the settlement of this dispute by negotiations."

(iv) Prior to and following the Claimant's issuance of the Notice of Dispute, certain events took place in Ukraine which can be summarised as follows:

(a) On 2 May 2018, a number of Ukrainian companies and individuals obtained an arbitral award against the Russian Federation **("Everest Award")** for approximately USD 140 million, which they sought to recognise and enforce in Ukraine. The Kyiv Appellate Court granted the request for enforcement on 25 September 2018.

(b) On 5 September 2018, the Kyiv Appellate Court attached a number of assets in Ukraine, including the property of PIB and shares in PIB owned by the Claimant. The attachment order was contested by the affected parties and, on 25 January 2019, Ukraine's Supreme Court varied the order such that it only attached those shares in Ukrainian banks that were registered in the name of the Russian Federation.

(c) In March 2019, the State Bailiff commenced execution proceedings against the Russian Federation in respect to the Everest Award and again attached the Claimant's PIB shares on the basis that they belonged to the Russian Federation.

(d) In June 2019, the State Bailiff valued the Claimant's PIB shares and announced plans to sell them at a public auction to satisfy Russia's debt arising from the Everest Award. The auction sale was scheduled to take place on 28 August 2019.

(v) On 20 June 2019, approximately nine months following the issuance of the Claimant's Notice of Dispute, the Claimant commenced the present Arbitration by way of submission of its Request for Arbitration to the SCC, and followed that soon after with a request for the appointment of an Emergency Arbitrator to impede the auction sale scheduled to take place before the end of August 2019.

215.    Having considered these facts, the Tribunal turns to consider specifically:
(i) Whether the Claimant's Notice of Dispute was adequate; and

(ii) Whether the Respondent can rely on the absence of active negotiations between the Parties subsequent to the Respondent's receipt of the Notice(s) of Dispute to establish that the pre-conditions to arbitration were not fulfilled.

# 1. Was the Claimant's Notice of Dispute adequate?

216.    The Tribunal finds that the Claimant's Notice of Dispute dated 14 September 2018 amply fulfilled the requirements of such a notice set out in Article 9 of the Treaty. It amounted to "a notification in writing", and provided "detailed comments" on the subject matter of the dispute in the form of a detailed attachment to the Notice which specified the facts, allegedly wrongful actions and the violations of the Treaty that those actions were alleged to have entailed.[185] It was sent by Mr Igor Krasnov, who was both a Senior Vice President and the Head of the Legal Directorate of the Claimant. And it was sent to and received by appropriate recipients within the Government of Ukraine, namely the President, the Prime Minister, the Minister of Foreign Affairs, the First Vice Prime Minister and Minister of Economic Development and Trade, the Head of the National Bank of Ukraine, and the Chargé d'Affaires of Ukraine to Russia, with the Ministry of Justice subsequently acknowledging receipt of the Notice. As such, there can be no reasonable doubt that it provided the Respondent with adequate notice of the dispute that the Claimant considered had arisen, and a prewarning that this would result in arbitration if not resolved amicably. In so doing, it fulfilled the first precondition for launching arbitration proceedings not less than six months later.

217.    Furthermore, the Tribunal cannot adopt the Respondent's submission that the Notice of Dispute could not be considered sufficient because it was not accompanied by an adequate Power of Attorney. The terms of the Treaty do not require a Notice of Dispute to be accompanied by a Power of Attorney. Moreover, there is no overwhelming practice to the Tribunal's knowledge - of such notices being accompanied by powers of attorney, and it is not apparent why the Respondent would have any reasonable doubt that the sending of the Notice of Dispute by the Claimant had been properly authorised given that:

(i) it was sent on the Claimant's headed-paper;

(ii) it was sent and signed by Mr Krasnov, the Head of the Claimant's Legal Department and a Senior Vice President of the Claimant; and

(iii) it was accompanied by a power of attorney signed by the Chairman of the Management Board of the Claimant, and which authorised Mr Krasnov as signatory of the Notice to "represent the interests of [the Claimant] in all foreign state courts *and other dispute resolution bodies"*, to "perform ... all procedural actions" in a case, and to "perform other legal actions and formalities, *as well as to sign, receive and transmit documents ... which are required for the performance and/or documentation of actions,* which I.S. Krasnov is authorised to perform by the present power of attorney".[186]

218.    In the light of all of these indications and confirmations of authority, the Tribunal has difficulty in understanding the Respondent's belated response received in mid-March of 2019 in which it stated that "a document confirming the authority of [Mr Krasnov] to sign and deliver the Notice of a dispute ... is not attached to such Notice."[187] Even though the Tribunal has already found that such a power of attorney was not required, precisely such an authority to "sign documents" that were "required for the performance" of "actions" was attached to the Notice of Dispute.[188]

219.    Moreover, and *in* any event, the Tribunal is constrained to observe that if the Respondent could still have had a reasonable doubt that the Notice of Dispute was properly authorised, despite the indications and confirmations to the contrary, it would have expected the Respondent to indicate such a doubt in a timely fashion. It did not do so, but rather waited instead until the expiry of almost the entire six-month "cooling-off" period to request further proof of authority. Such conduct appears less consistent with a genuine concern that the Notice of Dispute was properly authorised, and more indicative of a party hoping to generate

impediments to progress in the dispute resolution process. While this is relevant to the Tribunal's evaluation of whether adequate efforts were made to make use of the opportunity to negotiate an amicable settlement following the Notice (which is considered below), the Tribunal has no hesitation in finding that the belated questions raised about the authorisation of the Notice of Dispute do not affect the adequacy and validity of the Notice of Dispute when the Claimant originally sent it.

## 2. Can the Respondent rely on the absence of active negotiations between the Parties to establish that the pre-conditions to arbitration were not fulfilled?

220.    Although the Parties' respective translations of the Treaty feature greater differences in that part of Article 9 that refers to attempts at negotiation, the Tribunal again considers the differences not to be material to the question before it.

221.    In both English translations, the Treaty effectively imposes a duty to attempt to negotiate a settlement of the dispute that has been notified. As settlement requires an agreement of the parties which neither is obliged to reach, the essence of that duty is to provide opportunity for settlement: that is all; that is enough. And it is a duty that is imposed on both the investor and the host State of the investment. In the memorable words of the tribunal in *Louis Dreyfus*, it "takes two to tango".[189]

222.    For the reasons explained below, the Tribunal finds that the duty was adequately fulfilled by the Claimant, and that the Respondent's own conduct made plain that it would not be reasonable to expect the Claimant to have made further efforts in the circumstances.

223.    Very simply, the Claimant offered to meet and negotiate with the Respondent's representatives in a Notice of Dispute that the Tribunal has found to have been adequate. In terms, the Claimant invited the Respondent to "[p]lease contact us forthwith and start the negotiations on the amicable settlement of the dispute in accordance with article 9(1) if the [Treaty]."[190] The making of such an invitation alone can fulfil an investor's obligation to afford a reasonable opportunity to negotiate, unless the invitation is accepted by the Respondent State party and then not reasonably progressed by the investor.

224.    In the event, the Respondent did the opposite of accepting the invitation to negotiate. It made no response whatsoever until only a few weeks before the expiry of the six-month negotiating window, and then raised questions as to authority that were unwarranted in the circumstances. If the Respondent had a genuine interest in exploring a negotiated resolution, it could have raised its questions as to authority sooner. That the Respondent did not show such an interest is perhaps unsurprising given the Respondent's view - as expressed in its first objection - that the Claimant was an arm or agent of a State with which it found itself in a broader political dispute.

225.    As already observed, the duties imposed with regard to negotiations by Article 9 were mutual. Furthermore, they cannot be reasonably interpreted as imposing an obligation to engage in an exercise in futility. The Respondent's own conduct indicates that any further efforts expended by the Claimant would have been precisely that. Indeed, not only was the Respondent notably unresponsive to the invitation to negotiate contained in the Claimant's validNotice of Dispute but, as has been recalled above, steps were being taken following the Notice within

Ukraine that were themselves the opposite of "cooling-off".[191] An obligation to act in a constructive matter during a "cooling-off" period applies to all parties to a dispute. One party cannot be required to do more to "cool down" the dispute when its counterparty is contributing to the dispute 'warming up'.

226.   Ultimately, nine months elapsed between the Claimant's Notice of Dispute, in which it invited negotiations, and the launch of this Arbitration. That eventual launch took place against the backdrop of other steps being taken on the ground in Ukraine that led to the Claimant's successful application for emergency measures against the Respondent. The Tribunal finds that this amounted to more than the adequate opportunity to negotiate a settlement that is required by Article 9.

227.   For these reasons, the Tribunal finds that all of the pre-conditions to arbitration were adequately fulfilled by the Claimant by the time it launched arbitration in June 2019, and that the Respondent's second preliminary objection must also be dismissed.

# VI. THE SCOPE OF THE TREATY PROTECTIONS AT ARTICLE 3 OF THE TREATY

228.   The final preliminary objection that is addressed in this Partial Award, is not strictly in the nature of an objection to jurisdiction or admissibility. Rather, it is a question that goes to the substantive scope and limits of one of the protections that the Claimant relies on in bringing its claim. For this reason, the Tribunal begins by summarising the Claimant's position on this issue, before turning to the Respondent's position.

# A. The Claimant's position

229.   The Claimant's position is that Article 3(1) of the Treaty allows an investor to rely on any standards of investment protection found in the host State's other investment treaties, such as FET, FPS and "umbrella" clause protection.[192]

230.   The English translation of Article 3(1) relied on by the Claimant provides as follows:
Each of the Contracting Parties shall, in respect of investments made by investors of the other Contracting Party and of activities relating to such investments, ensure in its territory a regime that is no less favourable than the one provided to its own investors or investors of any third state, and which excludes the application of measures of a discriminatory character that might prevent the management and disposal of investments.[193]

231.   The Claimant's submission is that Article 3(1) contains three standards: that is, in addition to the national treatment and MFN standards, the final phrase "and which excludes the application of measures of a discriminatory character that might prevent the management and disposal of investments" (referred to by the Claimant as a "non-discrimination clause" or the "Contested Phrase") operates as another standard of investment protection, rather than as a restriction on the scope of the national treatment and MFN clause that precede it.

232.   The Claimant justifies its interpretation of Article 3(1) based on the following

textual considerations:

(i) The English translation relied on by the Claimant separates the Contested Phrase with a comma and a conjunction "and", making it clear that the Contested Phrase operates as another standard of investment protection that the host State's "regime" must comply with.

(ii) The English translation relied on by the Respondent also does not suggest that the Contested Phrase operates as a restriction on the MFN clause because it also separates the MFN clause and the Contested Phrase with a comma, denoting distinct features of the "regime".

(iii) If the Contracting Parties had intended for the Contested Phrase to restrict the scope of the MFN clause, they would have placed the Contested Phrase *before* rather than *after* the MFN clause (e.g. "the regime, precluding the application of discriminatory measures..., shall be no less favourable..."); this is how contracting States commonly draft a restriction on MFN treatment in an investment treaty.

(iv) The Contested Phrase operates as a non-discrimination clause which bans any kind of discrimination in management and disposal of investment, not necessarily based on nationality. In this regard, its wording closely resembles a non-impairment standard, which is considered to be one of the aspects of the FET standard.

233.    Furthermore, given that the object and purpose of investment treaties is to promote investments, the Claimant argues that an interpretation providing for additional protection rather than imposing limitations for investments should be preferred.

234.    Moreover, the Claimant emphasises that the Treaty contains an express list of exclusions from the MFN treatment in Article 3(3). If Article 3(1) restricted the scope of the MFN clause only to discriminatory measures, it would be unnecessary for the Contracting Parties to add Article 3(3) and expressly exclude the importation of positive benefits and privileges therein.

235.    The Claimant also submits that the Respondent's interpretation of the Contested Phrase is contrary to the position adopted by the Respondent in other investment treaty cases. [194] Accordingly, the Claimant argues that the Respondent cannot in good faith change its position with respect to the interpretation of Article 3(1) of the Treaty solely to enable its objection to the Claimant's importation of other treaty protections in this arbitration.

236.    Finally, the Claimant considers that, contrary to the Respondent's reading of the drafting history of Article 3(1), the draft text of the Treaty relied on by the Respondent suggests that the Contracting Parties intended the MFN treatment to be as broad as possible. [195] According to the Claimant, the deletion of the FET clause from the draft text of the Treaty does not mean that the contracting States rejected its application to protected investors, but to the contrary indicates they contemplated the importance of it. In particular, the Claimant suggests that the contracting States may have deleted the FET clause because it was redundant in view of FET protection being available to investors via the MFN clause.

## B. The Respondent's position

237.    The Respondent objects to the Claimant's reliance on additional standards of protection imported from treaties other than the Treaty, namely FET, FPS and an "umbrella" clause (i.e. observance of contractual undertakings), by way of the MFN provision in Article 3(1). [196]

VEB v. Ukraine, Partial Award on Preliminary Objections (Case No. V2014/088), 30 Jun 2021                                          1/25/23, 1:49 PM

238.    The Respondent disagrees with the Claimant's interpretation that the final lines of Article 3(1) form an independent guarantee. Instead, the Respondent argues that the final lines characterise and qualify the national and MFN treatment protections that are referred to earlier in the Article, and that this is confirmed by the additional English translation of the Article submitted by the Respondent as Exhibit RL-161. According to this additional translation, Article 3(1) is translated into English from the Russian original text as follows:

Each of the Contracting Parties shall provide on its respective territory to investments made by investors of the other Contracting Party, as well as to activities connected with such investments, a regime no less favorable than the regime granted to its own investors or investors of any third State, precluding the use of discriminatory measures, which could interfere with the management and disposal of investments.

239.    In the Respondent's submission, this translation makes clear that the final phrase of Article 3(1) is not a self-standing standard of investor protection, but rather a phrase that qualifies the national and MFN treatment standards that appear earlier in the provision.

240.    Based on the Respondent's interpretation of Article 3(1), it is not a universal provision applicable to all and any matters related to foreign investments but is rather a narrow guarantee that investors of one Contracting Party will suffer no discrimination in the management and disposal of their investments vis-à-vis investors from the other Contracting Party or from any third State. Put simply, according to the Respondent, the MFN treatment in Article 3(1) of the Treaty is afforded only in respect of "discriminatory measures, which could interfere with the management and disposal of those investments". Accordingly, the Respondent contends that Article 3(1) can only incorporate standards of protection from other treaties if, and to the extent that, such standards have as their subject matter non-discrimination in the sphere of management and disposal of investments.

241.    The Respondent argues that the MFN protection in the Treaty does not enable the importation of FPS and "umbrella" clause protections from the UK-Ukraine BIT because those standards concern different and unrelated subject matters as compared with the protection against discrimination. Similarly, the Respondent argues that the Claimant's reliance on the FET standard from the UK-Ukraine BIT to allege a breach of its legitimate expectations, including by way of Ukraine's alleged failure to act "in a consistent manner" and without arbitrariness,[197] is in excess of what is permissible according to the text of Article 3(1) of the Treaty.

242.    The Respondent further disagrees that limitations of the scope of MFN treatment are contained only in Article 3(3). The Respondent's submission is that Article 3(3) determines the specific contexts in which the MFN clause, the scope of which is defined in Article 3(1), does not apply. In other words, according to the Respondent, Articles 3(1) and 3(3) work as a double-barrel test.

243.    Moreover, the Respondent submits that its interpretation of Article 3(1) is supported by the *travaux préparatoires* of the Treaty, as a draft of the Treaty reveals that the Parties agreed to exclude an earlier express reference to FET protection. In particular, the draft of the Treaty, which was prepared by the Minishy of Economy of the Russian Federation and sent to the Ukrainian Embassy in Moscow on 30 September 1997, contained an earlier version of Article 3(1) that read as follows:

Article 3

Regime of investments

1. Each Contracting Party will provide on its respective territory a regime for the investments made by investors of the other Contracting Party, and also with respect to the activity involved in making such investments *which regime shall be fair and equitable,* precluding the use of discriminatory measures, which could interfere with the management and disposal of those investments. [198]

244.    Both the heading of the draft provision, and the express reference to FET protection, were changed and removed from the final text of Article 3(1) of the Treaty.

245.    As further evidence of the Parties' intention to exclude the FET standard from the scope of protections available under the Treaty, the Respondent relies on the following:

(i) both Ukraine and Russia concluded other bilateral investment treaties around the same time, in 1998, which contained FET clauses; [199] and

(ii) at the time Ukraine and Russia concluded the Treaty, both States already had bilateral investment treaties with third countries that contained general FET clauses. [200]

246.    Accordingly, the Respondent argues that the Claimant's FET, FPS and "umbrella" clause claims cannot proceed to the merits phase.

## C. The Tribunal 's analysis

247.    In relation to this third preliminary objection, the differences in the English translations of the Treaty relied on by the Parties have taken on greater importance. For this reason, in relation to this last preliminary objection, the Tribunal says a few words about each of the translations relied on by the Parties in turn.

248.    The Claimant's chosen translation was certified, and was used in another treaty arbitration involving the Respondent, i.e. it was not prepared for the purposes of this Arbitration. Specifically, it was the version previously used by the English High Court in the case of *Tatneft v. Ukraine,* [201] and it translates Article 3(1) of the Treaty as follows:

Each of the Contracting Parties shall, in respect of investments made by investors of the other Contracting Party and of activities relating to such investments, ensure in its territory a regime that is no less favourable than the one provided to its own investors or investors of any third state, and which excludes the application of measures of a discriminatory character that might prevent the management and disposal of investments. [202]

249.    For its part, the Respondent initially relied on the UNCTAD translation of the Treaty. Thus, although it was not relying on a certified translation, it was relying on a translation prepared by a reliable source, and that was also not prepared for the purposes of this Arbitration. The translation relied on by the Respondent translates Article 3(1) of the Treaty as follows:

Each Contracting Party shall provide on its respective territory a regime for the investments made by investors of the other Contracting Party, and also with respect to the activity involved in making such investments which regime shall be no less favorable than the one granted to its own investors or investors of any third state, precluding the use of discriminatory measures, which could interfere with the management and disposal of those investments. [203]

250.    Because of the "battle of the forms" that arose between the Parties' initially-relied-upon translations, the Respondent subsequently offered a further, certified translation of Article 3(1) of the Treaty, that appeared at Exhibit RL-161, and that also contained comments by the translator on the earlier translations of Article 3(1) relied on by the Parties. In this third translation, Article 3(1) is translated into English from the Russian original text as follows:

Each of the Contracting Parties shall provide on its respective territory to investments made by investors of the other Contracting Party, as well as to activities connected with such investments, a regime no less favorable than the regime granted to its own investors or investors of any third State, precluding the use of discriminatory measures, which could interfere with the management and disposal of investments.

251.    A suggestion was made by the Respondent at the hearing that this third translation constituted an expert report by an expert translator that the Claimant had chosen not to call for cross examination. [204] For its part, the Claimant indicated that it had not understood this exhibit to amount to an expert report. [205] The Tribunal shared the Claimant's understanding, and notes that, not only was the translator not presented as an expert available for examination until the hearing, but the description by the translator of the assignment that he was set by counsel for the Respondent is not consistent with his performing the role of an expert witness. He has not described his exercise as being that of an expert witness, nor does his document contain the usual and necessary affirmations consistent with it amounting to independent expert evidence. The Tribunal, therefore, does not treat it as an independent expert report.

252.    Nevertheless, the Tribunal notes that the Claimant did not dispute this last certified translation of Article 3(1) before the hearing. Furthermore, it did not contest its accuracy during the hearing, [206] and acknowledged that in one aspect at least (its omission of the conjunction "and" linking the first part of the Article with the final part of the Article) it was indeed more consistent with the Russian and Ukrainian original texts than the translation that the Claimant had submitted. For these reasons, and although it has had regard to all the translations of Article 3(1) that have been placed on the record by the Parties, the Tribunal has had regard in particular to the English translation of Article 3(1) of the Treaty that appears as Exhibit RL-161, as being an uncontested and accurate English translation of the Treaty.

253.    In approaching the interpretation of Article 3(1) of the Treaty, the Tribunal notes that MFN clauses are not boilerplate provisions. They are often specifically negotiated and, as a result, they take many different forms. In the words of a leading commentary on *The Law of Treaties*, "although it is customary to speak of *the* most favoured-nation clause, there are many forms of the clause, so that any attempt to generalise upon the meaning and effect of such clauses must be made, and accepted, with caution." [207] Indeed other well-known commentators have gone further and noted that "even where the words used in two treaties are the same, they may not bear the same meaning" because the words used in the treaty must be "interpreted in their context and in the light of the object and purpose of the treaty" which "may vary to such an extent that even identically worded provisions take on different meanings". [208]

254.    The varying forms and meanings of different MFN clauses is reflected in the investment treaty case law. Thus, the different wording of the MFN clauses that appeared in the different treaties relevant to the cases of *White Industries v. India* and *Paushok v. Mongolia* led tribunals to interpret those MFN clauses quite differently. [209] In this Tribunal's view, that is unsurprising and, in the same way, this Tribunal is not tasked with determining a general meaning of MFN clauses.

Rather, its task is to interpret the particular meaning of the MFN clause that appears specifically in the Treaty at issue here, which - as both sides in this Arbitration acknowledge - was the subject of specific negotiation.

255.  In doing so, for a number of reasons, the Tribunal cannot adopt the interpretation contended for by the Claimant.

256.  To recall, it is the Claimant's case that the last phrase of Article 3(1), which it has labelled as the "Contested Phrase", constitutes a self-standing standard of protection that is additional to the MFN provision that appears earlier in the article.

257.  In particular, it divides, labels and explains Article 3(1) as follows in its Skeleton for the September hearing:
      Article 3(1) of the BIT provides that *"[the host state] shall, in respect of investments made by investors of the [home state] and of activities relating to such investments, ensure in its territory a regime that is no less favourable than the one provided to its own investors or investors of any third state, <u>and which excludes the application of measures of a discriminatory character that might prevent the management and disposal of investments</u>"* (the **"Contested Phrase").**

      Article 3(1) allows an investor to rely on standards of investment protection found in the host state's other investment treaties, such as the FET, FPS and umbrella protection. As follows from the VCLT's rules of treaty interpretation, the Contested Phrase operates as another standard of investment protection rather than as a restriction on the scope of the national treatment and MFN clause that precedes it.[210]

258.  The Tribunal considers this to be an unavailing interpretation of the ordinary meaning of the terms of Article 3(1) in two ways.

259.  First, it appears to require the Claimant to place emphasis on the existence of a conjunction "and" at the beginning of the "Contested Phrase" in order to contend that the latter operates as another and additional standard of investment protection that the host state's "regime" must comply with. However, as a matter of accurate translation of the provision, this is problematic for the Claimant because, as the translation that appeared last at Exhibit RL-161 indicates, and as the Claimant itself confirmed during the hearing,[211] such a conjunction does not appear in either of the Russian or Ukrainian original texts of the Treaty.

260.  Secondly, and regardless of whether the conjunction "and" appears or is necessary in the original texts of the Treaty, the Claimant's interpretation results in a redundancy in Article 3(1) that would make little sense. For the uncontested part of Article 3(1) manifestly comprises both an undertaking to provide a regime "no less favorable than the regime granted to its *own* investors or investors of *any third State"*. As such, that uncontested provision is an undertaking not to discriminate by providing both national treatment and MFN treatment. That being so, it makes little sense for the final, contested, phrase of the article additionally and separately to comprise a non-discrimination undertaking, because that would make the final phrase duplicative of the protection offered in the first phrase.

261.  It is therefore far more coherent to interpret the final phrase as related to, and qualifying of, the first phrase in the provision; i.e. particularising what type of discrimination would fall foul of the protection offered in the first phrase of the article. Understanding the article in this way also makes more sense of the dependent nature of the contested phrase (i.e. in using the present participle ("precluding") to specify and qualify the nondiscrimination standard that is being

established by the first phrase]. It is also more consistent with the title of Article 3, which announces that it comprises only "National Regime and Most Favoured Nation Treatment".

262.  In response to this more natural reading of Article 3(1), the Claimant further argues that the "Contested Phrase" could not reasonably be understood as a qualification and limitation on the earlier part of the article because the qualifications on protection in the article are set out separately in Article 3(3).

263.  To recall, Article 3(3) of the Treaty provides as follows:
The most favoured nation treatment provided in accordance with point 1 of this Article shall not extend to privileges granted or to be granted by a Contracting Party:

a) in connection with involvement in a free-trade zone or in a customs or economic union, a monetary union, or an international agreement providing for similar associations, or in other forms of regional cooperation in which any Contracting Party is or may become a participant;

b) by virtue of an agreement on the avoidance of double taxation or other agreements on matters of taxation. [212]

264.  In this way, Article 3(3) limits the protection offered in Article 3(1) in two particular ways. But such limitation does not tell us anything about the better way of interpreting Article 3(1) itself, which determines the general scope of the protection in Article 3. Put another way, either of the Parties' interpretations of Article 3(1) could be consistent with the terms of Article 3(3), and so it does not assist us in choosing between them. Very simply, Article 3(3) does not alter the Tribunal's view of the better way of interpreting Article 3(1).

265.  The Tribunal's view as to the narrower scope of protection set out in Article 3(1) is confirmed by consideration of the *travaux préparatoires* and the drafting history of the Article. Both Parties have acknowledged the drafting history of the Article, and that it appeared in the following form in an earlier draft:
**Article 3**

**Regime of investments**

1. Each Contracting Party will provide on its respective territory a regime for the investments made by investors of the other Contracting Party, and also with respect to the activity involved in making such investments which regime shall be fair and equitable, precluding the use of discriminatory measures, which could interfere with the management and disposal of those investments.

2. The regime, referred to in Item 1 of this Article, will be no less favourable than one granted in connection with investments and investment activities of its own investors and investors of any third state.

[...] [213]

266.  Thus, the earlier draft of Article 3: (i) featured a broader title, which was not focused specifically on National and MFN treatment; (ii) included an express reference to the FET standard; and (iii) tied MFN treatment specifically to the FET protection included in the draft article itself.

267.  The paradox of the Claimant's interpretation of the final terms of Article 3 is that, even though the contracting States removed the express reference to FET, according to the Claimant they intended nevertheless to retain such a protection by making a general reference to MFN treatment. Indeed, if the Claimant's interpretation of the meaning of Article 3 were accepted, it would import FET and

other treaty protection standards in an unlimited manner which would make the protection broader than the earlier draft, even though that earlier draft contained express reference to FET. The Tribunal does not consider such an interpretation to be persuasive in circumstances in which express reference to FET protection was removed by the contracting States.

268.    Finally, the Tribunal notes that, according to the Claimant, another tribunal hearing claims under the Treaty may have reached a differing view on the scope of protection offered by Article 3 in the case of *Naftogaz v Russia*. While a brief report of that decision has been published (and is relied on by the Claimant),[214] the Tribunal is unwilling to alter its own view as to the better interpretation of the Treaty on the basis of a non-binding decision of another tribunal that it has not had the opportunity to see itself.

269.    For all these reasons, the Tribunal accepts the Respondent's interpretation of Article 3(1). It finds that the Article does not import other standards of protection, such as FET. Rather, it amounts to a non-discrimination standard that only and specifically precludes the application of measures of a discriminatory character that could interfere with the management and disposal of the investment in question.

# VII. DISPOSITION

270.    Taking into account the above considerations, the Tribunal decides as follows in respect of the Respondent's preliminary objections:

(i) the Respondent's first preliminary objection that the Tribunal has no jurisdiction *ratione personae* is **dismissed;**

(ii) the Respondent's second preliminary objection that the pre-conditions for access to arbitration in Article 9 of the Treaty have not been met is **dismissed;** and

(iii) the Respondent's third preliminary objection that Article 3(1) of the Treaty cannot import other standards of protection, such as the FET, FPS and 'umbrella' clause standards, is **upheld.**

271.    All costs and expenses of the Parties and the Tribunal incurred in connection with this stage of the proceedings are reserved for subsequent determination.

# The Search Engine for
# International Law & Arbitration

(https://twitter.com/JusMundi_com)        (https://www.linkedin.com/company/27021413/)        (https://www.facebook.com/JusMundicom/)

›   CHAT WITH US

# Product

Pricing (/en/pricing)

Request a Demo (https://jusmundi.typeform.com/to/Z9USXq)

Search Engine (/en/search)

Wiki Notes (/en/wiki)

Jus Connect (/en/directory/arbitrators/all)

States Profiles (/en/d/profile/state)

Firms Profiles (/en/d/profile/firm)

Arbitral Institutions Profiles (/en/d/profile/institution)

Conflict Checker (/en/conflict-checker)

# Resources

Blog (https://blog.jusmundi.com/)

ICC x Jus Mundi Partnership (/en/partnership/icc)

IBA x Jus Mundi Partnership (/en/partnership/iba)

ICDR x Jus Mundi Partnership (/en/partnership/icdr)

RAC x Jus Mundi Partnership (/en/partnership/rac/awards)

In-House Counsel (/en/in-house-counsel)

Help Center (https://help.jusmundi.com/en/)

Tutorials (https://tutorial.jusmundi.com/)

Reports (https://reports.jusmundi.com/)

# Coverage

Investment Arbitration (/en/coverage/investment-arbitration)

Commercial Arbitration (/en/coverage/commercial-arbitration)

PIL & Law of the Sea (/en/coverage/public-international-law-and-law-of-the-sea)

International Trade Law (/en/coverage/international-trade-law)

# Company

About Us (/en/about)

We are hiring! ❤️ (https://www.welcometothejungle.com/en/companies/jus-mundi)

Newsletter (https://hnfq5lps.sibpages.com)

Terms of Use (/en/terms-of-use)

Cookies

Privacy Charter (/en/privacy-charter)

JUS MUNDI HAS BEEN FEATURED IN:

(https://www.forbes.com/sites/louiscolumbus/2020/04/26/top-25-machine-learning-startups-to-watch-in-2020/?sh=2a45df041f52)

(https://www.law.com/newyorklawjournal/2020/11/20/the-increasing-use-of-data-analytics-in-international-arbitration/)

(https://www.maddyness.com/2020/04/03/mad-177-millions-mars-2020/)

# Stockholm Arbitration Court bars Ukraine from selling shares of VEB subsidiary

Published Aug. 28, 2019 at 5:42 pm



The Arbitration Institute of the Stockholm Chamber of Commerce, which has been hearing an investment dispute between Russia's VEB and Ukraine regarding the expropriation of VEB subsidiary Prominvestbank (PIB), has banned Ukraine from selling shares in PIB and has ordered it to compensate VEB for any arbitration costs, the Russian state corporation said.

"Following a series of special hearings and pleading, the English legal counsel issued a verdict that backed the legal position developed by the VEB

legal team and by Monastyrsky, Zyuba, Stepanov, and Partners, granted all of VEB's claims, prohibited Ukraine from selling shares in PIB and ordered Ukraine to reimburse all arbitration costs borne by VEB," a VEB representative told reporters.

# Stockholm court bans Ukraine from selling Prominvestbank shares

MOSCOW (Reuters) - An arbitration court in Stockholm has banned authorities in Kiev from selling shares in Prominvestbank, the Ukrainian subsidiary of Russia's VEB state development bank, a spokesman for VEB said on Wednesday.

Reporting by Darya Korsunskay; writing by Tom Balmforth; editing by Hugh Lawson

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Case category No **824/178/19:** Civil cases (after 01.01.2019); Special procedure cases; **Cases on recognition and enforcement of international commercial arbitral awards, of which:**

Sent by the court: **not specified.** Registered: **24.01.2021.** Published: **25.01.2021.**
Date of entry into force: **14.01.2021**
Proceeding number: **61-15459av20**

---

[Coat of Arms] Supreme Court

**Judgment**

**in the name of Ukraine**

14 January 2021,

Kyiv

case No 824/178/19

proceeding No 61-15459av20

**The Supreme Court, comprised of the judicial panel of the
First Judicial Chamber of the Civil Court of Cassation:**

V.V. Shypovych (judge-rapporteur), E.V. Synelnykov, S.F. Khopta;

with the attendance of Kh.I. Klimkovska, court secretary

**parties**:

**appellant (claimant in the arbitration proceedings) -** VEB.RF State Development Corporation,

**representative of VEB.RF State Development Corporation -** Oleksandr Mykhailovych Denysenko,

**respondent in the arbitration proceedings -** the State of Ukraine, represented by the Ministry of Justice of Ukraine,

**Representative of the State of Ukraine in the person of the**

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



**Ministry of Justice of Ukraine, -** Inna Oleksandrivna Vasina,

having considered at a public hearing the appeal of VEB.RF State
Development Corporation represented by Oleksandr Mykhailovych
Denysenko, attorney, against the judgment of the Kyiv Court of Appeal of 7
September 2020, issued by judge S.V. Kulikova in the matter of an
application of VEB.RF State Development Corporation for the recognition
and enforcement of the award of the Emergency Arbitrator of the
Arbitration Institute of the Stockholm Chamber of Commerce dated 28
August 2019 in case No 2019/113 concerning the claim of VEB.RF State
Development Corporation against the State of Ukraine (in the person of the
Ministry of Justice of Ukraine) ordering interim measures,

**FINDS AS FOLLOWS:**

**Summary of the application for the recognition and enforcement
of the international commercial arbitral award**

[1]   In September 2019, VEB.RF State Development Corporation (hereinafter -
"VEB.RF"), represented by Oleksandr Mykhailovych Denysenko, attorney,
brought an application before the Kyiv Court of Appeal for the recognition and
enforcement of an international commercial arbitral award.

[2]   VEB.RF's application is based on the fact that, on 27 November 1998, the
Cabinet of Ministers of Ukraine (hereinafter: CMU) and the Government of
the Russian Federation (hereinafter: RF) signed the Agreement on the
encouragement and mutual protection of investments that was ratified by Law
of Ukraine No 1302-XII of 15 December 1999 (hereinafter - "the BIT").

[3]   In accordance with Article 9 of the BIT, in case of any dispute between either
Contracting Party and an investor of the other Contracting Party that may arise
in connection with investments, including disputes concerning the amount,
conditions of and procedure for the payment of compensation referred to in
Article 5 of this Agreement or the procedure for effecting a transfer of
payments referred to in Article 7 of this Agreement, shall be notified in writing
accompanied with detailed comments which the investor shall forward to the
Contracting Party involved in the dispute. The parties to the dispute shall
endeavour to settle such dispute by way of negotiations. If the dispute cannot
be resolved through negotiations within six months from the date of the written
notification referred to in paragraph 1 of this Article, such dispute shall
submitted to: a) a competent court or arbitral tribunal of the Contracting Party

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



on whose territory the investments were made; b) the Arbitration Institute of the Stockholm Chamber of Commerce, c) an *ad hoc* arbitral tribunal pursuant to the Arbitration Rules of the United Nations Commission for International Trade Law (UNCITRAL).

[4]     In the 28 August 2019 award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce, the State of Ukraine (in the person of the Chief Public Bailiff of the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine) was ordered to halt the forced sale of the shares of Prominvestbank Public Joint-Stock Company (hereinafter - "PJSC") registered in the name of VEB.RF, including in order to collect the debts owed by the Russian Federation under any arbitral or judicial decision, and to refrain from any equivalent actions with respect to the shares of Prominvestbank PJSC pending the decision by the Arbitral Tribunal in the final arbitral award as to whether such sale is contrary to international law. The State of Ukraine was ordered to pay VEB.RF an application fee of EUR 4,000; the Emergency Arbitrator's fee of EUR 16,000; and the applicant's reasonable costs of legal services in connection with this application, which shall be subject to assessment unless agreed.

[5]     Given that the debtor has failed to comply with this decision voluntarily, based on Articles 474-475, 479 of the Civil Procedure Code of Ukraine (hereinafter - the CPC of Ukraine), Articles 35, 81, and 82 of the Law of Ukraine On International Commercial Arbitration and Article 1-4 of the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (hereinafter - the New York Convention), the applicant requested the court to recognize and enforce the award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce dated 28 August 2019 in case No 2019/113 concerning the claim of VEB.RF State Development Corporation against the State of Ukraine (in the person of the Ministry of Justice of Ukraine) ordering interim measures, and to issue an enforcement order for the enforced execution thereof.

**Summary of the court decision under appeal**

[6]     By judgment of 7 September 2020, the Kyiv Court of Appeal rejected VEB.RF's request for the recognition and enforcement of the award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce of 28 August 2019 in case No 2019/113 concerning the claim of VEB.RF against the state of Ukraine (in the person of the Ministry of Justice of Ukraine) ordering interim measures.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[7]    The Kyiv Court of Appeal judgment is based on the reasoning that the
       Emergency Arbitrator award deals with a dispute that did not fall under the
       arbitration agreement (lack of jurisdiction of the emergency arbitrator), given
       that the procedure for appointing an emergency arbitrator of the Arbitration
       Institute of the Stockholm Chamber of Commerce was first provided in the
       2010 version of the Arbitration Rules, to the application of which the State of
       Ukraine did not consent.

[8]    The court also considered that the State of Ukraine (against which the decision
       was made) was, for good reasons, unable to provide its comments, given that,
       of the five-day period that the State had available to prepare its legal position,
       three fell on non-working days in Ukraine, which deprived the respondent of
       the opportunity to provide its detailed position in the case for reasons that were
       outside its control and that it could not eliminate.

[9]    Furthermore, when considering the application for the recognition and
       enforcement of the Emergency Arbitrator award, the court established that the
       recognition and enforcement of this decision would be contrary to the public
       order of Ukraine, including the provisions of Article 129 of the Constitution of
       Ukraine on the binding force of judicial decisions, insofar as the recognition
       and enforcement of the Emergency Arbitrator award would jeopardize the rule
       of law and legal certainty by preventing the State from executing the award of
       the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018
       in PCA case No 2015-36 concerning the claim of Everest Estate LLC and
       others against the Russian Federation.

**Summary of the grounds of the cassation appeal**

[10]   In the appeal brought before the Supreme Court in October 2020, attorney
       O.M. Denysenko, acting on behalf of VEB.RF, requested the Court to quash
       the 7 September 2020 Kyiv Court of Appeal judgment and to render a new
       judgment granting VEB.RF's application.

**Cassation appeal proceedings in the Supreme Court**

[11]   By order of 27 October 2020, the Supreme Court initiated an appeal
       proceeding in case No 824/178/19 concerning the appeal of VEB.RF against
       the 7 September 2020 Kyiv Court of Appeal judgment.

[12]   By order of the Supreme Court of 20 November 2020, the case was assigned

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



for a public hearing with notice to the parties.

**The parties' arguments**

**The arguments of the appellant**

[13]    In support of its appeal, VEB.RF argues that Article 9 of the BIT contained no directions as to the particular version of the Arbitration Rules to be applied, whereas the Rules of the Arbitration Institute at the Stockholm Chamber of Commerce (Arbitration Rules 2017) provide that unless otherwise agreed by the parties in any arbitration agreement referring to the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce, the parties shall be deemed to have agreed to the application of those rules, or such amended rules as may be in force on the date of the filing of the application for the appointment of an Emergency Arbitrator. At the same time, the State of Ukraine did not expressly exclude the applicability to Ukraine of the rules for the appointment of emergency arbitrators pursuant to the Arbitration Rules currently in force. Furthermore, in its answer to the request for arbitration, the State of Ukraine refers to the current version of the Arbitration Rules without any reservations as to the applicability of some of their provisions.

[14]    The appellant further asserts that the State of Ukraine has duly exercised its right to provide comments by timely providing a detailed answer to VEB.RF's request for provisional measures in Case No 2019/113 on 11 pages, accompanied by factual and legal exhibits.

[15]    Furthermore, in considering the appeal in Case No 757/5777/15, the Supreme Court had not held that the Emergency Arbitrator award was issued in a dispute that was outside the scope of the arbitration agreement as a result of the application of the rules in force at the time the dispute arose, while the circumstance that, in that case, the Emergency Arbitrator granted the State of Ukraine three days to state its position, of which two fell on the weekend, had not been treated as a ground to refuse the recognition of the Emergency Arbitrator award.

[16]    He further argues that the Kyiv Court of Appeal was wrong to conclude that the Emergency Arbitrator award jeopardized the rule of law and legal certainty by preventing the State from executing another arbitral award, given that such conclusion contradicts the text of the Emergency Arbitrator award, which merely orders Ukraine to halt the forced sale of Prominvestbank PJSC shares registered in the name of VEB.RF, not to halt execution actions in enforcement

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



proceedings.

He argues that the Emergency Arbitrator's decision to prohibit the forced sale of shares of Prominvestbank PJSC is temporary in nature and does not interfere with the execution of the 2 May 2018 award of the Arbitral Tribunal in PCA Case No 2015-36, given that that decision can be enforced against other assets of the Russian Federation.

[17]   He emphasizes that the unjustified refusal to recognize and enforce an international arbitral award would constitute a breach by Ukraine of international law, violate Article 1(1) of Protocol No 1 to the <u>Convention for the Protection of Human Rights and Fundamental Freedoms</u>, and interfere with the property rights in the Prominvestbank PJSC shares.

**The arguments of the appellee**

[18]   In her response to the appeal filed in November 2020, the authorized representative of the Ministry of Justice of Ukraine N.V. Hryshyna objects to the appeal and asks the court to uphold the 7 September 2020 judgment of the Kyiv Court of Appeal.

[19]   In her view, the Emergency Arbitrator lacked jurisdiction to decide against the State of Ukraine, since, by ratifying the BIT in 1999, Ukraine agreed to settle disputes with Russian investors under the Arbitration Rules of the Stockholm Arbitration Institute in force at the time when the BIT was concluded (the 1999 Arbitration Rules). Ukraine did not, however, agree to the application of the 2017 version of the Arbitration Rules in disputes to which it may be party. Ukraine had no reason to believe, in 1999, that the Arbitration Rules may be amended in such a way as to introduce the institution of emergency arbitrator and as well as provisions under which the new version of the Rules would apply automatically.

[20]   She points out that the appellant did not refute the court's finding that the State of Ukraine had been deprived of the opportunity to state its position in detail for reasons outside its control which it was unable to eliminate, namely that part of the time-limit for providing comments fell on 24, 25 and 26 August 2019, which were non-working days and public holidays in Ukraine.

[21]   She agrees with the conclusion of the Kyiv Court of Appeal that the recognition and enforcement of the Emergency Arbitrator award conflicts with

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



the public order of Ukraine and entails consequences that are incompatible with the law of Ukraine, which constitutes a clear ground to reject VEB.RF's application.

**The facts of the case established by the court**

[22]  On 27 November 1998, the Cabinet of Ministers of Ukraine and the Government of the Russian Federation signed the Agreement on encouragement and mutual protection of investments, which was ratified by <u>Law of Ukraine No 1302-XIV of 15 December 1999</u>.

[23]  On 21 August 2019, VEB.RF brought an application to the Arbitration Institute of the Stockholm Chamber of Commerce for the appointment of an Emergency Arbitrator and a request for provisional measures before the submission of the dispute to an Arbitral Tribunal.

[24]  The 28 August 2019 award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce ordered the State of Ukraine (in the person of the Chief Public Bailiff of the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine) to halt the forced sale of the shares of Prominvestbank PJSC registered in the name of VEB.RF, including in order to collect the debt owed by the Russian Federation under any arbitral or judicial decision, and to refrain from any equivalent actions with respect to the Prominvestbank PJSC shares pending the decision by the Arbitral Tribunal in the final arbitral award as to whether such sale is contrary to international law. The State of Ukraine was ordered to pay VEB.RF an application fee of EUR 4,000; the Emergency Arbitrator's fee of EUR 16,000; and the applicant's reasonable costs of legal services in connection with this application, which shall be subject to assessment unless agreed.

[25]  The State of Ukraine failed to voluntarily comply with this Emergency Arbitrator award.

**Comments of the parties' representatives**

[26]  At the hearing, O.M. Denysenko, attorney acting on behalf of VEB.RF, maintained the arguments of the cassation appeal in full and demanded that the appeal be allowed.

[27]  The representatives of the State of Ukraine (in the person of the Ministry of

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Justice of Ukraine) N.V. Hryshyna (at the hearing of December 10, 2020) and
I.O. Vasina (at the hearing of 14 January 2021) asked the court to reject
VEB.RF's cassation appeal on the grounds stated in the response to the
cassation appeal.

[28]   In the written comments submitted in December 2020, I.O. Vasina, in her
capacity as representative of the State of Ukraine (in the person of the Ministry of
Justice of Ukraine) additionally stated that, on 4 March 2020, as part of an auction
sale of securities on the securities market, 5,080,310,373 ordinary
Prominvestbank PJSC shares were sold on the stock exchange and the relevant
exchange contract was concluded on 6 March 2020. On 11 March 2020, the
deposit account of the Section for the Execution of Decisions of the State
Enforcement Service Department of the Ministry of Justice of Ukraine
(hereinafter - the Department) received the proceeds of the share sales. On 12
March 2020, the state bailiff of the Department drew up the distribution accounts
for the amounts collected from the debtor in proportion to the amounts due to
each debtor. On 13 March 2020, in connection with the payment for the purchased
assets (securities), a resolution was issued to lift the attachments of the debtor's
property; paragraph 2 of the resolution required the depository institution to
transfer the securities to the buyer's account. However, the procedure of
transferring the sold shares to the buyer is, at present, not yet completed due to the
10 March 2020 judgment of the Kyiv Commercial Court in case No 910/3480/20
adopted in proceedings concerning an application for security, as well as the 27
May 2020 judgment of the Pechersky District Court of the City of Kyiv in case
No 757/21587/20 concerning attachment of property and a prohibition to
undertake certain actions.

**The Supreme Court's Position**

[29]   Articles 24(2) and 351(2) of the Civil Procedure Code of Ukraine provide that the
Supreme Court shall apply the appellate procedure when reviewing decisions of
courts of appeal issued in the capacity of first instance courts.

[30]   After hearing the report of the judge-rapporteur and the comments of the parties'
representatives at the hearing, clarifying the circumstances of the case and
verifying them against the available evidence, the court concludes that the
cassation appeal must be partially allowed, and the 7 September 2020 Kyiv Court
of Appeal judgment must be amended.

**The Supreme Court's reasoning and the applicable law**

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[31]    Pursuant to <u>Article 368(3) of the Civil Procedure Code of Ukraine</u>, the matter shall be heard by the appellate instance court applying the simplified claim procedure with the modalities laid down in this chapter. The appellate instance court shall consider matters in a court hearing with notice to the parties, with the exceptions provided in <u>Article 369 of this Code</u>.

[32]    Pursuant to <u>Article 367(1) of the Civil Procedure Code of Ukraine,</u> the appellate court shall review the case on the basis of existing as well as additional evidence, and shall verify the legality and the reasoning of the first instance decision within the scope of the arguments and claims of the appeal.

[33]    According to <u>Article 263(1)-(2) and (5) of the Civil Procedure Code of Ukraine</u>, a court decision must be lawful and reasoned, and must comply with the principle of the rule of law. A decision is lawful if it is adopted by the court in accordance with the rules of substantive law and in compliance with the rules of procedural law. A decision is reasoned if it is adopted on the basis of a complete and comprehensive examination of the facts invoked by the parties as the basis of their claims and defences and confirmed by the evidence examined at the hearing.

[34]    According to Article V of the New York Convention:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



arbitration may be recognized and enforced; or

d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made; or [*sic*]

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

a) The subject matter of the difference is not capable of settlement by arbitration under the <u>law</u> of that country; or

b) The recognition or enforcement of the award would be contrary to the public policy of that country.

[35]   In accordance with <u>Article 478 of the Civil Procedure Code of Ukraine,</u> the court shall refuse to recognize and enforce an international arbitral award if:

1) at the request of the party against whom the award is issued, if [*sic*] that party furnishes to the court proof that: a) one of the parties to the arbitration agreement was under some incapacity; or such agreement is not valid under the law to which the parties have subjected it or, absent an indication of such law, under the law of the country where the award was made; or b) the party against whom the award was made was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or for other valid reasons was unable to present its position; or c) the award deals with a dispute not contemplated by the arbitration agreement or a dispute not falling within its terms, or contains decisions on matters outside the scope of the arbitration agreement; provided that, if the decisions on matters covered by the arbitration agreement can be separated from those not covered by the agreement, that part of the award which contains decisions on matters covered by the arbitration agreement may be recognized and enforced; or d) the composition of the international commercial arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties, or, absent such agreement, was not in accordance with the law of the country where the arbitration took place; or e) the award has not yet become binding on the parties, or has been set aside, or its execution has been suspended by a court of the country in which, or under the law of which, that

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



award was made; or 2) if the court finds that: a) the law provides that the dispute may not be referred to international commercial arbitration in view of its subject matter; or b) the recognition and enforcement of such award would be contrary to the public order of Ukraine.

[36]   In its judgment of 17 April 2019 in case No 761/41709/17, the Supreme Court stated that, in deciding on the recognition and enforcement of an international commercial arbitration award, the court may not assess the correctness of the award on the merits or make any changes to its content, but merely verifies compliance with the application deadlines, compliance with the procedural requirements as to form and content of the application, and the existence of circumstances that may constitute grounds to reject the application.

*Whether the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award complies with Ukraine's public order*

[37]   <u>Article 478 of the Civil Procedure Code of Ukraine</u> does not contain a definition of the term "public order".

[38]   According to the explanations set out in paragraph 12 of <u>Resolution No 12 of 24 December 1999 of the Plenum of the Supreme Court of Ukraine on the Judicial Practice with Respect to Applications for Recognition and Enforcement of Foreign Arbitral and Judicial Decisions and annulment of decisions rendered by Way of International Commercial Arbitration in the Territory of Ukraine</u>, public order means the legal order of a State, and the defining principles and foundations which form the basis of the system that exists in the State (concerning its independence, integrity, sovereignty and inviolability, basic constitutional rights, freedoms, guarantees, etc.).

[39]   In its judgment of 23 July 2018 in case No 796/3/2018, the Supreme Court held that public order must be understood as the legal order of the State, and the defining principles and foundations which form the basis of the system that exists in it (concerning its independence, integrity, sovereignty and inviolability, basic constitutional rights, freedoms, guarantees, etc.). The international public order of any country includes the fundamental principles and foundations of justice and morals that the State wishes to protect even in cases that do not directly implicate the State itself; rules that secure the fundamental political, social and economic interests of the State (rules of public order); the duty of the State to comply with its obligations towards other States and international organizations. These are the unchanging principles that express the stability of the international system, including State sovereignty, non-interference in States' internal affairs, territorial

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



integrity, and so on.

[40] The legal notion of public order thus exists to protect the State from foreign arbitral awards that violate the fundamental principles of fairness and justice that are in force in the State. Such provisions are designed to establish a legal barrier to decisions that are made contrary to the fundamental procedural and substantive principles on which public and State order is based.

[41] In its judgment of 5 July 2018 in case No 761/46285/16, the Supreme Court held that the object of the public order reservation are international private law relations, while its subject-matter is the non-application of the foreign law chosen to regulate private law relations with a foreign element where the application of such law would conflict with the State's public order. In this case, the public order reservation will regulate an independent sphere of public relations, which does not depend on the sphere of inter-State relations.

[42] In view of the above, a reference to a breach of public order may only be made in cases where the execution of a foreign arbitral award is incompatible with the foundations of the State's legal order.

[43] Under Article 129(1)(9) of the Constitution of Ukraine, the basic principles of justice in Ukraine include the binding force of judicial decisions.

[44] A court decision is the highest act of justice, and, as such, must be enforced, given that the enforcement of a court decision, which constitutes the final stage of judicial proceedings, forms an integral part of the right to a fair trial secured, *inter alia*, by Article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms.

[45] When the Kyiv Court of Appeal found that allowing the application of VEB.RF for the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award would *de facto* preclude the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36 concerning the claim of Everest Estate LLC and others against the Russian Federation, which had been enforced by the 25 September 2018 judgment of the Kyiv Court of Appeal in case No 796/165/2018 (upheld by the 25 January 2019 judgment of the Supreme Court), it arrived at a reasonable conclusion that the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award was contrary to the public order of Ukraine.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[46]   The court also notes that the applicant had brought applications for security in Ukrainian national courts requesting measures similar to those ordered in the Emergency Arbitrator award of 28 August 2019. In particular, in case No 757/36346/19-ts the applicant requested a suspension of the sale of shares of Prominvestbank PJSC, a prohibition for the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine to perform any sale of those shares and a prohibition for the PFTS Stock Exchange to carry out any actions related to the preparation and conduct of an auction sale of those shares.

[47]   However, by judgment of 27 August 2019 in case No 757/36346/19-ts (upheld by the Supreme Court on 6 November 2019), the Kyiv Court of Appeal rejected this application for security, stating, *inter alia*, that it would be unacceptable to halt the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36, which had been enforced by the judgment of the Kyiv Court of Appeal of 25 September 2018 (upheld by the judgment of the Supreme Court of 25 January 2019), given that such actions would conflict with the principle of the binding nature of judicial decisions that have entered into legal force.

[48]   It follows that the court has reached a correct conclusion that there were grounds to reject VEB.RF's application for the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award under Article V(2)(b) of the New York Convention and Article 478(1)(2)(b) of the Civil Procedure Code

[49]   The court rejects as unfounded the appellant's arguments that this conclusion of the court of appeal contradicts the text of the Emergency Arbitrator award itself, given that it merely ordered the State of Ukraine to halt the forced sale of the Prominvestbank PJSC shares registered in the name of VEB.RF State Development Corporation rather than to halt the acts of execution in any enforcement proceedings.

[50]   According to the 28 August 2019 Emergency Arbitrator award, the obligation to halt the sale of Prominvestbank PJSC shares is imposed on the State of Ukraine in the person of the Chief Public Bailiff of the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine, that is, the same person who is charged with executing in enforcement proceedings the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36.

[51]   The arguments that these measures are temporary do not change the fact that the

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



recognition and enforcement of the 28 August 2019 Emergency Arbitrator award will *de facto* entail the termination of the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 which had been enforced by the judgment of the Kyiv Court of Appeal of 25 September 2018 (upheld by the judgment of the Supreme Court of 25 January 2019).

*The emergency arbitrator's jurisdiction*

[52]   On 27 November 1998, the Cabinet of Ministers of Ukraine and the Government of the Russian Federation signed the Agreement on encouragement and mutual protection of investments, which was ratified by Law of Ukraine No 1302-XIV of 15 December 1999.

[53]   In accordance with Article 9 of the BIT, in case of any dispute between either Contracting Party and an investor of the other Contracting Party that may arise in connection with investments, including disputes concerning the amount, conditions of and procedure for payment of compensation referred to in Article 5 of this Agreement or the procedure for effecting a transfer of payments referred to in Article 7 of this Agreement, shall be notified in writing accompanied with detailed comments which the investor shall forward to the Contracting Party involved in the dispute. The parties to the dispute shall endeavour to settle such dispute by way of negotiations. If the dispute cannot be resolved through negotiations within six months from the date of the written notification referred to in paragraph 1 of this Article, the dispute shall be submitted, *inter alia*, to the Arbitration Institute of the Stockholm Chamber of Commerce.

[54]   The State of Ukraine, in the person of the Ministry of Justice of Ukraine, objected to VEB.RF's application, noting, in particular, that the Emergency Arbitrator award deals with a dispute that is outside the scope of the arbitration agreement (lack of jurisdiction of the emergency arbitrator), arguing for the applicability of the 1999 version of the Arbitration Rules, which does not provide for the emergency arbitrator procedure.

[55]   In refusing to recognize and enforce the 28 August 2019 Emergency Arbitrator award, the court of appeal agreed with the respondent's arguments, pointing out, in particular, that the BIT did not provide for the procedure of appointing an Emergency Arbitrator, which was first introduced by the 2010 version of the Arbitration Rules, to the application of which the State of Ukraine did not consent.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[56]   However, the Court of Appeal failed to take into account that the BIT and/or Law of Ukraine No 1302-XIV of 15 December 1999 that ratified it contained no reservations as to the applicability of a certain version of the Arbitration Rules of the Stockholm Chamber of Commerce, including the version in force at the time of the signing or ratification of the BIT.

[57]   In view of the above, the court considers that there are no grounds under Article V(1)(c) of the New York Convention and Article 478(1)(1)(c) of the Civil Procedure Code of Ukraine to refuse to recognize and enforce the 28 August 2019 Emergency Arbitrator award, and the conclusion of the Kyiv Court of Appeal to the effect that the Emergency Arbitrator award dealt with a dispute that did not fall under the arbitration agreement is erroneous.

*Compliance with the Emergency Arbitrator procedure*

[58]   In considering VEB.RF's application, the Kyiv Court of Appeal also saw a violation of the dispute resolution procedure, given that the State of Ukraine did not have enough time to provide its detailed position in the case for reasons that were outside its control and that it could not eliminate.

[59]   Article 8(1) of Appendix II to the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce provides that any emergency decision on interim measures shall be made no later than 5 days from the date the application was referred to the Emergency Arbitrator.

[60]   It follows from the 28 August 2019 Emergency Arbitrator award that the claimant made the application for an Emergency Arbitrator appointment on 21 August 2019. On the same day, the Secretariat of the Stockholm Chamber of Commerce confirmed in writing to the applicant the receipt of the application and the payment of the costs of the emergency proceedings. The Secretariat of the Stockholm Chamber of Commerce notified the Respondent of the application. The parties were informed that the Board of the Stockholm Chamber of Commerce will seek to appoint an emergency arbitrator within 24 hours.

[61]   By letter dated 22 August 2019, the Board of the Stockholm Chamber of Commerce appointed Mr. Joe Tirado as an emergency arbitrator in the said proceedings.

[62]   The court agrees that, in accordance with due legal process, the State of Ukraine is entitled to provide its comments as to the issue brought for decision before the

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Emergency Arbitrator and points out that the respondent in the arbitration dispute has duly exercised this right by providing the Emergency Arbitrator with written comments on VEB.RF's application.

In addition, the Emergency Arbitrator award shows that the deadline for the State of Ukraine's response to the VEB.RF's application was extended at the State's request, which indicates that the Emergency Arbitrator has complied with the emergency procedure.

[63]    In view of the above, the court considers that there are no grounds under Article V(1)(b) of the New York Convention and Article 478(1)(1)(b) of the Civil Procedure Code of Ukraine to refuse to recognize and enforce the the of 28 August 2019 Emergency Arbitrator award, and the conclusion of the Kyiv Court of Appeal that the State of Ukraine was deprived of the opportunity to provide its detailed position in the case is erroneous.

**The Supreme Court's conclusions on the appeal**

[64]    Article 376(1)-(2) and (4) of the Civil Procedure Code of Ukraine provides the following grounds for quashing a court decision in whole or in part and adopting a new decision in the relevant part, or amending a court decision: 1) incomplete determination of the relevant facts; 2) lack of proof of the relevant facts treated by the first instance court as established; 3) inconsistency between the conclusions set out in the first instance court's decision and the facts of the case; 4) violation of procedural law or incorrect application of substantive law.

[65]    Incorrect application of substantive law encompasses the misinterpretation of the law, the application of inapplicable law, or the failure to apply the applicable law.

[66]    A court decision may be amended by way of supplementation, or by amending the reasoning and/or the dispositif.

[67]    The court found that, in its 7 September 2020 judgment, the Kyiv Court of Appeal had arrived at a substantively correct conclusion rejecting VEB.RF's application, and that there is therefore no basis to quash the challenged court decision and to adopt a new decision recognizing and enforcing the 28 August 2019 Emergency Arbitrator award.

[68]    However, at the same time, in providing the reasoning for its judgment, the court of first instance has, in addition to the grounds under Article V(2)(b) of the New

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



York Convention and <u>Article 478(1)(2)(b) of the Civil Procedure Code of Ukraine</u> for a refusal to recognize and enforce the 28 August 2019 Emergency Arbitrator award – which the Supreme Court accepts – also erroneously based its 7 September 2020 judgment on the lack of jurisdiction of the Emergency Arbitrator and the lack of opportunity on the part of the State of Ukraine to provide its comments.

[69]    The Supreme Court considers that the grounds provided in Article V(1)(b) and (c) of the New York Convention and <u>Article 478(1)(1)(b) and (c) of the Civil Procedure Code of Ukraine</u> for a refusal to recognize and enforce the Emergency Arbitrator award of 28 August 2019 are not met, and the contested decision of the Kyiv Court of Appeal of 7 September 2020 must therefore be amended as to its reasoning, taking into account the conclusions set out in this Supreme Court judgment.

[70]    The Supreme Court found no grounds to supplement or amend the dispositif of the 7 September 2020 Kyiv Court of Appeal judgment.

[71]    Based on Articles <u>24</u>, <u>351</u>, <u>367</u>, <u>368</u>, <u>374</u>, <u>376</u>, <u>381-384</u>, and <u>478 of the Civil Procedure Code of Ukraine</u>, the Supreme Court comprised of the judicial panel of the First Judicial Chamber of the Civil Court of Cassation

**RESOLVES AS FOLLOWS**

The appeal of VEB.RF State Development Corporation represented by attorney Oleksandr Mykhailovych Denysenko is partially allowed.

The Kyiv Court of Appeal judgment of 7 September 2020 shall be amended as to its reasoning, taking into account the conclusions set out in this Supreme Court judgment.

The judgment of the court of cassation shall enter into force from the moment it is issued; it shall be final and not subject to appeal.

**Judges: V.V. Shypovych E.V. Synelnykov S.F. Khopta**

# Confiscation Of Prominvestbank: An Oversight That May Cost Ukraine Dearly

On March 4, Justice Ministry officials sold 99.8% of Prominvestbank (PIB) shares on the PFTS, bypassing the decision of Stockholm arbitration and the standards of the National Bank of Ukraine (NBU). Russian shareholders represented by Vnesheconombank (VEB) have already announced that they intend to recover the entire market value of PIB from Ukraine. The regulator threatened to declare the bank insolvent and the bank's borrowers in restructuring process are not aware of who the new owner of the bank is. The asset is "suitcase without a handle" after the sale, because the new management's future policy will be to aggressively collect collateral and not engage in classic banking.

Moreover, in the long run, the confiscation of PIB will weaken the negotiating position of Privat Group in international courts to recover the almost $150 million remaining from the Russia. That's why it's better for the NBU and Justice Ministry to "play back" the move and return to the long-term and proven strategy for collecting penalties from Russia for assets it seized in Crimea.

**History of conflict.** On May 2, 2018, the arbitration court in The Hague ruled that Russia should indemnify a number of Privat companies in connection with the annexation of Crimea. Signed in 1998 and still in force, a bilateral agreement on the protection of investments created a "window" for recognizing Russia as the ultimate beneficiary of the assets of Ukrainian companies after the annexation of Crimea.

Confiscation Of Prominvestbank: An Oversight May May Cost Ukraine Dearly | Seeking Alpha                    1/25/23, 2:24 PM

Other large business groups, such as Naftogaz and Ukrnafta, filed similar claims with international arbitration courts to recover compensation from Russia for assets expropriated in Crimea. In particular, Oschadbank managed to achieve recognition not only of the principal amount of the debt of $598 million, but also of potential profit for 2014–2019. The total amount of the lawsuit won was $1.3 billion.

As for Privat Group, it was represented by a list of 18 companies (Everest Estate LLC, Dairis, Aerobud and others) and one individual — Oleksandr Dubilet. The total amount of compensation to the final beneficiaries — I. Kolomoisky, H. Boholiubov and O. Dubilet, approved by the decision of the Hague Arbitration at the UN, amounted to $160 million.

Further, on September 25, 2019, the Kyiv Court of Appeal, in accordance with the provisions of the New York Convention of 1959 on the recognition and enforcement of a foreign arbitral award, seized three Russian state-owned banks: Sberbank, VTB and PIB . At first glance, these banks are the direct property of Russia and can be recovered by the Justice Ministry in compensation for the Crimean assets of Privat Group.

However, a month earlier in August 2019, the Stockholm Chamber of Commerce Arbitration Institute banned Ukraine from selling the arrested shares of PIB. The decision could serve as the basis on several technical points as recognition of the full representation of the party against which the decision was made in court (and Russia usually ignores lawsuits in order to drag out time), such as jurisdiction compliance and others technical legal points.

The specified decision of August 2019 was appealed by Ukraine before the full composition of the tribunal of the Stockholm Chamber of Commerce. But the Arbitration Institute of the Stockholm Chamber of Commerce, by its

decision of February 28, 2020, dismissed Ukraine's complaint about the above decision and forbade Ukraine to sell shares of PIB.

Does the decision of the Stockholm arbitration, which prohibits Ukraine from selling PIB contradict the Hague ruling of May 2, 2018, which approved the recovery amount of $160 million? Of course not! Russia must return $160 million to Privat Group. Every day of "delay" costs about $10,000 in accumulating interest. However, the toolkit, in the form of the arrest of PIB shares, contravenes international law.

Imagine if the Naftogaz team, instead of continuing their lawsuit in Stockholm to recover the entire amount of its claim, simply confiscated Russian gas from storage facilities for $100-$150 million. That would be tantamount to a violation of the decision of the same Stockholm arbitration.

This is exactly what Privat Group did: On March 4, 2020 on the PFTS stock exchange, 99.7726% of PIB were sold for $11 million. I emphasize that the Justice Ministry was actually the initiator of trading in PIB shares. Unlike the case of Naftogaz, Privat Group does not care at all how legitimate such a penalty was. They received a perfectly legitimate $11 million from the Justice Ministry.

Russia's VEB will have to sue for the arrest and sale of PIB shares in international arbitration exclusively with Ukraine's Justice Ministry. This complies with the spirit of privatizing profits and nationalizing losses.

Unfortunately, the Justice Ministry will have to answer the following unpleasant questions:

- *Did the National Bank and the bank's management participate in its deliberate bankruptcy?*
- *Why was the bank sold for $11 million with a regulatory capital of $85*

*million?*

- *How is the Justice Ministry to prove this in the Stockholm arbitration?*
- *Is the value of the bank underestimated due to its actual arrest and pressure from various nationalist groups for the purpose of bankruptcy?*
- *How much was PIB really worth when it was put up for sale?*
- *Isn't this just an attempt to bring high-quality collateral through an administrative resource and earn 100% profitability on "quality work with distressed assets?*
- *Has the bank not specifically gone bankrupt with local management based on such a scenario?*

All these issues, in hundreds of millions of claims, can settled by the NBU and the Justice Ministry if they recognize that the sale of PIB shares was illegal, an act that perhaps will benefit no one, except Ukraine.



12 Oct, 2020

# Ukraine's competition watchdog approves sale of Prominvestbank to local banker

**IN THIS LIST**

**Ukraine's competition watchdog approves sale of Prominvestbank to local banker**

BLOG
**Banking Essentials Newsletter: January 11th Edition**

BLOG
**Banking Essentials Newsletter December 21st Edition**

BLOG
**The Road to Basel IV: Navigating the challenge facing European banks**

BLOG
Basel Framework- Utilizing data to analyze the capital position of European banks.



| Author | **Beata Fojcik** |
| Theme | **Banking** |

The Antimonopoly Committee of Ukraine allowed Cypriot company Luregio Ltd. to indirectly acquire PSC Prominvestbank by purchasing a majority stake in Fortify Financial Company LLC, Delo.ua reported Oct. 9.

Luregio is owned by Ukrainian businessman Serhii Tihipko, who also controls JSC Universal Bank and JSC Taskombank.

A 99.77% stake in Prominvestbank, owned by State Development Corp. VEB.RF, was sold in March for 268.7 million hryvnia to an undisclosed investor, with financial companies Fortify and VR Capital later named by local media outlets as potential buyers. VEB called the sale of Prominvestbank a violation of international law and pledged at the time to take legal steps to challenge the transaction.

*As of Oct. 9, US$1 was equivalent to 28.30 Ukrainian hryvnia.*



Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Case category No **824/178/19: not specified.**
Sent by the court: **not specified.** Registered: **15.09.2020.** Published: **15.09.2020.**
Date of entry into force: **07.09.2020**
Proceeding number: **not specified**

---

[COAT OF ARMS]

KYIV COURT OF APPEAL proceeding number No 2-vk/824/4/2020

unique case number

824/178/19

# D E C I S I O N

## I N   T H E   N A M E   O F   U K R A I N E

7 September 2020                                                                     Kyiv

Kyiv Court of Appeal

composed of: S.V.

Kulikova, presiding judge

(N.V. Osinchuk, Secretary)

having considered at a public session in Kyiv the application of Oleksandr Mykhailovych Denysenko, acting in the interests of VEB.RF State Development Corporation, for the recognition and enforcement of the award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce of 28 August 2019 in case No 2019/113 concerning the claim of VEB.RF State Development Corporation against the State of Ukraine (in the person of the Ministry of Justice of Ukraine) ordering interim measures,

## f i n d s   a s   f o l l o w s :

The 28 August 2019 award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce (Stockholm, Sweden) ordered the State of Ukraine (in the person of the Chief Public Bailiff of the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine) to halt the forced sale of shares of Prominvestbank PJSC, which are registered in the name of VEB.RF State Development Corporation, including in order to collect the debt of the Russian Federation under any arbitral or judicial decision, and to refrain from any equivalent actions with respect to the shares of Prominvestbank PJSC pending the Arbitral Tribunal's decision in its final arbitral award on whether such sale is contrary to international law.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



The State of Ukraine was ordered to pay VEB.RF State Development Corporation an application fee of EUR 4,000; the Emergency Arbitrator's fee of EUR 16,000; and the applicant's reasonable costs of legal services in connection with the application, which shall be subject to assessment unless agreed (Vol 1, pp 31-52).

Given that the debtor failed to voluntarily comply with this arbitral award, on 19 September 2019, the applicant applied to the Kyiv Court of Appeal for the recognition and enforcement of the award.

On 20 September 2019, the Kyiv Court of Appeal sent a copy of the application and annexes to the debtor's address and invited the Ministry of Justice of Ukraine to file its objections to the application within one month.

However, the debtor failed to submit any objections within the time limit fixed by the court.

By order of the judge of the Kyiv Court of Appeal of 30 October 2019, the application of VEB.RF State Development Corporation was appointed for hearing at the court's premises.

By order of 18 December 2019, the Kyiv Court of Appeal granted the request of the Ministry of Justice of Ukraine and stayed the proceedings in case No 824/178/19 on the application of Oleksandr Mykhailovych Denysenko (acting in the interests of VEB.RF State Development Corporation) for the recognition and enforcement of the 28 August 2019 award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce in case No 2019/113 concerning the claim of VEB.RF State Development Corporation against the State of Ukraine (in the person of the Ministry of Justice of Ukraine) ordering interim measures, pending consideration by the Arbitration Institute of the Chamber of Commerce of Stockholm (Sweden) of the application of the State of Ukraine (Respondent) for the annulment of the 28 August 2019 award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce in case No 2019/113.

By order of the Kyiv Court of Appeal of 6 March 2020, the stay of the proceedings was lifted due to the termination of the circumstances on which it was based.

At the hearing, the applicant's representative supported the application and requested that it be upheld.

The debtor's representative objected to the application.

After hearing the views of the hearing participants and examining the case record, the court concludes that the application must be refused for the following reasons.

The court has established that, on 27 November 1998, the Cabinet of Ministers of Ukraine and the Government of the Russian Federation signed the Agreement on encouragement and mutual protection of investments, which was ratified by Law of Ukraine No 1302-XIV On the ratification of the Agreement between the Cabinet of Ministers of Ukraine and the Government of the Russian Federation on encouragement and mutual protection of investments of 15 December 1999. Article 9 of the Agreement provides that, in case of any dispute between either Contracting Party and the investor of the other Contracting Party, which may arise in connection with investments, including disputes concerning the amount, conditions of and procedure for payment of compensation provided for in Article 5 of this Agreement, or the procedure for effecting a transfer of payments provided for in Article 7 of this Agreement, shall be notified in writing accompanied with detailed comments, which the investor shall

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



forward to the Contracting Party involved in the dispute. The parties to the dispute shall endeavour to settle such dispute by way of negotiations. If the dispute cannot be resolved through negotiations within six months from the date of the written notification referred to in paragraph 1 of this Article, the dispute shall be submitted, *inter alia*, to the Arbitration Institute of the Stockholm Chamber of Commerce.

On 14 September 2018, VEB.RF State Development Corporation sent a notice of dispute to Ukraine, in accordance with Article 9 of the Agreement.

On 21 August 2019, VEB.RF State Development Corporation applied to the Arbitration Institute of the Stockholm Chamber of Commerce for the appointment of an Emergency Arbitrator and a request for provisional measures before the submission of the dispute to an Arbitral Tribunal.

The 28 August 2019 decision of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce ordered the State of Ukraine (in the person of the Chief Public Bailiff of the execution section of the Department of the State Enforcement Service of the Ministry of Justice of Ukraine) to halt the forced sale of shares of Prominvestbank PJSC registered in the name of VEB.RF State Development Corporation, including in order to collect the debt of the Russian Federation under any arbitral or judicial decision, and to refrain from any equivalent actions with respect to the shares of Prominvestbank PJSC pending the Arbitral Tribunal's decision in its final arbitral award on whether such sale is contrary to international law. The State of Ukraine was ordered to pay VEB.RF State Development Corporation an application fee of EUR 4,000; the Emergency Arbitrator's fee of EUR 16,000; and the applicant's reasonable costs of legal services in connection with the application, which shall be subject to assessment unless agreed (Vol 1 pp 31-52).

According to Article 9(1) of Appendix II to the SCC Arbitration Rules, the award shall remain unchanged and shall be binding on the parties, except as provided in Article 9(4) of Appendix II to the SCC Arbitration Rules (paragraph 1.6 of the award).

It is established that the debtor has failed to comply with the award voluntarily.

In view of this, the applicant requested the court to enforce the said foreign arbitral award.

The disputed legal relations in this dispute are regulated by the 1958 New York Convention on the Recognition and Enforcement of Foreign [Arbitral] Awards ratified by Ukraine on 10 August 1960, the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce which entered into force for Ukraine on 7 June 1959, the Agreement on encouragement and mutual protection of investments, which was ratified by Law of Ukraine No 1302-XIV On the ratification of the Agreement between the Cabinet of Ministers of Ukraine and the Government of the Russian Federation on encouragement and mutual protection of investments of 15 December 1999.

According to Article V(1) of the 1958 New York Convention on the Recognition and Enforcement of Foreign [Arbitral] Awards, recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

-   The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



- The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case;

- The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration.

Furthermore, in accordance with paragraph 2 of the same Convention Article, recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that the recognition or enforcement of the award would be contrary to the public policy of that country.

In accordance with Article 478 of the Civil Procedure Code of Ukraine the court shall refuse to recognise and enforce an international arbitral award if: 1) at the request of the party against whom the award was issued, if [*sic*] that party furnishes to the court proof that: a) one of the parties to the arbitration agreement was under some incapacity; or such agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or b) the party against whom the award was made was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was, for other valid reasons, unable to present its position; or c) the award deals with a dispute not contemplated by the arbitration agreement or a dispute not falling within its terms, or contains decisions on matters outside the scope of the arbitration agreement; provided that, if the decisions on matters covered by the arbitration agreement can be separated from those not covered by the agreement, that part of the award which contains decisions on matters covered by the arbitration agreement may be recognised and enforced; or d) the composition of the international commercial arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties, or, absent such agreement, was not in accordance with the law of the country where the arbitration took place; or e) the award has not yet become binding on the parties, or has been set aside, or its execution has been suspended by a court of the country in which, or under the law of which, that award was made; or 2) if the court finds that: a) the law provides that the dispute may not be referred to international commercial arbitration in view of its subject matter; or b) the recognition and enforcement of such award would be contrary to the public order of Ukraine.

Specifically, the Ministry of Justice of Ukraine, which represents the State of Ukraine in the dispute, objected to the application of VEB.RF State Development Corporation, alleging grounds for it as laid down in Article 478 of the Civil Procedure Code of Ukraine.

Specifically, as a ground to refuse the application, the Ministry of Justice of Ukraine indicated that the Emergency Arbitrator award was made in a dispute that does not fall within the terms of the arbitration agreement (lack of jurisdiction of the Emergency Arbitrator).

In examining these arguments, the Court notes the following.

The arbitration agreement in investor-State arbitration proceedings consists of:

- the provisions of a bilateral or multilateral international agreement on the promotion and mutual protection of foreign investment, the terms of which contain a public offer of a contracting (host)

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



State addressed to an indefinite number of foreign investors of another contracting State to submit to an arbitral tribunal disputes arising out of the provisions of such international agreement between the (host) Contracting State and an investor of another Contracting State concerning the protection of its investments in the territory of the host State: - the acceptance of that offer by an investor of the other Contracting State, which crystallises in the request for arbitration submitted to the arbitral tribunal.

According to this rule, the offer of the State of Ukraine to submit the dispute with an investor of the Russian Federation concerning its investments in Ukraine is limited by the conditions set out in the Agreement between the Cabinet of Ministers of Ukraine and the Government of the Russian Federation on encouragement and mutual protection of investments of 12 December 1999 ratified by the Law of Ukraine No 1302-XIV of 15 December 1999 (hereinafter - the BIT).

By ratifying the BIT, the State of Ukraine agreed to resolve disputes with Russian investors under the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (hereinafter - the Arbitration Rules).

The version of the Arbitration Rules, in force at the time when the BIT was concluded (Arbitration Rules 1999) did not provide for a procedure for appointing an emergency arbitrator. By contrast, the procedure for appointing an emergency arbitrator was only provided in the 2010 version of the Arbitration Rules, i.e., 10 years after Ukraine gave its consent to resolve disputes in accordance with the said Arbitration Rules.

Since 1999, the State of Ukraine has agreed to apply the Arbitration Rules in only four instances of concluding bilateral and multilateral agreements on the promotion and mutual protection of foreign investments, namely: the Agreement between the Cabinet of Ministers of Ukraine and the Government of the Russian Federation on encouragement and mutual protection of investments of 1999 December, ratified by Law of Ukraine No 1302-XIV of 15 December 1999; the Agreement between the Government of Ukraine and the Belgian-Luxembourg Economic Union on mutual promotion and protection of investments ratified by Law of Ukraine No 118/97-VR of 26 February 1997; the Agreement between the Government of Ukraine and the Government of the People's Republic of China on the promotion and mutual protection of investments, entered into force on 30 May 1993; The Energy Charter Treaty and Final Act, ratified by Law of Ukraine No 89/98-VR (89/98-VR) of 6 February 1998.

Ukraine did not, however, agree to the application of the 2017 version of the Arbitration Rules in disputes to which it is party.

Thus, the emergency arbitrator did not have jurisdiction to rule against the State of Ukraine in this case.

Therefore, the court agrees with the arguments of the Ministry of Justice of Ukraine that the Emergency Arbitrator award was made in a dispute that does not fall within the terms of the arbitration agreement (lack of jurisdiction of the Emergency Arbitrator).

In addition, the norms of international legal acts must be applied in the versions in force at the time of their ratification and recognition by Ukraine.

However, the emergency arbitration procedure and appointment of the emergency arbitrator was governed by the 2017 Arbitration Rules, even though Law of Ukraine No 1302-XIV On the ratification of the Agreement between the Cabinet of Ministers of Ukraine and the Government of the

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Russian Federation on encouragement and mutual protection of investments was adopted on 15 December 1999.

As another ground to refuse the application, the Ministry of Justice of Ukraine pointed out that the State of Ukraine (against which the decision was made) was, for good reasons, unable to provide its comments (violation of due process). The court considers that in the course of the review of the application for the recognition and enforcement of the Emergency Arbitrator Award, such arguments have been confirmed for the following reasons.

It follows from the Emergency Arbitrator award that the claimant applied for an Emergency Arbitrator appointment on 21 August 2019. On the same day, the SCC Secretariat confirmed in writing to the applicant the receipt of the application and the payment of the costs of the Emergency Arbitrator Proceedings. The SCC Secretariat informed the Respondent that it had received the Application. Both Parties were informed that the SCC Board would endeavour to appoint an Emergency Arbitrator within 24 hours. By letter dated 22 August 2019, received by e-mail at 09:23 (London time), the SCC Board appointed Joe Tirado as Emergency Arbitrator in the above-mentioned emergency proceedings.

The above shows that the emergency arbitrator received the application on Thursday, 22 August 2019; pursuant to the Arbitration Rules, the award was thus to be issued within five days, by 27 August 2019.

In accordance with due legal process, the State of Ukraine is entitled to provide its comments concerning the issue brought for decision before the Emergency Arbitrator.

However, Saturday 24 August 2019 fell on a national holiday in Ukraine (Independence Day). As a result, Monday 26 August 2019 was a non-working day.

Thus, of the five days that the State had available to prepare its legal position, three fell on non-working days in Ukraine.

In view of the above, the *court concludes that* **the State of Ukraine was deprived of the opportunity to state its detailed position in the case for reasons that in no way depended on it and could not be eliminated by it.**

Furthermore, when considering the application for the recognition and enforcement of the Emergency Arbitrator award, the court established that the recognition and enforcement of such award would be contrary to the public order (public policy) of Ukraine.

According to the explanations set out in paragraph 12 of Resolution No 12 of the Plenum of the Supreme Court of Ukraine of 24 December 1999 On judicial practice with respect to applications for recognition and enforcement of foreign arbitral and judicial decisions and annulment of decisions rendered by way of international commercial arbitration in the territory of Ukraine, "public order" means the legal order of a State, and the defining principles and foundations which form the basis of the system that exists in the State (in particular, concerning its independence, integrity, sovereignty and inviolability, basic constitutional rights, freedoms, guarantees, etc.).

Furthermore, in accordance with Article 12 of the Law of Ukraine On Private International Law, a rule of

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



law of a foreign State shall not be applied when its application leads to consequences that are manifestly incompatible with the foundations of the legal order (public policy) of Ukraine.

In defining the content of this concept, account should be taken of the recommendations of the International Law Association on Public Policy adopted in 2002 in New Delhi, which states that the finality of awards rendered in the context of international commercial arbitration should be respected save in exceptional circumstances

Such exceptional circumstances may in particular be found to exist if recognition or enforcement of the international arbitral award would contravene international public policy. According to paragraph 1(d) of these recommendations, international public policy of any State includes: (i) fundamental principles, pertaining to justice or morality that the State wishes to protect even when it is not directly concerned (ii) rules designed to serve the essential political, social or economic interests of the State, these being known as "lois de police" or "public policy rules" and (iii) the duty of the State to respect its obligations towards other States or international organisations.

Public order will be violated if the recognition and enforcement of a decision of a foreign arbitral tribunal in a specific case conflicts with national norms to an extent that would be unacceptable under the national principles of the legal order.

The Emergency Arbitrator Award, which orders the state to suspend enforcement actions in enforcement proceedings under enforcement order No 796/165/2018 issued on 19 February 2019 by the Kyiv Court of Appeal concerning the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) dated 2 May 2018 in PCA Case No 2015-36 concerning the claim of Everest Estate LLC and others contradicts the public order of Ukraine.

Specifically, the court has established that the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36 concerning the recovery from the debtor – the Russian Federation in the person of the Ministry of Finance of the Russian Federation – as compensation for the relevant immovable property established that the respondent had unlawfully expropriated the claimants' property contrary to Article 5 of the Agreement between the Cabinet of Ministers of Ukraine and the Government of the Russian Federation on the promotion and mutual protection of investments of 27 November 1998. According to para b) of the Award, the Claimants were awarded as compensation for their respective immovables the amounts listed below:

i. Everest Estate LLC: USD 8,454,596, with interest accrued from 3 September 2014;

ii. Edelweiss-2000 PE: USD 35,767,393, with interest accrued from 3 September 2014;

iii. Fortuna PJSC: USD 16,980,281, with interest accrued from 3 September 2014;

iv. UBK-Invest PJSC: USD 5,248,483, with interest accrued from 3 September 2014;

v. Niva-Tour LLC: USD 12,127,235, with interest accrued from 3 September 2014;

vi. Imme LLC: USD 356,070, with interest accrued from 3 September 2014;

vii. Planeta PE: USD 272,555, with interest accrued from 3 September 2014;

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



viii  Krim Development LLC: USD 319,319, with interest accrued from 3 September 2014;

ix. Aerobud PJSC: (a) USD 817,150, with interest accrued from 3 September 2014; and (a) USD 257,999, with interest accrued from 9 September 2014;

x. Privatoffice LLC: USD 3,768,461, with interest accrued from 3 September 2014;

xi. Dayris LLC and Privatland LLC jointly: USD 5,062,435, with interest accrued from 3 September 2014;

xii. Diline Ltd LLC: (a) USD 2,165,754, with interest accrued from 3 September 2014; and (b) USD 1,176,219, with interest accrued from 27 February 2015;

xiii. Zhisa TRC LLC: USD 368,576, with interest accrued from 3 September 2014;

xiv. Dan-Panorama LLC: USD 5,715,827, with interest accrued from 24 September 2014;

xv. Sanatorium Energetic LLC: USD 10,920,929, with interest accrued from 24 September 2014;

xvi. Financial Capital AMC LLC: USD 15,463,757 (for Capital Investments MVIF) and 226,311 (For the New Fund MVIF),, with interest accrued from 3 September 2014;

xvii. FINANCIAL VECTOR AMC LLC (for D-Capital Plus MVIF): USD 3,967,724, with interest accrued from 3 September 2014; and

xviii. Mr PERSON_2: USD 1,049,288, with interest accrued from 3 September 2014;

(c) Each of the claimants was awarded a corresponding share of the claimants' costs totalling USD 8,583,110.02.

d) Each of the claimants was awarded a corresponding share of the Tribunal and SCC costs totalling EUR 650,000.

(e) The claimants were awarded: (i) interest on all amounts awarded at the annual 12-month LIBOR rate plus one percent compounded annually; (ii) the initial rate shall be the 12-month LIBOR rate in effect on the last business day of the month preceding the date of this Arbitral Award plus one percent, this rate to be reviewed annually until full payment of the amounts awarded; (iii) for the amounts awarded as compensation for expropriation, interest shall accrue from the date of the expropriation (as referred to in paragraph (b) above); and (iv) for amounts awarded in paragraphs (c) and (d) above, interest shall accrue from the date of this Arbitration Award.

All other claims were dismissed.

In July 2018, Everest Estate Limited Liability Company, Edelweiss-2000 Private enterprise, Fortuna Private Joint Stock Company, UKB Invest Private Joint Stock Company, Niva-Tour Limited Liability Company, Imme Limited Liability Company, Planeta Private enterprise, Krim Development Limited Liability Company, Aerobud Private Joint Stock Company, Privatoffice Limited Liability Company, Dayris Limited Liability Company, Diline LTD Liability Company, Zhisa TV and Radio Company

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Limited Liability Company, Privatland Limited Liability Company, Dan-Panorama Limited Liability Company with Foreign Investment Share, Sanatorium Energetic Limited Liability Company, FINANCIAL CAPITAL Asset Management Company Limited Liability Company, FINANCIAL VECTOR Asset Management Company Limited Liability Company and PERSON_1 applied to the Kyiv Court of Appeal for the recognition and enforcement of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36 concerning the recovery from the debtor – the Russian Federation in the person of the Ministry of Finance of the Russian Federation – of amounts in compensation for the relevant immovable property.

In August 2018, the applicants in the above matter submitted an application for interim measures pursuant to Article 477(3) of the Civil Procedure Code of Ukraine.

On 5 September 2018, the Kyiv Court of Appeal granted to the application of Everest Estate LLC, Edelweiss-2000 PE, Fortuna PJSC, UBK-Invest PJSC, Niva-Tour LLC, Imme LLC, Planeta PE, Krim Development LLC, Aerobud PJSC, Privatoffice LLC, Dayris LLC, Diline Ltd LLC, Zhisa TV and Radio Company Limited Liability Company, Privatland LLC, Dan-Panorama LLC with Foreign Investment Share, Sanatorium Energetic LLC, FINANCIAL CAPITAL Asset Management Company LLC, FINANCIAL VECTOR Asset Management Company LLC, and PERSON_1 for interim measures in the matter of the application of Everest Estate LLC, Edelweiss-2000 PE, Fortuna PJSC, UBK-Invest PJSC, Niva-Tour LLC, Imme LLC, Planeta PE, Krim Development LLC, Aerobud PJSC, Privatoffice LLC, Dayris LLC, Diline Ltd LLC, Zhisa TV and Radio Company LLC, Privatland LLC, Dan-Panorama LLC with Foreign Investment Share, Sanatorium Energetic LLC, FINANCIAL CAPITAL Asset Management Company LLC, FINANCIAL VECTOR Asset Management Company LLC, and PERSON_l for the recognition and enforcement of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36 concerning the recovery from the debtor – the Russian Federation in the person of the Ministry of Finance of the Russian Federation – of amounts in compensation for the relevant immovable property.

In particular, the court attached the ordinary registered shares of Prominvestbank PJSC (EDRPOU[1] code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) owned by the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN[2] 1077711000102).

INVINTUM LLC (EDRPOU code 38511128, address: 01133, Kyiv, Kutuzova st, bldg 18/7-B, room 79) was ordered to amend the depository accounting system with respect to the attachment of securities of PJSC Prominvestbank (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) owned by the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102) and registered on a securities account with a depository institution.

INVINTUM LLC (EDRPOU code 38511128, address: 01133, Kyiv, Kutuzova st, bldg 18/7-B, room 79) was prohibited from performing any accounting transactions on the securities account of the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102) opened in a depository

---

[1] Translator's note: Ukrainian legal entities identification code
[2] Translator's note: Russian legal entities identification code

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



institution entailing a change in the number of securities of Prominvestbank PJSC (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) registered on a securities account and/or changes in title to securities registered on the securities account of the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102) including, but not limited to, securities write-off, transfer, and assignment operations on securities of Prominvestbank PJSC (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) for the purpose of crediting such securities to a securities account with the same depositor with a different depository institution, etc.

The depository institution holding the securities account of depositor Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102), containing the entries for the ordinary registered shares of Prominvestbank PJSC (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) was ordered to amend the depository accounting system with respect to the attachment of securities of Prominvestbank PJSC (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) owned by the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102) and registered on the securities account of the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102), and prohibited from performing any accounting transactions on the securities account of the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102), leading to a change in the number of securities of Prominvestbank Public Joint-Stock Company (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) on the securities account of the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102), and/or changes in title to securities of Prominvestbank PJSC (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) on the securities account of the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102), including, but not limited to, securities write-off, transfer, and assignment operations of Prominvestbank Public Joint-Stock Company (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) and registered on the securities account of the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102), from the securities account of the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102), for the purpose of such securities to the securities account of the same depositor in another depository institution.

National Depository of Ukraine PJSC (EDRPOU code 30370711, location 04107, Kyiv, Tropinina st, bldg 7-D) was ordered to send to the depository institutions that hold accounts registering the ordinary registered shares of Prominvestbank PJSC (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Lane) notifications concerning the attachment of the ordinary registered shares on the securities account of the depositor of the Bank for Development and Foreign Economic Affairs State Corporation (Vnesheconombank), 9 Akademika Sakharova Ave, Moscow, 107996, Russian Federation, OGRN 1077711000102) accompanied by the court decision, and prohibited from undertaking any actions in relation to those securities.

The Joint-Stock Commercial Industrial and Investment Bank Public Joint-Stock Company (Prominvestbank PJSC) (EDRPOU code 00039002, registered address: Ukraine, 01001, Kyiv-I, 12 Shevchenko Lane) was prohibited from conducting a liquidation or reorganisation of the legal entity.

The Joint-Stock Commercial Industrial and Investment Bank Public Joint-Stock Company (Prominvestbank PJSC) (01001, Kyiv-1, 12, Shevchenko lane, EDRPOU code 00039002) was prohibited from carrying out any actions aimed at alienating the movable and immovable property in its ownership and or alienating any movable and immovable property in its ownership in any way, including, but not limited to, under contracts of sale, exchange, gift, etc.

By judgment of 25 January 2019, the Supreme Court amended the decision of the Kyiv Court of Appeal of 5 September 2018. The applications of Everest Estate LLC, Edelweiss-2000 PE, Fortuna PJSC, UBK-Invest PJSC, Niva-Tour LLC, Imme LLC, Planeta PE, Krim Development LLC, Aerobud PJSC, Privatoffice LLC, Dayris LLC, Diline Ltd LLC, Zhisa TV and Radio Company LLC, Privatland LLC, Dan-Panorama LLC with Foreign Investment Share, Sanatorium Energetic LLC, Financial Capital Asset Management Company LLC, Financial Vector Asset Management Company LLC, and PERSON_1 for interim measures were granted in part.

In particular, attachment was imposed on the ordinary registered shares of the Joint-Stock Commercial Industrial and Investment Bank Public Joint-Stock Company (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: 01001, Kyiv-1, 12 Shevchenko lane), belonging to the debtor, the Russian Federation.

The Joint-Stock Commercial Industrial and Investment Bank Public Joint-Stock Company (EDRPOU code 00039002, International Securities Identification Number UA 4000136329, registered address: 01001, Kyiv-1, 12 Shevchenko lane) was prohibited from carrying out any actions aimed at alienating the movable and immovable property belonging to the debtor, the Russian Federation, or alienating such property in any way.

Attachment was imposed on the ordinary registered shares of Sberbank Joint-Stock Company (EDRPOU code 25959784, International Securities Identification Number UA 1004171005, registered address: Ukraine, 01601, Kyiv, 46 Volodymyrska st) which belong to the debtor, the Russian Federation.

The decision of the Supreme Court is final and not subject to appeal.

In addition, the decision of the Kyiv Court of Appeal of 25 September 2019, granted the application of Everest Estate LLC, Edelweiss-2000 PE, Fortuna PJSC, UBK-Invest PJSC, Niva-Tour LLC, Imme LLC, Planeta PE, Krim Development LLC, Aerobud PJSC, Privatoffice LLC, Dayris LLC, Diline Ltd LLC, Zhisa TV and Radio Company Limited Liability Company, Privatland LLC, Dan-Panorama LLC with Foreign Investment Share, Sanatorium Energetic LLC, Asset Management Company FINANCIAL CAPITAL LLC, Asset Management Company FINANCIAL VECTOR LLC, and

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



PERSON_1 for the recognition and enforcement of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36.

There was issued an enforcement order for the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36 concerning the claim of Everest Estate LLC, Edelweiss-2000 PE, Fortuna PJSC, UBK-Invest PJSC, Niva-Tour LLC, Imme LLC, Planeta PE, Krim Development LLC, Aerobud PJSC, Privatoffice LLC, Dayris LLC, Diline Ltd LLC, Zhisa TV and Radio Company Limited Liability Company, Privatland LLC, Dan-Panorama LLC with Foreign Investment Share, Sanatorium Energetic LLC, Asset Management Company FINANCIAL CAPITAL LLC, Asset Management Company FINANCIAL VECTOR LLC, and PERSON_1 against the Russian Federation (in the person of the Ministry of Finance of the Russian Federation) for damages in compensation for the relevant immovable property.

Enforcement orders were issued to collect from the Russian Federation (in the person of the Ministry of Finance of the Russian Federation) in favour of the claimants the following amounts in accordance with the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36.

The Russian Federation (in the person of the Ministry of Finance of the Russian Federation) was ordered to pay to each claimant UAH 881.00 in court fees.

By judgment of 25 January 2019, the Supreme Court upheld the decision of the Kyiv Court of Appeal of 25 September 2018.

The decision of the Supreme Court is final and not subject to appeal.

Consequently, the recognition and enforcement of the Emergency Arbitrator award would jeopardise the rule of law and legal certainty by preventing the State from implementing the execution of the arbitral award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 05 in PCA case No 2018-2015 concerning the claim of Everest Estate LLC and others against the Russian Federation in accordance with the obligations imposed on the State under the New York Convention.

At the same time, the binding force of a court decision was enshrined in the Constitution of Ukraine, specifically in Article 129, which stipulates that the binding nature of a court decision constitutes one of the principles of judicial proceedings.

In view of the above, the recognition and enforcement of the Arbitral Award is contrary to the public policy of the State of Ukraine, and these circumstances constitute grounds provided in Article V of the New York Convention to refuse the application.

Pursuant to subparagraph Article 478(1)(2)(b) of the Civil Procedure Code of Ukraine, the application for enforcement of an international commercial arbitration decision may be refused if the enforcement of the decision is contrary to the public order of Ukraine.

In summary, the court concludes that there are grounds as provided in Article 478 of the Civil Procedure Code of Ukraine to refuse the application of VEB.RF State Development Corporation for the recognition and enforcement of the award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce dated 28 August 2019 in Case No 2019/113.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



In accordance with Article 479(1) of the Civil Procedure Code of Ukraine, having considered the application for the recognition and enforcement of an international commercial arbitral award the court shall decide on the recognition and enforcement of an international commercial arbitral award or on a refusal to recognise and enforce an international commercial arbitral award pursuant to the rules laid down in the Code for the adoption of a decision.

For the above reasons, and based on Articles 35 and 36 of the Law of Ukraine On International Commercial Arbitration" and Articles 474-479 of the Civil Procedure Code of Ukraine, the court

## d e c i d e s  a s  f o l l o w s:

the application of Oleksandr Mykhailovych Denysenko, acting in the interests of VEB.RF State Development Corporation, for the recognition and enforcement of the arbitral award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce dated 28 August 2019 in Case No 2019/113 concerning the claim of VEB.RF State Development Corporation against the State of Ukraine, in the person of the Ministry of Justice of Ukraine, ordering interim measures is refused.

The court's decision may be appealed to the Supreme Court within thirty days from the date of its issuance.

If only the introduction and dispositif of the decision were pronounced at the court's session, the above time period shall run from the date when the full text of the decision was drawn up.

If not challenged by way of appeal, the court's decision shall become final upon the expiry of the time limit for appeal.

If appealed, the decision shall become final after consideration by the appellate court.

The full text of the decision was drawn up on 14 September 2020.

Judge:

Case 6:22-cv-00990-DNH-TWD Document 49-2 Filed 01/27/23 Page 152 of 209 1/25/23, 2:33 PM

# NBU receives documents from Tigipko to approve purchase of PIB

Published Oct. 12, 2020 at 5:32 pm



The National Bank of Ukraine (NBU) has received a package of documents from Ukrainian businessman Serhiy Tigipko to approve the acquisition of Prominvestbank (PIB, Kyiv), the NBU press service told Interfax-Ukraine on Monday.

The bank's press service has not yet been disclosed more details about the relevant application for approval.

The Antimonopoly Committee of Ukraine (AMC) has approved the

NBU receives documents from Tigipko to approve purchase of PIB - Oct 15, 2020 | KyivPost                    1/25/23, 2:33 PM

acquisition of Prominvestbank (PIB, Kyiv) by the Cypriot company Luregio Limited, the ultimate beneficiary of which is Ukrainian businessman Sergiy Tigipko, through the purchase of Financial Company Fortify LLC. The committee voted for this decision at a meeting on October 8.

According to the report of the Antimonopoly Committee, in both cases the matter concerns acquisitions that will provide the buyer with over 50% of the voting shares on the company's board.

In accordance with the information in the state register, Luregio Limited registered Luregio Invest LLC with a charter capital of Hr 350 million on August 28 this year. Its core business is consulting and management, provision of financial services and other auxiliary commercial services.

Liudmyla Nazarenko, who was the deputy director for legal issues of TAS Group LLC and a member of the supervisory board of Universal Bank owned by Tigipko, was appointed head of the enterprise.

PJSC Prominvestbank was founded in 1992. VEB became the owner of Prominvestbank in 2008. It owns 99.7726% of its shares. VEB estimates its investments in the development of the subsidiary bank at $2.7 billion.

According to the National Bank of Ukraine, as of June 1, 2020, in terms of total assets (Hr 40.611 billion), Prominvestbank ranked 12th among 75 operating banks.

About us     White paper     News     State trust management company     Sustainable development     Contacts

+7 (495) 604-63-63
RU

Business     Investor Relations     Agent for the Government     International Cooperation

# BVI Court charged shares owned by Ukraine in satisfaction of VEB.RF's claims

14 december 2020          #News                                              Back

On 10 April 2020 an arbitral tribunal constituted under the rules of the Arbitration Institute of the Stockholm Chamber of Commerce issued two Separate Awards in favor of VEB.RF whereby it ordered Ukraine to reimburse VEB.RF its expenses incurred in the course of investment treaty arbitration concerning expropriation of VEB.RF's subsidiary bank Prominvestbank (PIB). Ukraine refused to voluntarily pay to VEB.RF the sums awarded by the arbitral tribunal.

'Ukraine will face consequences as a result of such disrespect for the decisions of international tribunals, said Igor Krasnov, Chief Legal Officer. 'VEB has repeatedly stated that it is firmly committed to recover the entire amount of the debt from Ukraine, pursuing its claims in all possible jurisdictions'.

On 15 October 2020 the Eastern Caribbean Supreme Court of the Virgin Islands recognized and enforced the awards of the Stockholm Arbitral Tribunal, and on 10 December 2020 at the request of VEB.RF issued a

## Related news



24 February          #News

Even in the face of the restrictions imposed by the US, VEB.RF will maintain and deepen its commitment to its mission



charging order over the shares of the shipping company owned by Ukraine - Fishing Company S.A. The State Agency of Fisheries of Ukraine is authorized to manage these shares on behalf of Ukraine. The Fishing Company itself owns several vessels that fish in the waters of the Pacific and Atlantic Oceans.

'Now there is a real possibility that because of unwillingness of Ukrainian politicians to comply with decisions of international tribunals, Ukraine will lose its entire fishing fleet in Southeast Asia and West Africa, which will be sold to repay the debt of Ukraine owned to the Russian state corporation', added Igor Krasnov.

VEB.RF intends to make further efforts to locate and attach property of Ukraine all over the world.

  

Back



8 February    #News

**Work Starts on Building Russia's First Green Steel Mill in Nizhni Novgorod Region**



8 February    #News

**First Verifiers Receive VEB.RF's Approval for Green Financial Instruments**



8 February    #News

**Russia's Civic Chamber Recommends Register for Regional Social Needs**

**Social networks**

   

  

**BUSINESS**

**INVESTORS**

**AGENT FOR THE GOVERNMENT**

About us

News

Contacts

Old site

**Address:**

Vozdvizhenka Street, 10, Moscow, 125009, Russian Federation

+7 (495) 604-63-63

© VEB.RF, 2006—2023

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Case category No **824/178/19**: Civil cases (after 01.01.2019); Special procedure cases; **Cases on recognition and enforcement of international commercial arbitral awards, of which:**

Sent by the court: **not specified.** Registered: **24.01.2021.** Published: **25.01.2021.**
Date of entry into force: **14.01.2021**
Proceeding number: **61-15459av20**

---

[Coat of Arms] Supreme Court

## Judgment

## in the name of Ukraine

14 January 2021,

Kyiv

case No 824/178/19

proceeding No 61-15459av20

**The Supreme Court, comprised of the judicial panel of the First Judicial Chamber of the Civil Court of Cassation:**

V.V. Shypovych (judge-rapporteur), E.V. Synelnykov, S.F. Khopta;

with the attendance of Kh.I. Klimkovska, court secretary

**parties**:

**appellant (claimant in the arbitration proceedings) -** VEB.RF State Development Corporation,

**representative of VEB.RF State Development Corporation -** Oleksandr Mykhailovych Denysenko,

**respondent in the arbitration proceedings -** the State of Ukraine, represented by the Ministry of Justice of Ukraine,

**Representative of the State of Ukraine in the person of the**

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



**Ministry of Justice of Ukraine, -** Inna Oleksandrivna Vasina,

having considered at a public hearing the appeal of VEB.RF State Development Corporation represented by Oleksandr Mykhailovych Denysenko, attorney, against the judgment of the Kyiv Court of Appeal of 7 September 2020, issued by judge S.V. Kulikova in the matter of an application of VEB.RF State Development Corporation for the recognition and enforcement of the award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce dated 28 August 2019 in case No 2019/113 concerning the claim of VEB.RF State Development Corporation against the State of Ukraine (in the person of the Ministry of Justice of Ukraine) ordering interim measures,

**FINDS AS FOLLOWS:**

**Summary of the application for the recognition and enforcement of the international commercial arbitral award**

[1]   In September 2019, VEB.RF State Development Corporation (hereinafter - "VEB.RF"), represented by Oleksandr Mykhailovych Denysenko, attorney, brought an application before the Kyiv Court of Appeal for the recognition and enforcement of an international commercial arbitral award.

[2]   VEB.RF's application is based on the fact that, on 27 November 1998, the Cabinet of Ministers of Ukraine (hereinafter: CMU) and the Government of the Russian Federation (hereinafter: RF) signed the Agreement on the encouragement and mutual protection of investments that was ratified by Law of Ukraine No 1302-XII of 15 December 1999 (hereinafter - "the BIT").

[3]   In accordance with Article 9 of the BIT, in case of any dispute between either Contracting Party and an investor of the other Contracting Party that may arise in connection with investments, including disputes concerning the amount, conditions of and procedure for the payment of compensation referred to in Article 5 of this Agreement or the procedure for effecting a transfer of payments referred to in Article 7 of this Agreement, shall be notified in writing accompanied with detailed comments which the investor shall forward to the Contracting Party involved in the dispute. The parties to the dispute shall endeavour to settle such dispute by way of negotiations. If the dispute cannot be resolved through negotiations within six months from the date of the written notification referred to in paragraph 1 of this Article, such dispute shall submitted to: a) a competent court or arbitral tribunal of the Contracting Party

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



on whose territory the investments were made; b) the Arbitration Institute of
the Stockholm Chamber of Commerce, c) an *ad hoc* arbitral tribunal pursuant
to the Arbitration Rules of the United Nations Commission for International
Trade Law (UNCITRAL).

[4]    In the 28 August 2019 award of the Emergency Arbitrator of the Arbitration
Institute of the Stockholm Chamber of Commerce, the State of Ukraine (in the
person of the Chief Public Bailiff of the execution section of the State
Enforcement Service Department of the Ministry of Justice of Ukraine) was
ordered to halt the forced sale of the shares of Prominvestbank Public Joint-
Stock Company (hereinafter - "PJSC") registered in the name of VEB.RF,
including in order to collect the debts owed by the Russian Federation under
any arbitral or judicial decision, and to refrain from any equivalent actions
with respect to the shares of Prominvestbank PJSC pending the decision by the
Arbitral Tribunal in the final arbitral award as to whether such sale is contrary
to international law. The State of Ukraine was ordered to pay VEB.RF an
application fee of EUR 4,000; the Emergency Arbitrator's fee of EUR 16,000;
and the applicant's reasonable costs of legal services in connection with this
application, which shall be subject to assessment unless agreed.

[5]    Given that the debtor has failed to comply with this decision voluntarily, based
on Articles 474-475, 479 of the Civil Procedure Code of Ukraine (hereinafter -
the CPC of Ukraine), Articles 35, 81, and 82 of the Law of Ukraine On
International Commercial Arbitration and Article 1-4 of the 1958 Convention
on the Recognition and Enforcement of Foreign Arbitral Awards (hereinafter -
the New York Convention), the applicant requested the court to recognize and
enforce the award of the Emergency Arbitrator of the Arbitration Institute of
the Stockholm Chamber of Commerce dated 28 August 2019 in case No
2019/113 concerning the claim of VEB.RF State Development Corporation
against the State of Ukraine (in the person of the Ministry of Justice of
Ukraine) ordering interim measures, and to issue an enforcement order for the
enforced execution thereof.

**Summary of the court decision under appeal**

[6]    By judgment of 7 September 2020, the Kyiv Court of Appeal rejected
VEB.RF's request for the recognition and enforcement of the award of the
Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of
Commerce of 28 August 2019 in case No 2019/113 concerning the claim of
VEB.RF against the state of Ukraine (in the person of the Ministry of Justice
of Ukraine) ordering interim measures.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[7]    The Kyiv Court of Appeal judgment is based on the reasoning that the Emergency Arbitrator award deals with a dispute that did not fall under the arbitration agreement (lack of jurisdiction of the emergency arbitrator), given that the procedure for appointing an emergency arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce was first provided in the 2010 version of the Arbitration Rules, to the application of which the State of Ukraine did not consent.

[8]    The court also considered that the State of Ukraine (against which the decision was made) was, for good reasons, unable to provide its comments, given that, of the five-day period that the State had available to prepare its legal position, three fell on non-working days in Ukraine, which deprived the respondent of the opportunity to provide its detailed position in the case for reasons that were outside its control and that it could not eliminate.

[9]    Furthermore, when considering the application for the recognition and enforcement of the Emergency Arbitrator award, the court established that the recognition and enforcement of this decision would be contrary to the public order of Ukraine, including the provisions of <u>Article 129 of the Constitution of Ukraine</u> on the binding force of judicial decisions, insofar as the recognition and enforcement of the Emergency Arbitrator award would jeopardize the rule of law and legal certainty by preventing the State from executing the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36 concerning the claim of Everest Estate LLC and others against the Russian Federation.

**Summary of the grounds of the cassation appeal**

[10]    In the appeal brought before the Supreme Court in October 2020, attorney O.M. Denysenko, acting on behalf of VEB.RF, requested the Court to quash the 7 September 2020 Kyiv Court of Appeal judgment and to render a new judgment granting VEB.RF's application.

**Cassation appeal proceedings in the Supreme Court**

[11]    By order of 27 October 2020, the Supreme Court initiated an appeal proceeding in case No 824/178/19 concerning the appeal of VEB.RF against the 7 September 2020 Kyiv Court of Appeal judgment.

[12]    By order of the Supreme Court of 20 November 2020, the case was assigned

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



for a public hearing with notice to the parties.

**The parties' arguments**

**The arguments of the appellant**

[13]   In support of its appeal, VEB.RF argues that Article 9 of the BIT contained no
directions as to the particular version of the Arbitration Rules to be applied,
whereas the Rules of the Arbitration Institute at the Stockholm Chamber of
Commerce (Arbitration Rules 2017) provide that unless otherwise agreed by
the parties in any arbitration agreement referring to the Arbitration Rules of
the Arbitration Institute of the Stockholm Chamber of Commerce, the parties shall
be deemed to have agreed to the application of those rules, or such amended
rules as may be in force on the date of the filing of the application for the
appointment of an Emergency Arbitrator. At the same time, the State of
Ukraine did not expressly exclude the applicability to Ukraine of the rules for
the appointment of emergency arbitrators pursuant to the Arbitration Rules
currently in force. Furthermore, in its answer to the request for arbitration, the
State of Ukraine refers to the current version of the Arbitration Rules without
any reservations as to the applicability of some of their provisions.

[14]   The appellant further asserts that the State of Ukraine has duly exercised its
right to provide comments by timely providing a detailed answer to VEB.RF's
request for provisional measures in Case No 2019/113 on 11 pages,
accompanied by factual and legal exhibits.

[15]   Furthermore, in considering the appeal in Case No 757/5777/15, the Supreme
Court had not held that the Emergency Arbitrator award was issued in a
dispute that was outside the scope of the arbitration agreement as a result of
the application of the rules in force at the time the dispute arose, while the
circumstance that, in that case, the Emergency Arbitrator granted the State of
Ukraine three days to state its position, of which two fell on the weekend, had
not been treated as a ground to refuse the recognition of the Emergency
Arbitrator award.

[16]   He further argues that the Kyiv Court of Appeal was wrong to conclude that
the Emergency Arbitrator award jeopardized the rule of law and legal certainty
by preventing the State from executing another arbitral award, given that such
conclusion contradicts the text of the Emergency Arbitrator award, which
merely orders Ukraine to halt the forced sale of Prominvestbank PJSC shares
registered in the name of VEB.RF, not to halt execution actions in enforcement

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



proceedings.

He argues that the Emergency Arbitrator's decision to prohibit the forced sale of shares of Prominvestbank PJSC is temporary in nature and does not interfere with the execution of the 2 May 2018 award of the Arbitral Tribunal in PCA Case No 2015-36, given that that decision can be enforced against other assets of the Russian Federation.

[17]   He emphasizes that the unjustified refusal to recognize and enforce an international arbitral award would constitute a breach by Ukraine of international law, violate Article 1(1) of Protocol No 1 to the <u>Convention for the Protection of Human Rights and Fundamental Freedoms</u>, and interfere with the property rights in the Prominvestbank PJSC shares.

**The arguments of the appellee**

[18]   In her response to the appeal filed in November 2020, the authorized representative of the Ministry of Justice of Ukraine N.V. Hryshyna objects to the appeal and asks the court to uphold the 7 September 2020 judgment of the Kyiv Court of Appeal.

[19]   In her view, the Emergency Arbitrator lacked jurisdiction to decide against the State of Ukraine, since, by ratifying the BIT in 1999, Ukraine agreed to settle disputes with Russian investors under the Arbitration Rules of the Stockholm Arbitration Institute in force at the time when the BIT was concluded (the 1999 Arbitration Rules). Ukraine did not, however, agree to the application of the 2017 version of the Arbitration Rules in disputes to which it may be party. Ukraine had no reason to believe, in 1999, that the Arbitration Rules may be amended in such a way as to introduce the institution of emergency arbitrator and as well as provisions under which the new version of the Rules would apply automatically.

[20]   She points out that the appellant did not refute the court's finding that the State of Ukraine had been deprived of the opportunity to state its position in detail for reasons outside its control which it was unable to eliminate, namely that part of the time-limit for providing comments fell on 24, 25 and 26 August 2019, which were non-working days and public holidays in Ukraine.

[21]   She agrees with the conclusion of the Kyiv Court of Appeal that the recognition and enforcement of the Emergency Arbitrator award conflicts with

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



the public order of Ukraine and entails consequences that are incompatible with the law of Ukraine, which constitutes a clear ground to reject VEB.RF's application.

**The facts of the case established by the court**

[22]  On 27 November 1998, the Cabinet of Ministers of Ukraine and the Government of the Russian Federation signed the Agreement on encouragement and mutual protection of investments, which was ratified by Law of Ukraine No 1302-XIV of 15 December 1999.

[23]  On 21 August 2019, VEB.RF brought an application to the Arbitration Institute of the Stockholm Chamber of Commerce for the appointment of an Emergency Arbitrator and a request for provisional measures before the submission of the dispute to an Arbitral Tribunal.

[24]  The 28 August 2019 award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce ordered the State of Ukraine (in the person of the Chief Public Bailiff of the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine) to halt the forced sale of the shares of Prominvestbank PJSC registered in the name of VEB.RF, including in order to collect the debt owed by the Russian Federation under any arbitral or judicial decision, and to refrain from any equivalent actions with respect to the Prominvestbank PJSC shares pending the decision by the Arbitral Tribunal in the final arbitral award as to whether such sale is contrary to international law. The State of Ukraine was ordered to pay VEB.RF an application fee of EUR 4,000; the Emergency Arbitrator's fee of EUR 16,000; and the applicant's reasonable costs of legal services in connection with this application, which shall be subject to assessment unless agreed.

[25]  The State of Ukraine failed to voluntarily comply with this Emergency Arbitrator award.

**Comments of the parties' representatives**

[26]  At the hearing, O.M. Denysenko, attorney acting on behalf of VEB.RF, maintained the arguments of the cassation appeal in full and demanded that the appeal be allowed.

[27]  The representatives of the State of Ukraine (in the person of the Ministry of

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Justice of Ukraine) N.V. Hryshyna (at the hearing of December 10, 2020) and
I.O. Vasina (at the hearing of 14 January 2021) asked the court to reject
VEB.RF's cassation appeal on the grounds stated in the response to the
cassation appeal.

[28]   In the written comments submitted in December 2020, I.O. Vasina, in her
capacity as representative of the State of Ukraine (in the person of the Ministry of
Justice of Ukraine) additionally stated that, on 4 March 2020, as part of an auction
sale of securities on the securities market, 5,080,310,373 ordinary
Prominvestbank PJSC shares were sold on the stock exchange and the relevant
exchange contract was concluded on 6 March 2020. On 11 March 2020, the
deposit account of the Section for the Execution of Decisions of the State
Enforcement Service Department of the Ministry of Justice of Ukraine
(hereinafter - the Department) received the proceeds of the share sales. On 12
March 2020, the state bailiff of the Department drew up the distribution accounts
for the amounts collected from the debtor in proportion to the amounts due to
each debtor. On 13 March 2020, in connection with the payment for the purchased
assets (securities), a resolution was issued to lift the attachments of the debtor's
property; paragraph 2 of the resolution required the depository institution to
transfer the securities to the buyer's account. However, the procedure of
transferring the sold shares to the buyer is, at present, not yet completed due to the
10 March 2020 judgment of the Kyiv Commercial Court in case No 910/3480/20
adopted in proceedings concerning an application for security, as well as the 27
May 2020 judgment of the Pechersky District Court of the City of Kyiv in case
No 757/21587/20 concerning attachment of property and a prohibition to
undertake certain actions.

**The Supreme Court's Position**

[29]   Articles 24(2) and 351(2) of the Civil Procedure Code of Ukraine provide that the
Supreme Court shall apply the appellate procedure when reviewing decisions of
courts of appeal issued in the capacity of first instance courts.

[30]   After hearing the report of the judge-rapporteur and the comments of the parties'
representatives at the hearing, clarifying the circumstances of the case and
verifying them against the available evidence, the court concludes that the
cassation appeal must be partially allowed, and the 7 September 2020 Kyiv Court
of Appeal judgment must be amended.

**The Supreme Court's reasoning and the applicable law**

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[31]   Pursuant to <u>Article 368(3) of the Civil Procedure Code of Ukraine</u>, the matter shall be heard by the appellate instance court applying the simplified claim procedure with the modalities laid down in this chapter. The appellate instance court shall consider matters in a court hearing with notice to the parties, with the exceptions provided in <u>Article 369 of this Code</u>.

[32]   Pursuant to <u>Article 367(1) of the Civil Procedure Code of Ukraine,</u> the appellate court shall review the case on the basis of existing as well as additional evidence, and shall verify the legality and the reasoning of the first instance decision within the scope of the arguments and claims of the appeal.

[33]   According to <u>Article 263(1)-(2) and (5) of the Civil Procedure Code of Ukraine</u>, a court decision must be lawful and reasoned, and must comply with the principle of the rule of law. A decision is lawful if it is adopted by the court in accordance with the rules of substantive law and in compliance with the rules of procedural law. A decision is reasoned if it is adopted on the basis of a complete and comprehensive examination of the facts invoked by the parties as the basis of their claims and defences and confirmed by the evidence examined at the hearing.

[34]   According to Article V of the New York Convention:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



arbitration may be recognized and enforced; or

d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made; or [*sic*]

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

a) The subject matter of the difference is not capable of settlement by arbitration under the <u>law</u> of that country; or

b) The recognition or enforcement of the award would be contrary to the public policy of that country.

[35]   In accordance with <u>Article 478 of the Civil Procedure Code of Ukraine,</u> the court shall refuse to recognize and enforce an international arbitral award if:

1) at the request of the party against whom the award is issued, if [*sic*] that party furnishes to the court proof that: a) one of the parties to the arbitration agreement was under some incapacity; or such agreement is not valid under the law to which the parties have subjected it or, absent an indication of such law, under the law of the country where the award was made; or b) the party against whom the award was made was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or for other valid reasons was unable to present its position; or c) the award deals with a dispute not contemplated by the arbitration agreement or a dispute not falling within its terms, or contains decisions on matters outside the scope of the arbitration agreement; provided that, if the decisions on matters covered by the arbitration agreement can be separated from those not covered by the agreement, that part of the award which contains decisions on matters covered by the arbitration agreement may be recognized and enforced; or d) the composition of the international commercial arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties, or, absent such agreement, was not in accordance with the law of the country where the arbitration took place; or e) the award has not yet become binding on the parties, or has been set aside, or its execution has been suspended by a court of the country in which, or under the law of which, that

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



award was made; or 2) if the court finds that: a) the law provides that the dispute may not be referred to international commercial arbitration in view of its subject matter; or b) the recognition and enforcement of such award would be contrary to the public order of Ukraine.

[36]   In its judgment of 17 April 2019 in case No 761/41709/17, the Supreme Court stated that, in deciding on the recognition and enforcement of an international commercial arbitration award, the court may not assess the correctness of the award on the merits or make any changes to its content, but merely verifies compliance with the application deadlines, compliance with the procedural requirements as to form and content of the application, and the existence of circumstances that may constitute grounds to reject the application.

*Whether the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award complies with Ukraine's public order*

[37]   Article 478 of the Civil Procedure Code of Ukraine does not contain a definition of the term "public order".

[38]   According to the explanations set out in paragraph 12 of Resolution No 12 of 24 December 1999 of the Plenum of the Supreme Court of Ukraine on the Judicial Practice with Respect to Applications for Recognition and Enforcement of Foreign Arbitral and Judicial Decisions and annulment of decisions rendered by Way of International Commercial Arbitration in the Territory of Ukraine, public order means the legal order of a State, and the defining principles and foundations which form the basis of the system that exists in the State (concerning its independence, integrity, sovereignty and inviolability, basic constitutional rights, freedoms, guarantees, etc.).

[39]   In its judgment of 23 July 2018 in case No 796/3/2018, the Supreme Court held that public order must be understood as the legal order of the State, and the defining principles and foundations which form the basis of the system that exists in it (concerning its independence, integrity, sovereignty and inviolability, basic constitutional rights, freedoms, guarantees, etc.). The international public order of any country includes the fundamental principles and foundations of justice and morals that the State wishes to protect even in cases that do not directly implicate the State itself; rules that secure the fundamental political, social and economic interests of the State (rules of public order); the duty of the State to comply with its obligations towards other States and international organizations. These are the unchanging principles that express the stability of the international system, including State sovereignty, non-interference in States' internal affairs, territorial

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



integrity, and so on.

[40]   The legal notion of public order thus exists to protect the State from foreign arbitral awards that violate the fundamental principles of fairness and justice that are in force in the State. Such provisions are designed to establish a legal barrier to decisions that are made contrary to the fundamental procedural and substantive principles on which public and State order is based.

[41]   In its judgment of 5 July 2018 in case No 761/46285/16, the Supreme Court held that the object of the public order reservation are international private law relations, while its subject-matter is the non-application of the foreign law chosen to regulate private law relations with a foreign element where the application of such law would conflict with the State's public order. In this case, the public order reservation will regulate an independent sphere of public relations, which does not depend on the sphere of inter-State relations.

[42]   In view of the above, a reference to a breach of public order may only be made in cases where the execution of a foreign arbitral award is incompatible with the foundations of the State's legal order.

[43]   Under Article 129(1)(9) of the Constitution of Ukraine, the basic principles of justice in Ukraine include the binding force of judicial decisions.

[44]   A court decision is the highest act of justice, and, as such, must be enforced, given that the enforcement of a court decision, which constitutes the final stage of judicial proceedings, forms an integral part of the right to a fair trial secured, *inter alia*, by Article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms.

[45]   When the Kyiv Court of Appeal found that allowing the application of VEB.RF for the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award would *de facto* preclude the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36 concerning the claim of Everest Estate LLC and others against the Russian Federation, which had been enforced by the 25 September 2018 judgment of the Kyiv Court of Appeal in case No 796/165/2018 (upheld by the 25 January 2019 judgment of the Supreme Court), it arrived at a reasonable conclusion that the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award was contrary to the public order of Ukraine.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[46] The court also notes that the applicant had brought applications for security in Ukrainian national courts requesting measures similar to those ordered in the Emergency Arbitrator award of 28 August 2019. In particular, in case No 757/36346/19-ts the applicant requested a suspension of the sale of shares of Prominvestbank PJSC, a prohibition for the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine to perform any sale of those shares and a prohibition for the PFTS Stock Exchange to carry out any actions related to the preparation and conduct of an auction sale of those shares.

[47] However, by judgment of 27 August 2019 in case No 757/36346/19-ts (upheld by the Supreme Court on 6 November 2019), the Kyiv Court of Appeal rejected this application for security, stating, *inter alia*, that it would be unacceptable to halt the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36, which had been enforced by the judgment of the Kyiv Court of Appeal of 25 September 2018 (upheld by the judgment of the Supreme Court of 25 January 2019), given that such actions would conflict with the principle of the binding nature of judicial decisions that have entered into legal force.

[48] It follows that the court has reached a correct conclusion that there were grounds to reject VEB.RF's application for the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award under Article V(2)(b) of the New York Convention and Article 478(1)(2)(b) of the Civil Procedure Code

[49] The court rejects as unfounded the appellant's arguments that this conclusion of the court of appeal contradicts the text of the Emergency Arbitrator award itself, given that it merely ordered the State of Ukraine to halt the forced sale of the Prominvestbank PJSC shares registered in the name of VEB.RF State Development Corporation rather than to halt the acts of execution in any enforcement proceedings.

[50] According to the 28 August 2019 Emergency Arbitrator award, the obligation to halt the sale of Prominvestbank PJSC shares is imposed on the State of Ukraine in the person of the Chief Public Bailiff of the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine, that is, the same person who is charged with executing in enforcement proceedings the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36.

[51] The arguments that these measures are temporary do not change the fact that the

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



recognition and enforcement of the 28 August 2019 Emergency Arbitrator award will *de facto* entail the termination of the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 which had been enforced by the judgment of the Kyiv Court of Appeal of 25 September 2018 (upheld by the judgment of the Supreme Court of 25 January 2019).

*The emergency arbitrator's jurisdiction*

[52]   On 27 November 1998, the Cabinet of Ministers of Ukraine and the Government of the Russian Federation signed the Agreement on encouragement and mutual protection of investments, which was ratified by Law of Ukraine No 1302-XIV of 15 December 1999.

[53]   In accordance with Article 9 of the BIT, in case of any dispute between either Contracting Party and an investor of the other Contracting Party that may arise in connection with investments, including disputes concerning the amount, conditions of and procedure for payment of compensation referred to in Article 5 of this Agreement or the procedure for effecting a transfer of payments referred to in Article 7 of this Agreement, shall be notified in writing accompanied with detailed comments which the investor shall forward to the Contracting Party involved in the dispute. The parties to the dispute shall endeavour to settle such dispute by way of negotiations. If the dispute cannot be resolved through negotiations within six months from the date of the written notification referred to in paragraph 1 of this Article, the dispute shall be submitted, *inter alia*, to the Arbitration Institute of the Stockholm Chamber of Commerce.

[54]   The State of Ukraine, in the person of the Ministry of Justice of Ukraine, objected to VEB.RF's application, noting, in particular, that the Emergency Arbitrator award deals with a dispute that is outside the scope of the arbitration agreement (lack of jurisdiction of the emergency arbitrator), arguing for the applicability of the 1999 version of the Arbitration Rules, which does not provide for the emergency arbitrator procedure.

[55]   In refusing to recognize and enforce the 28 August 2019 Emergency Arbitrator award, the court of appeal agreed with the respondent's arguments, pointing out, in particular, that the BIT did not provide for the procedure of appointing an Emergency Arbitrator, which was first introduced by the 2010 version of the Arbitration Rules, to the application of which the State of Ukraine did not consent.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[56]   However, the Court of Appeal failed to take into account that the BIT and/or Law of Ukraine No 1302-XIV of 15 December 1999 that ratified it contained no reservations as to the applicability of a certain version of the Arbitration Rules of the Stockholm Chamber of Commerce, including the version in force at the time of the signing or ratification of the BIT.

[57]   In view of the above, the court considers that there are no grounds under Article V(1)(c) of the New York Convention and Article 478(1)(1)(c) of the Civil Procedure Code of Ukraine to refuse to recognize and enforce the 28 August 2019 Emergency Arbitrator award, and the conclusion of the Kyiv Court of Appeal to the effect that the Emergency Arbitrator award dealt with a dispute that did not fall under the arbitration agreement is erroneous.

*Compliance with the Emergency Arbitrator procedure*

[58]   In considering VEB.RF's application, the Kyiv Court of Appeal also saw a violation of the dispute resolution procedure, given that the State of Ukraine did not have enough time to provide its detailed position in the case for reasons that were outside its control and that it could not eliminate.

[59]   Article 8(1) of Appendix II to the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce provides that any emergency decision on interim measures shall be made no later than 5 days from the date the application was referred to the Emergency Arbitrator.

[60]   It follows from the 28 August 2019 Emergency Arbitrator award that the claimant made the application for an Emergency Arbitrator appointment on 21 August 2019. On the same day, the Secretariat of the Stockholm Chamber of Commerce confirmed in writing to the applicant the receipt of the application and the payment of the costs of the emergency proceedings. The Secretariat of the Stockholm Chamber of Commerce notified the Respondent of the application. The parties were informed that the Board of the Stockholm Chamber of Commerce will seek to appoint an emergency arbitrator within 24 hours.

[61]   By letter dated 22 August 2019, the Board of the Stockholm Chamber of Commerce appointed Mr. Joe Tirado as an emergency arbitrator in the said proceedings.

[62]   The court agrees that, in accordance with due legal process, the State of Ukraine is entitled to provide its comments as to the issue brought for decision before the

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Emergency Arbitrator and points out that the respondent in the arbitration dispute has duly exercised this right by providing the Emergency Arbitrator with written comments on VEB.RF's application.

In addition, the Emergency Arbitrator award shows that the deadline for the State of Ukraine's response to the VEB.RF's application was extended at the State's request, which indicates that the Emergency Arbitrator has complied with the emergency procedure.

[63]    In view of the above, the court considers that there are no grounds under Article V(1)(b) of the New York Convention and Article 478(1)(1)(b) of the Civil Procedure Code of Ukraine to refuse to recognize and enforce the of 28 August 2019 Emergency Arbitrator award, and the conclusion of the Kyiv Court of Appeal that the State of Ukraine was deprived of the opportunity to provide its detailed position in the case is erroneous.

**The Supreme Court's conclusions on the appeal**

[64]    Article 376(1)-(2) and (4) of the Civil Procedure Code of Ukraine provides the following grounds for quashing a court decision in whole or in part and adopting a new decision in the relevant part, or amending a court decision: 1) incomplete determination of the relevant facts; 2) lack of proof of the relevant facts treated by the first instance court as established; 3) inconsistency between the conclusions set out in the first instance court's decision and the facts of the case; 4) violation of procedural law or incorrect application of substantive law.

[65]    Incorrect application of substantive law encompasses the misinterpretation of the law, the application of inapplicable law, or the failure to apply the applicable law.

[66]    A court decision may be amended by way of supplementation, or by amending the reasoning and/or the dispositif.

[67]    The court found that, in its 7 September 2020 judgment, the Kyiv Court of Appeal had arrived at a substantively correct conclusion rejecting VEB.RF's application, and that there is therefore no basis to quash the challenged court decision and to adopt a new decision recognizing and enforcing the 28 August 2019 Emergency Arbitrator award.

[68]    However, at the same time, in providing the reasoning for its judgment, the court of first instance has, in addition to the grounds under Article V(2)(b) of the New

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



York Convention and Article 478(1)(2)(b) of the Civil Procedure Code of Ukraine for a refusal to recognize and enforce the 28 August 2019 Emergency Arbitrator award – which the Supreme Court accepts – also erroneously based its 7 September 2020 judgment on the lack of jurisdiction of the Emergency Arbitrator and the lack of opportunity on the part of the State of Ukraine to provide its comments.

[69]   The Supreme Court considers that the grounds provided in Article V(1)(b) and (c) of the New York Convention and Article 478(1)(1)(b) and (c) of the Civil Procedure Code of Ukraine for a refusal to recognize and enforce the Emergency Arbitrator award of 28 August 2019 are not met, and the contested decision of the Kyiv Court of Appeal of 7 September 2020 must therefore be amended as to its reasoning, taking into account the conclusions set out in this Supreme Court judgment.

[70]   The Supreme Court found no grounds to supplement or amend the dispositif of the 7 September 2020 Kyiv Court of Appeal judgment.

[71]   Based on Articles 24, 351, 367, 368, 374, 376, 381-384, and 478 of the Civil Procedure Code of Ukraine, the Supreme Court comprised of the judicial panel of the First Judicial Chamber of the Civil Court of Cassation

**RESOLVES AS FOLLOWS**

The appeal of VEB.RF State Development Corporation represented by attorney Oleksandr Mykhailovych Denysenko is partially allowed.

The Kyiv Court of Appeal judgment of 7 September 2020 shall be amended as to its reasoning, taking into account the conclusions set out in this Supreme Court judgment.

The judgment of the court of cassation shall enter into force from the moment it is issued; it shall be final and not subject to appeal.

**Judges: V.V. Shypovych E.V. Synelnykov S.F. Khopta**

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Case category No **824/178/19: Civil cases (after 01.01.2019); Special procedure cases; Cases on recognition and enforcement of international commercial arbitral awards, of which:**

Sent by the court: **not specified.** Registered: **24.01.2021.** Published: **25.01.2021.**
Date of entry into force: **14.01.2021**
Proceeding number: **61-15459av20**

---

[Coat of Arms] Supreme Court

## Judgment

## in the name of Ukraine

14 January 2021,

Kyiv

case No 824/178/19

proceeding No 61-15459av20

**The Supreme Court, comprised of the judicial panel of the First Judicial Chamber of the Civil Court of Cassation:**

V.V. Shypovych (judge-rapporteur), E.V. Synelnykov, S.F. Khopta;

with the attendance of Kh.I. Klimkovska, court secretary

**parties**:

**appellant (claimant in the arbitration proceedings) -** VEB.RF State Development Corporation,

**representative of VEB.RF State Development Corporation -** Oleksandr Mykhailovych Denysenko,

**respondent in the arbitration proceedings -** the State of Ukraine, represented by the Ministry of Justice of Ukraine,

**Representative of the State of Ukraine in the person of the**

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



**Ministry of Justice of Ukraine, -** Inna Oleksandrivna Vasina,

having considered at a public hearing the appeal of VEB.RF State Development Corporation represented by Oleksandr Mykhailovych Denysenko, attorney, against the judgment of the Kyiv Court of Appeal of 7 September 2020, issued by judge S.V. Kulikova in the matter of an application of VEB.RF State Development Corporation for the recognition and enforcement of the award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce dated 28 August 2019 in case No 2019/113 concerning the claim of VEB.RF State Development Corporation against the State of Ukraine (in the person of the Ministry of Justice of Ukraine) ordering interim measures,

**FINDS AS FOLLOWS:**

**Summary of the application for the recognition and enforcement of the international commercial arbitral award**

[1]   In September 2019, VEB.RF State Development Corporation (hereinafter - "VEB.RF"), represented by Oleksandr Mykhailovych Denysenko, attorney, brought an application before the Kyiv Court of Appeal for the recognition and enforcement of an international commercial arbitral award.

[2]   VEB.RF's application is based on the fact that, on 27 November 1998, the Cabinet of Ministers of Ukraine (hereinafter: CMU) and the Government of the Russian Federation (hereinafter: RF) signed the Agreement on the encouragement and mutual protection of investments that was ratified by Law of Ukraine No 1302-XII of 15 December 1999 (hereinafter - "the BIT").

[3]   In accordance with Article 9 of the BIT, in case of any dispute between either Contracting Party and an investor of the other Contracting Party that may arise in connection with investments, including disputes concerning the amount, conditions of and procedure for the payment of compensation referred to in Article 5 of this Agreement or the procedure for effecting a transfer of payments referred to in Article 7 of this Agreement, shall be notified in writing accompanied with detailed comments which the investor shall forward to the Contracting Party involved in the dispute. The parties to the dispute shall endeavour to settle such dispute by way of negotiations. If the dispute cannot be resolved through negotiations within six months from the date of the written notification referred to in paragraph 1 of this Article, such dispute shall submitted to: a) a competent court or arbitral tribunal of the Contracting Party

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



on whose territory the investments were made; b) the Arbitration Institute of the Stockholm Chamber of Commerce, c) an *ad hoc* arbitral tribunal pursuant to the Arbitration Rules of the United Nations Commission for International Trade Law (UNCITRAL).

[4]     In the 28 August 2019 award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce, the State of Ukraine (in the person of the Chief Public Bailiff of the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine) was ordered to halt the forced sale of the shares of Prominvestbank Public Joint-Stock Company (hereinafter - "PJSC") registered in the name of VEB.RF, including in order to collect the debts owed by the Russian Federation under any arbitral or judicial decision, and to refrain from any equivalent actions with respect to the shares of Prominvestbank PJSC pending the decision by the Arbitral Tribunal in the final arbitral award as to whether such sale is contrary to international law. The State of Ukraine was ordered to pay VEB.RF an application fee of EUR 4,000; the Emergency Arbitrator's fee of EUR 16,000; and the applicant's reasonable costs of legal services in connection with this application, which shall be subject to assessment unless agreed.

[5]     Given that the debtor has failed to comply with this decision voluntarily, based on Articles 474-475, 479 of the Civil Procedure Code of Ukraine (hereinafter - the CPC of Ukraine), Articles 35, 81, and 82 of the Law of Ukraine On International Commercial Arbitration and Article 1-4 of the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (hereinafter - the New York Convention), the applicant requested the court to recognize and enforce the award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce dated 28 August 2019 in case No 2019/113 concerning the claim of VEB.RF State Development Corporation against the State of Ukraine (in the person of the Ministry of Justice of Ukraine) ordering interim measures, and to issue an enforcement order for the enforced execution thereof.

**Summary of the court decision under appeal**

[6]     By judgment of 7 September 2020, the Kyiv Court of Appeal rejected VEB.RF's request for the recognition and enforcement of the award of the Emergency Arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce of 28 August 2019 in case No 2019/113 concerning the claim of VEB.RF against the state of Ukraine (in the person of the Ministry of Justice of Ukraine) ordering interim measures.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[7]   The Kyiv Court of Appeal judgment is based on the reasoning that the Emergency Arbitrator award deals with a dispute that did not fall under the arbitration agreement (lack of jurisdiction of the emergency arbitrator), given that the procedure for appointing an emergency arbitrator of the Arbitration Institute of the Stockholm Chamber of Commerce was first provided in the 2010 version of the Arbitration Rules, to the application of which the State of Ukraine did not consent.

[8]   The court also considered that the State of Ukraine (against which the decision was made) was, for good reasons, unable to provide its comments, given that, of the five-day period that the State had available to prepare its legal position, three fell on non-working days in Ukraine, which deprived the respondent of the opportunity to provide its detailed position in the case for reasons that were outside its control and that it could not eliminate.

[9]   Furthermore, when considering the application for the recognition and enforcement of the Emergency Arbitrator award, the court established that the recognition and enforcement of this decision would be contrary to the public order of Ukraine, including the provisions of <u>Article 129 of the Constitution of Ukraine</u> on the binding force of judicial decisions, insofar as the recognition and enforcement of the Emergency Arbitrator award would jeopardize the rule of law and legal certainty by preventing the State from executing the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36 concerning the claim of Everest Estate LLC and others against the Russian Federation.

**Summary of the grounds of the cassation appeal**

[10]   In the appeal brought before the Supreme Court in October 2020, attorney O.M. Denysenko, acting on behalf of VEB.RF, requested the Court to quash the 7 September 2020 Kyiv Court of Appeal judgment and to render a new judgment granting VEB.RF's application.

**Cassation appeal proceedings in the Supreme Court**

[11]   By order of 27 October 2020, the Supreme Court initiated an appeal proceeding in case No 824/178/19 concerning the appeal of VEB.RF against the 7 September 2020 Kyiv Court of Appeal judgment.

[12]   By order of the Supreme Court of 20 November 2020, the case was assigned

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



for a public hearing with notice to the parties.

**The parties' arguments**

**The arguments of the appellant**

[13]    In support of its appeal, VEB.RF argues that Article 9 of the BIT contained no directions as to the particular version of the Arbitration Rules to be applied, whereas the Rules of the Arbitration Institute at the Stockholm Chamber of Commerce (Arbitration Rules 2017) provide that unless otherwise agreed by the parties in any arbitration agreement referring to the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce, the parties shall be deemed to have agreed to the application of those rules, or such amended rules as may be in force on the date of the filing of the application for the appointment of an Emergency Arbitrator. At the same time, the State of Ukraine did not expressly exclude the applicability to Ukraine of the rules for the appointment of emergency arbitrators pursuant to the Arbitration Rules currently in force. Furthermore, in its answer to the request for arbitration, the State of Ukraine refers to the current version of the Arbitration Rules without any reservations as to the applicability of some of their provisions.

[14]    The appellant further asserts that the State of Ukraine has duly exercised its right to provide comments by timely providing a detailed answer to VEB.RF's request for provisional measures in Case No 2019/113 on 11 pages, accompanied by factual and legal exhibits.

[15]    Furthermore, in considering the appeal in Case No 757/5777/15, the Supreme Court had not held that the Emergency Arbitrator award was issued in a dispute that was outside the scope of the arbitration agreement as a result of the application of the rules in force at the time the dispute arose, while the circumstance that, in that case, the Emergency Arbitrator granted the State of Ukraine three days to state its position, of which two fell on the weekend, had not been treated as a ground to refuse the recognition of the Emergency Arbitrator award.

[16]    He further argues that the Kyiv Court of Appeal was wrong to conclude that the Emergency Arbitrator award jeopardized the rule of law and legal certainty by preventing the State from executing another arbitral award, given that such conclusion contradicts the text of the Emergency Arbitrator award, which merely orders Ukraine to halt the forced sale of Prominvestbank PJSC shares registered in the name of VEB.RF, not to halt execution actions in enforcement

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



proceedings.

He argues that the Emergency Arbitrator's decision to prohibit the forced sale of shares of Prominvestbank PJSC is temporary in nature and does not interfere with the execution of the 2 May 2018 award of the Arbitral Tribunal in PCA Case No 2015-36, given that that decision can be enforced against other assets of the Russian Federation.

[17]   He emphasizes that the unjustified refusal to recognize and enforce an international arbitral award would constitute a breach by Ukraine of international law, violate Article 1(1) of Protocol No 1 to the Convention for the Protection of Human Rights and Fundamental Freedoms, and interfere with the property rights in the Prominvestbank PJSC shares.

**The arguments of the appellee**

[18]   In her response to the appeal filed in November 2020, the authorized representative of the Ministry of Justice of Ukraine N.V. Hryshyna objects to the appeal and asks the court to uphold the 7 September 2020 judgment of the Kyiv Court of Appeal.

[19]   In her view, the Emergency Arbitrator lacked jurisdiction to decide against the State of Ukraine, since, by ratifying the BIT in 1999, Ukraine agreed to settle disputes with Russian investors under the Arbitration Rules of the Stockholm Arbitration Institute in force at the time when the BIT was concluded (the 1999 Arbitration Rules). Ukraine did not, however, agree to the application of the 2017 version of the Arbitration Rules in disputes to which it may be party. Ukraine had no reason to believe, in 1999, that the Arbitration Rules may be amended in such a way as to introduce the institution of emergency arbitrator and as well as provisions under which the new version of the Rules would apply automatically.

[20]   She points out that the appellant did not refute the court's finding that the State of Ukraine had been deprived of the opportunity to state its position in detail for reasons outside its control which it was unable to eliminate, namely that part of the time-limit for providing comments fell on 24, 25 and 26 August 2019, which were non-working days and public holidays in Ukraine.

[21]   She agrees with the conclusion of the Kyiv Court of Appeal that the recognition and enforcement of the Emergency Arbitrator award conflicts with

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



the public order of Ukraine and entails consequences that are incompatible
with the law of Ukraine, which constitutes a clear ground to reject VEB.RF's
application.

**The facts of the case established by the court**

[22]   On 27 November 1998, the Cabinet of Ministers of Ukraine and the
Government of the Russian Federation signed the Agreement on
encouragement and mutual protection of investments, which was ratified by
<u>Law of Ukraine No 1302-XIV of 15 December 1999</u>.

[23]   On 21 August 2019, VEB.RF brought an application to the Arbitration
Institute of the Stockholm Chamber of Commerce for the appointment of an
Emergency Arbitrator and a request for provisional measures before the
submission of the dispute to an Arbitral Tribunal.

[24]   The 28 August 2019 award of the Emergency Arbitrator of the Arbitration
Institute of the Stockholm Chamber of Commerce ordered the State of Ukraine
(in the person of the Chief Public Bailiff of the execution section of the State
Enforcement Service Department of the Ministry of Justice of Ukraine) to halt
the forced sale of the shares of Prominvestbank PJSC registered in the name of
VEB.RF, including in order to collect the debt owed by the Russian Federation
under any arbitral or judicial decision, and to refrain from any equivalent
actions with respect to the Prominvestbank PJSC shares pending the decision
by the Arbitral Tribunal in the final arbitral award as to whether such sale is
contrary to international law. The State of Ukraine was ordered to pay
VEB.RF an application fee of EUR 4,000; the Emergency Arbitrator's fee of
EUR 16,000; and the applicant's reasonable costs of legal services in
connection with this application, which shall be subject to assessment unless
agreed.

[25]   The State of Ukraine failed to voluntarily comply with this Emergency
Arbitrator award.

**Comments of the parties' representatives**

[26]   At the hearing, O.M. Denysenko, attorney acting on behalf of VEB.RF,
maintained the arguments of the cassation appeal in full and demanded that the
appeal be allowed.

[27]   The representatives of the State of Ukraine (in the person of the Ministry of

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Justice of Ukraine) N.V. Hryshyna (at the hearing of December 10, 2020) and
I.O. Vasina (at the hearing of 14 January 2021) asked the court to reject
VEB.RF's cassation appeal on the grounds stated in the response to the
cassation appeal.

[28]    In the written comments submitted in December 2020, I.O. Vasina, in her
capacity as representative of the State of Ukraine (in the person of the Ministry of
Justice of Ukraine) additionally stated that, on 4 March 2020, as part of an auction
sale of securities on the securities market, 5,080,310,373 ordinary
Prominvestbank PJSC shares were sold on the stock exchange and the relevant
exchange contract was concluded on 6 March 2020. On 11 March 2020, the
deposit account of the Section for the Execution of Decisions of the State
Enforcement Service Department of the Ministry of Justice of Ukraine
(hereinafter - the Department) received the proceeds of the share sales. On 12
March 2020, the state bailiff of the Department drew up the distribution accounts
for the amounts collected from the debtor in proportion to the amounts due to
each debtor. On 13 March 2020, in connection with the payment for the purchased
assets (securities), a resolution was issued to lift the attachments of the debtor's
property; paragraph 2 of the resolution required the depository institution to
transfer the securities to the buyer's account. However, the procedure of
transferring the sold shares to the buyer is, at present, not yet completed due to the
10 March 2020 judgment of the Kyiv Commercial Court in case No 910/3480/20
adopted in proceedings concerning an application for security, as well as the 27
May 2020 judgment of the Pechersky District Court of the City of Kyiv in case
No 757/21587/20 concerning attachment of property and a prohibition to
undertake certain actions.

**The Supreme Court's Position**

[29]    Articles 24(2) and 351(2) of the Civil Procedure Code of Ukraine provide that the
Supreme Court shall apply the appellate procedure when reviewing decisions of
courts of appeal issued in the capacity of first instance courts.

[30]    After hearing the report of the judge-rapporteur and the comments of the parties'
representatives at the hearing, clarifying the circumstances of the case and
verifying them against the available evidence, the court concludes that the
cassation appeal must be partially allowed, and the 7 September 2020 Kyiv Court
of Appeal judgment must be amended.

**The Supreme Court's reasoning and the applicable law**

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[31]   Pursuant to <u>Article 368(3) of the Civil Procedure Code of Ukraine</u>, the matter shall be heard by the appellate instance court applying the simplified claim procedure with the modalities laid down in this chapter. The appellate instance court shall consider matters in a court hearing with notice to the parties, with the exceptions provided in <u>Article 369 of this Code</u>.

[32]   Pursuant to <u>Article 367(1) of the Civil Procedure Code of Ukraine,</u> the appellate court shall review the case on the basis of existing as well as additional evidence, and shall verify the legality and the reasoning of the first instance decision within the scope of the arguments and claims of the appeal.

[33]   According to <u>Article 263(1)-(2) and (5) of the Civil Procedure Code of Ukraine</u>, a court decision must be lawful and reasoned, and must comply with the principle of the rule of law. A decision is lawful if it is adopted by the court in accordance with the rules of substantive law and in compliance with the rules of procedural law. A decision is reasoned if it is adopted on the basis of a complete and comprehensive examination of the facts invoked by the parties as the basis of their claims and defences and confirmed by the evidence examined at the hearing.

[34]   According to Article V of the New York Convention:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



arbitration may be recognized and enforced; or

d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made; or [*sic*]

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

b) The recognition or enforcement of the award would be contrary to the public policy of that country.

[35]   In accordance with Article 478 of the Civil Procedure Code of Ukraine, the court shall refuse to recognize and enforce an international arbitral award if:

1) at the request of the party against whom the award is issued, if [*sic*] that party furnishes to the court proof that: a) one of the parties to the arbitration agreement was under some incapacity; or such agreement is not valid under the law to which the parties have subjected it or, absent an indication of such law, under the law of the country where the award was made; or b) the party against whom the award was made was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or for other valid reasons was unable to present its position; or c) the award deals with a dispute not contemplated by the arbitration agreement or a dispute not falling within its terms, or contains decisions on matters outside the scope of the arbitration agreement; provided that, if the decisions on matters covered by the arbitration agreement can be separated from those not covered by the agreement, that part of the award which contains decisions on matters covered by the arbitration agreement may be recognized and enforced; or d) the composition of the international commercial arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties, or, absent such agreement, was not in accordance with the law of the country where the arbitration took place; or e) the award has not yet become binding on the parties, or has been set aside, or its execution has been suspended by a court of the country in which, or under the law of which, that

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



award was made; or 2) if the court finds that: a) the law provides that the dispute may not be referred to international commercial arbitration in view of its subject matter; or b) the recognition and enforcement of such award would be contrary to the public order of Ukraine.

[36]   In its judgment of 17 April 2019 in case No 761/41709/17, the Supreme Court stated that, in deciding on the recognition and enforcement of an international commercial arbitration award, the court may not assess the correctness of the award on the merits or make any changes to its content, but merely verifies compliance with the application deadlines, compliance with the procedural requirements as to form and content of the application, and the existence of circumstances that may constitute grounds to reject the application.

*Whether the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award complies with Ukraine's public order*

[37]   Article 478 of the Civil Procedure Code of Ukraine does not contain a definition of the term "public order".

[38]   According to the explanations set out in paragraph 12 of Resolution No 12 of 24 December 1999 of the Plenum of the Supreme Court of Ukraine on the Judicial Practice with Respect to Applications for Recognition and Enforcement of Foreign Arbitral and Judicial Decisions and annulment of decisions rendered by Way of International Commercial Arbitration in the Territory of Ukraine, public order means the legal order of a State, and the defining principles and foundations which form the basis of the system that exists in the State (concerning its independence, integrity, sovereignty and inviolability, basic constitutional rights, freedoms, guarantees, etc.).

[39]   In its judgment of 23 July 2018 in case No 796/3/2018, the Supreme Court held that public order must be understood as the legal order of the State, and the defining principles and foundations which form the basis of the system that exists in it (concerning its independence, integrity, sovereignty and inviolability, basic constitutional rights, freedoms, guarantees, etc.). The international public order of any country includes the fundamental principles and foundations of justice and morals that the State wishes to protect even in cases that do not directly implicate the State itself; rules that secure the fundamental political, social and economic interests of the State (rules of public order); the duty of the State to comply with its obligations towards other States and international organizations. These are the unchanging principles that express the stability of the international system, including State sovereignty, non-interference in States' internal affairs, territorial

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



integrity, and so on.

[40]  The legal notion of public order thus exists to protect the State from foreign arbitral awards that violate the fundamental principles of fairness and justice that are in force in the State. Such provisions are designed to establish a legal barrier to decisions that are made contrary to the fundamental procedural and substantive principles on which public and State order is based.

[41]  In its judgment of 5 July 2018 in case No 761/46285/16, the Supreme Court held that the object of the public order reservation are international private law relations, while its subject-matter is the non-application of the foreign law chosen to regulate private law relations with a foreign element where the application of such law would conflict with the State's public order. In this case, the public order reservation will regulate an independent sphere of public relations, which does not depend on the sphere of inter-State relations.

[42]  In view of the above, a reference to a breach of public order may only be made in cases where the execution of a foreign arbitral award is incompatible with the foundations of the State's legal order.

[43]  Under Article 129(1)(9) of the Constitution of Ukraine, the basic principles of justice in Ukraine include the binding force of judicial decisions.

[44]  A court decision is the highest act of justice, and, as such, must be enforced, given that the enforcement of a court decision, which constitutes the final stage of judicial proceedings, forms an integral part of the right to a fair trial secured, *inter alia*, by Article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms.

[45]  When the Kyiv Court of Appeal found that allowing the application of VEB.RF for the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award would *de facto* preclude the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36 concerning the claim of Everest Estate LLC and others against the Russian Federation, which had been enforced by the 25 September 2018 judgment of the Kyiv Court of Appeal in case No 796/165/2018 (upheld by the 25 January 2019 judgment of the Supreme Court), it arrived at a reasonable conclusion that the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award was contrary to the public order of Ukraine.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[46]   The court also notes that the applicant had brought applications for security in Ukrainian national courts requesting measures similar to those ordered in the Emergency Arbitrator award of 28 August 2019. In particular, in case No 757/36346/19-ts the applicant requested a suspension of the sale of shares of Prominvestbank PJSC, a prohibition for the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine to perform any sale of those shares and a prohibition for the PFTS Stock Exchange to carry out any actions related to the preparation and conduct of an auction sale of those shares.

[47]   However, by judgment of 27 August 2019 in case No 757/36346/19-ts (upheld by the Supreme Court on 6 November 2019), the Kyiv Court of Appeal rejected this application for security, stating, *inter alia*, that it would be unacceptable to halt the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36, which had been enforced by the judgment of the Kyiv Court of Appeal of 25 September 2018 (upheld by the judgment of the Supreme Court of 25 January 2019), given that such actions would conflict with the principle of the binding nature of judicial decisions that have entered into legal force.

[48]   It follows that the court has reached a correct conclusion that there were grounds to reject VEB.RF's application for the recognition and enforcement of the 28 August 2019 Emergency Arbitrator award under Article V(2)(b) of the New York Convention and Article 478(1)(2)(b) of the Civil Procedure Code

[49]   The court rejects as unfounded the appellant's arguments that this conclusion of the court of appeal contradicts the text of the Emergency Arbitrator award itself, given that it merely ordered the State of Ukraine to halt the forced sale of the Prominvestbank PJSC shares registered in the name of VEB.RF State Development Corporation rather than to halt the acts of execution in any enforcement proceedings.

[50]   According to the 28 August 2019 Emergency Arbitrator award, the obligation to halt the sale of Prominvestbank PJSC shares is imposed on the State of Ukraine in the person of the Chief Public Bailiff of the execution section of the State Enforcement Service Department of the Ministry of Justice of Ukraine, that is, the same person who is charged with executing in enforcement proceedings the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 in PCA case No 2015-36.

[51]   The arguments that these measures are temporary do not change the fact that the

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



recognition and enforcement of the 28 August 2019 Emergency Arbitrator award will *de facto* entail the termination of the execution of the award of the Arbitral Tribunal (The Hague, Kingdom of the Netherlands) of 2 May 2018 which had been enforced by the judgment of the Kyiv Court of Appeal of 25 September 2018 (upheld by the judgment of the Supreme Court of 25 January 2019).

*The emergency arbitrator's jurisdiction*

[52]   On 27 November 1998, the Cabinet of Ministers of Ukraine and the Government of the Russian Federation signed the Agreement on encouragement and mutual protection of investments, which was ratified by Law of Ukraine No 1302-XIV of 15 December 1999.

[53]   In accordance with Article 9 of the BIT, in case of any dispute between either Contracting Party and an investor of the other Contracting Party that may arise in connection with investments, including disputes concerning the amount, conditions of and procedure for payment of compensation referred to in Article 5 of this Agreement or the procedure for effecting a transfer of payments referred to in Article 7 of this Agreement, shall be notified in writing accompanied with detailed comments which the investor shall forward to the Contracting Party involved in the dispute. The parties to the dispute shall endeavour to settle such dispute by way of negotiations. If the dispute cannot be resolved through negotiations within six months from the date of the written notification referred to in paragraph 1 of this Article, the dispute shall be submitted, *inter alia*, to the Arbitration Institute of the Stockholm Chamber of Commerce.

[54]   The State of Ukraine, in the person of the Ministry of Justice of Ukraine, objected to VEB.RF's application, noting, in particular, that the Emergency Arbitrator award deals with a dispute that is outside the scope of the arbitration agreement (lack of jurisdiction of the emergency arbitrator), arguing for the applicability of the 1999 version of the Arbitration Rules, which does not provide for the emergency arbitrator procedure.

[55]   In refusing to recognize and enforce the 28 August 2019 Emergency Arbitrator award, the court of appeal agreed with the respondent's arguments, pointing out, in particular, that the BIT did not provide for the procedure of appointing an Emergency Arbitrator, which was first introduced by the 2010 version of the Arbitration Rules, to the application of which the State of Ukraine did not consent.

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



[56] However, the Court of Appeal failed to take into account that the BIT and/or Law of Ukraine No 1302-XIV of 15 December 1999 that ratified it contained no reservations as to the applicability of a certain version of the Arbitration Rules of the Stockholm Chamber of Commerce, including the version in force at the time of the signing or ratification of the BIT.

[57] In view of the above, the court considers that there are no grounds under Article V(1)(c) of the New York Convention and Article 478(1)(1)(c) of the Civil Procedure Code of Ukraine to refuse to recognize and enforce the 28 August 2019 Emergency Arbitrator award, and the conclusion of the Kyiv Court of Appeal to the effect that the Emergency Arbitrator award dealt with a dispute that did not fall under the arbitration agreement is erroneous.

*Compliance with the Emergency Arbitrator procedure*

[58] In considering VEB.RF's application, the Kyiv Court of Appeal also saw a violation of the dispute resolution procedure, given that the State of Ukraine did not have enough time to provide its detailed position in the case for reasons that were outside its control and that it could not eliminate.

[59] Article 8(1) of Appendix II to the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce provides that any emergency decision on interim measures shall be made no later than 5 days from the date the application was referred to the Emergency Arbitrator.

[60] It follows from the 28 August 2019 Emergency Arbitrator award that the claimant made the application for an Emergency Arbitrator appointment on 21 August 2019. On the same day, the Secretariat of the Stockholm Chamber of Commerce confirmed in writing to the applicant the receipt of the application and the payment of the costs of the emergency proceedings. The Secretariat of the Stockholm Chamber of Commerce notified the Respondent of the application. The parties were informed that the Board of the Stockholm Chamber of Commerce will seek to appoint an emergency arbitrator within 24 hours.

[61] By letter dated 22 August 2019, the Board of the Stockholm Chamber of Commerce appointed Mr. Joe Tirado as an emergency arbitrator in the said proceedings.

[62] The court agrees that, in accordance with due legal process, the State of Ukraine is entitled to provide its comments as to the issue brought for decision before the

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



Emergency Arbitrator and points out that the respondent in the arbitration dispute has duly exercised this right by providing the Emergency Arbitrator with written comments on VEB.RF's application.

In addition, the Emergency Arbitrator award shows that the deadline for the State of Ukraine's response to the VEB.RF's application was extended at the State's request, which indicates that the Emergency Arbitrator has complied with the emergency procedure.

[63]   In view of the above, the court considers that there are no grounds under Article V(1)(b) of the New York Convention and Article 478(1)(1)(b) of the Civil Procedure Code of Ukraine to refuse to recognize and enforce the of 28 August 2019 Emergency Arbitrator award, and the conclusion of the Kyiv Court of Appeal that the State of Ukraine was deprived of the opportunity to provide its detailed position in the case is erroneous.

**The Supreme Court's conclusions on the appeal**

[64]   Article 376(1)-(2) and (4) of the Civil Procedure Code of Ukraine provides the following grounds for quashing a court decision in whole or in part and adopting a new decision in the relevant part, or amending a court decision: 1) incomplete determination of the relevant facts; 2) lack of proof of the relevant facts treated by the first instance court as established; 3) inconsistency between the conclusions set out in the first instance court's decision and the facts of the case; 4) violation of procedural law or incorrect application of substantive law.

[65]   Incorrect application of substantive law encompasses the misinterpretation of the law, the application of inapplicable law, or the failure to apply the applicable law.

[66]   A court decision may be amended by way of supplementation, or by amending the reasoning and/or the dispositif.

[67]   The court found that, in its 7 September 2020 judgment, the Kyiv Court of Appeal had arrived at a substantively correct conclusion rejecting VEB.RF's application, and that there is therefore no basis to quash the challenged court decision and to adopt a new decision recognizing and enforcing the 28 August 2019 Emergency Arbitrator award.

[68]   However, at the same time, in providing the reasoning for its judgment, the court of first instance has, in addition to the grounds under Article V(2)(b) of the New

Translated by Thames Translation
Email: gluce@thamestranslation.com
Web site: https://www.thamestranslation.com



York Convention and Article 478(1)(2)(b) of the Civil Procedure Code of Ukraine for a refusal to recognize and enforce the 28 August 2019 Emergency Arbitrator award – which the Supreme Court accepts – also erroneously based its 7 September 2020 judgment on the lack of jurisdiction of the Emergency Arbitrator and the lack of opportunity on the part of the State of Ukraine to provide its comments.

[69]  The Supreme Court considers that the grounds provided in Article V(1)(b) and (c) of the New York Convention and Article 478(1)(1)(b) and (c) of the Civil Procedure Code of Ukraine for a refusal to recognize and enforce the Emergency Arbitrator award of 28 August 2019 are not met, and the contested decision of the Kyiv Court of Appeal of 7 September 2020 must therefore be amended as to its reasoning, taking into account the conclusions set out in this Supreme Court judgment.

[70]  The Supreme Court found no grounds to supplement or amend the dispositif of the 7 September 2020 Kyiv Court of Appeal judgment.

[71]  Based on Articles 24, 351, 367, 368, 374, 376, 381-384, and 478 of the Civil Procedure Code of Ukraine, the Supreme Court comprised of the judicial panel of the First Judicial Chamber of the Civil Court of Cassation

**RESOLVES AS FOLLOWS**

The appeal of VEB.RF State Development Corporation represented by attorney Oleksandr Mykhailovych Denysenko is partially allowed.

The Kyiv Court of Appeal judgment of 7 September 2020 shall be amended as to its reasoning, taking into account the conclusions set out in this Supreme Court judgment.

The judgment of the court of cassation shall enter into force from the moment it is issued; it shall be final and not subject to appeal.

**Judges: V.V. Shypovych E.V. Synelnykov S.F. Khopta**

# Supreme Court lifts seizure of PIB shares, unblocks its funds



The Supreme Court on January 27 satisfied the cassation appeal of PJSC Prominvestbank (PIB), canceled the decisions of the courts of lower instances, and decided to lift a seizure order on the shares of the financial institution and unblock its funds on the accounts of the National Bank of Ukraine and other banks, the Finclub newspaper said on Thursday.

According to the Unified State Register of Court Decisions, the corresponding decision is not subject to appeal.

The Supreme Court also ruled to recover UAH 4,200 from the defendant Crimea Development LLC of court fees for filing appeals and cassation complaints.

As reported, the Economic Court of Kyiv on March 10, 2020 satisfied the appeal of Crimea Development LLC (it was repeatedly mentioned in the media as a legal entity associated with businessman Ihor Kolomoisky) to secure a claim against PIB and ordered to seize the bank's shares and funds on accounts of the NBU and other banks of Ukraine, as well as prohibit the liquidation or reorganization of the bank.

PJSC Prominvestbank was founded in 1992. VEB became the owner of Prominvestbank in 2008. It owns 99.7726% of its shares. VEB estimates its investments in the development of the subsidiary bank at $2.7 billion.

According to the National Bank of Ukraine, as of October 1, 2020, in terms of total assets (UAH 28.855 billion), Prominvestbank ranked 15th among 74

operating banks.

Ukrainian regulator blocks Prominvestbank's purchase by local banker | S&P Global Market Intelligence                    1/25/23, 2:36 PM

# Ukrainian regulator blocks Prominvestbank's purchase by local banker

The National Bank of Ukraine has rejected the request of local investor Serhii Tihipko to approve the indirect acquisition of an over 99% stake in PSC Prominvestbank.

The regulator said Feb. 5 the decision was taken after a comprehensive analysis of acquisition documents submitted by the investor and taking into account the ongoing problems with Prominvestbank's activities.

The planned acquisition of Prominvestbank by Tihipko, who already controls JSC Universal Bank and JSC Taskombank, was earlier approved by the Antimonopoly Committee of Ukraine.

A 99.77% stake in Prominvestbank, owned by State Development Corp. VEB.RF, was sold in March for 268.7 million hryvnia to an undisclosed investor, with financial companies Fortify and VR Capital later named by local media outlets as potential buyers. VEB called the sale of Prominvestbank a violation of international law and pledged at the time to take legal steps to challenge the transaction.

*As of Feb. 5, US$1 was equivalent to 28.01 Ukranian hryvnia.*

**Відомості про остаточних ключових учасників у структурі власності банку станом на 01 січня 2022 року**

Публічне акціонерне товариство "Акціонерний комерційний промислово-інвестиційний банк"

01001, м. Київ, вул. Малопідвальна, 8

| № з/п | Прізвище, ім'я та по батькові фізичної особи або повне найменування юридичної особи | Тип особи | Чи є особа власником істотної участі в банку | Інформація про особу | Участь особи в банку, % | | | Опис взаємозв'язку особи з банком |
|---|---|---|---|---|---|---|---|---|
| | | | | | пряма | опосередкована | сукупна | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 1. | Державна корпорація розвитку "ВЕБ.РФ", Російська Федерація (State Development Corporation "VEB.RF", Russian Federation) | ЮО | ТАК | Російська Федерація, 107996, м.Москва, просп.Академіка Сахарова, 9, (Russian Federation, 107996, Moscow, Akademika Sakharova Prospekt 9). Реєстраційний номер - 1077711000102 | 99,772644 | - | 99,772644 | Акціонер банку |
| 2. | Ірина Матвієнко (Irina Matvienko) | ФО | НІ | Громадянство: Канада. Швейцарія, зд.Лозанна (Citizen of Canada, Switzerland, Lausanne) | 0,077856 | - | 0,077856 | Акціонер банку |
| 3. | Шаповалова Тетяна Григорівна | ФО | НІ | Громадянство: Україна. Україна, м.Київ | 0,003077 | - | 0,003077 | Акціонер банку |
| 4. | Хрустальова Ірина Олександрівна | ФО | НІ | Громадянство: Україна. Україна, Донецька обл., Старобільнівський р-н, с.Основа | 0,001143 | - | 0,001143 | Акціонер банку |
| 5. | Віджила Дарина Володимирівна | ФО | НІ | Громадянство: Україна. Україна, місто Київ | 0,000615 | - | 0,000615 | Акціонер банку |
| 6. | Сєрьогін Юрій Володимирович | ФО | НІ | Громадянство: Україна. Україна, м.Київ | 0,000589 | - | 0,000589 | Акціонер банку |
| 7. | Смотрицький Леонід Феоктистович | ФО | НІ | Громадянство: Україна. Україна, Донецька обл., м.Горлівка | 0,000408 | - | 0,000408 | Акціонер банку |
| 8. | Комісарова Надія Юріївна, Комісаров Олексій Олександрович | ФО | НІ | Громадянство: Україна. Україна, м.Київ | 0,000375 | - | 0,000375 | Акціонер банку |
| 9. | Кравченко Михайло Михайлович | ФО | НІ | Громадянство: Україна. Україна, м.Київ | 0,000368 | - | 0,000368 | Акціонер банку |
| 10. | Звягільський Юхим Леонідович | ФО | НІ | Громадянство: Україна. Україна, Донецька обл., м.Донецьк | 0,000354 | - | 0,000354 | Акціонер банку |
| 11. | Старкова Валентина Григорівна | ФО | НІ | Громадянство: Україна. Україна, Дніпропетровська обл., м.Кривий Ріг | 0,000333 | - | 0,000333 | Акціонер банку |

| 12. | Лисенко Людмила Анатоліївна | ФО | НІ | Громадянство: Україна, Україна, м.Київ | 0,000323 | - | 0,000323 | Акціонер банку |
| 13. | Любімов Іван Михайлович | ФО | НІ | Громадянство: Україна, Україна, Дніпропетровська обл., м.Кривий Ріг | 0,000314 | - | 0,000314 | Акціонер банку |
| 14. | Ярова Валентина Пилипівна | ФО | НІ | Громадянство: Україна, Україна, м.Київ | 0,000297 | - | 0,000297 | Акціонер банку |
| 15. | Дубина Тетяна Василівна | ФО | НІ | Громадянство: Україна, Україна, Дніпропетровська обл., м.Кривий Ріг | 0,000293 | - | 0,000293 | Акціонер банку |
| 16. | Приходько Ніна Миколаївна | ФО | НІ | Громадянство: Україна, Україна, Запорізька обл., м.Запоріжжя | 0,000289 | - | 0,000289 | Акціонер банку |
| 17. | Гусєва Олена Володимирівна | ФО | НІ | Громадянство: Україна, Україна, м.Одеса | 0,000249 | - | 0,000249 | Акціонер банку |
| 18. | Титаян Зоя Мамаєлівна | ФО | НІ | Громадянство: Україна, Україна, Донецька обл., м.Кальміуське | 0,000245 | - | 0,000245 | Акціонер банку |
| 19. | Гончарук Дмитро Васильович | ФО | НІ | Громадянство: Україна, Україна, м.Київ | 0,000241 | - | 0,000241 | Акціонер банку |
| 20. | Слюсарєв Владислав Володимирович | ФО | НІ | Громадянство: Україна, Україна, Донецька обл., м.Донецьк | 0,000238 | - | 0,000238 | Акціонер банку |
| 21. | Лісогорський Олександр Анатолійович | ФО | НІ | Громадянство: Україна, Україна, м.Київ | 0,000202 | - | 0,000202 | Акціонер банку |

Голова Правління
(посада уповноваженої банком особи)

24.01.2022
(дата)

_____
(підпис)

Шумкова Н. Г.
(прізвище та ініціали виконавця)

Рожок А. В.
(прізвище та ініціали)

(044) 364-65-41
(телефон виконавця)

**Відомості про власників істотної участі в банку станом на 01 січня 2022 року**

Публічне акціонерне товариство "Акціонерний комерційний промислово-інвестиційний банк"
01001, м. Київ, вул. Малопідвальна, 8

| № з/п | Прізвище, ім'я та по батькові (фізичної особи) або повне найменування юридичної особи | Тип особи | Тип істотної участі | Інформація про особу | Опис взаємозв'язку особи з банком |
|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 |
| 1. | Державна корпорація розвитку "ВЕБ.РФ", Російська Федерація (State Development Corporation "VEB.RF", Russian Federation) | ЮО | П | Російська Федерація, 107996, м.Москва, просп.Академіка Сахарова 9, (Russian Federation, 107996, Moscow, Akademika Sakharova Prospekt 9). Реєстраційний номер - 1077711000102 | Акціонер банку, якому належить 99,772644% акцій банку. Дозвіл Національного банку України на придбання Внєшекономбанком істотної участі у банку у розмірі 75,000002% надано згідно з рішенням Комісії Національного банку України з питань нагляду та регулювання діяльності банків від 28.09.2009 №547. Державна корпорація розвитку "ВЕБ.РФ" створена Російською Федерацією на підставі спеціального Федерального закону "Про банк розвитку". Статутний капітал ВЕБ.РФ не розділений на акції (паї участників), особи, які розпоряджаються на будь-якій підставі акціями ВЕБ.РФ, відсутні. |

Голова Правління
(посада уповноваженої банком особіб)

_____
(підпис)

24.01.2022
(дата)

Рокок А. В.
(прізвище та ініціали)

Шумкова Н. Г.
(прізвище та ініціали виконавця)

(044) 364-65-41
(телефон виконавця)

СХЕМАТИЧНЕ ЗОБРАЖЕННЯ СТРУКТУРИ ВЛАСНОСТІ

Публічного акціонерного товариства
«Акціонерний комерційний промислово-інвестиційний банк»
станом на 01.01.2022



В.о. Голови Правління                                    А.Б. Дзюбатий

 

+1 502-822-6535 | support@rushtranslate.com

MEMBER #263976

# Certification of Translation Accuracy

Translation of **Bank Ownership Structure** from **Ukrainian** to **English**

As an authorized representative of RushTranslate, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified and competent professional translator, fluent in the above-mentioned language pair and that, in my best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a complete and accurate translation of the original document. This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. I do not make any claims or guarantees about the authenticity or content of the original document. Further, RushTranslate assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

Mike Bortscheller
Authorized Representative
Order Date: September 12, 2022

RushTranslate
640 South Fourth St
Suite 300
Louisville, KY 40202
United States




+1 502-822-6535 | support@rushtranslate.com


MEMBER #263976

**Data on final key participants in the bank ownership structure
as of January 01, 2022**

Public Stock Company "Joint-Stock Commercial Industrial and Investment Bank"
01001, City of Kyiv, St. Malopidvalna, 8

| No. | Last name, first name and patronymic of a natural person or a full name of a legal entity | Party type | Is the party a holder of essential participation in the bank | Information about the party | Party's participation in the bank, % | | | Description of the party's relation to the bank |
|---|---|---|---|---|---|---|---|---|
| | | | | | direct | indirect | joint | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 1. | State Development Corporation "VEB.RF", Russian Federation | Legal entity | YES | Russian Federation, 107996, City of Moscow, Akademika Sakharova Prospekt, 9 Registration number - 1077711000102 | 99,772644 | - | 99,772644 | Shareholder of the bank |
| 2. | Irina Matvienko | Natural person | NO | Citizenship: Canada. Switzerland, City of Lausanne | 0,077856 | - | 0,077856 | Shareholder of the bank |
| 3. | Shapovalova Tetiana Hryhorivna | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Kyiv | 0,003077 | - | 0,003077 | Shareholder of the bank |
| 4. | Chrustaliova Iryna Oleksandrivna | Natural person | NO | Citizenship: Ukraine. Ukraine, Donetsk Region, Starobersheve District, Village of Osykovo | 0,001143 | - | 0,001143 | Shareholder of the bank |
| 5. | Vidiakina Daryna Volodymyrivna | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Kyiv | 0,000615 | - | 0,000615 | Shareholder of the bank |
| 6. | Seriohin Yurii Volodymyrovych | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Kyiv | 0,000589 | - | 0,000589 | Shareholder of the bank |
| 7. | Smotrytskyi Leonid Feodosiiovych | Natural person | NO | Citizenship: Ukraine. Ukraine, Donetsk Region, City of Horlivka | 0,000408 | - | 0,000408 | Shareholder of the bank |
| 8. | Komisarova Nadia Yuriivna, Komisarov Oleksii Oleksandrovych | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Kyiv | 0,000375 | - | 0,000375 | Shareholder of the bank |
| 9. | Kravchenko Mykhailo Mykhailovych | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Kyiv | 0,000368 | - | 0,000368 | Shareholder of the bank |
| 10. | Zvyahilsky Yukhym Leonidovych | Natural person | NO | Citizenship: Ukraine. Ukraine, Donetsk Region, City of Donetsk | 0,000354 | - | 0,000354 | Shareholder of the bank |


+1 502-822-6535 | support@rushtranslate.com


MEMBER #263976

| 11. | Starikova Valentyna Hryhorivna | Natural person | NO | Citizenship: Ukraine. Ukraine, Dnipropetrovsk Region, City of Kryvyi Rih | 0,000333 | - | 0,000333 | Shareholder of the bank |
|-----|-------------------------------|----------------|----|------------------------------------------------------------------------|----------|---|----------|-------------------------|
| 12. | Lizenko Liudmyla Anatoliivna | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Kyiv | 0,000323 | - | 0,000323 | Shareholder of the bank |
| 13. | Liubymov Ivan Mykhailovych | Natural person | NO | Citizenship: Ukraine. Ukraine, Dnipropetrovsk Region, City of Kryvyi Rih | 0,000314 | - | 0,000314 | Shareholder of the bank |
| 14. | Yarova Valentyna Pylypivna | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Kyiv | 0,000297 | - | 0,000297 | Shareholder of the bank |
| 15. | Dubyna Tetiana Vasylivna | Natural person | NO | Citizenship: Ukraine. Ukraine, Dnipropetrovsk Region, City of Kryvyi Rih | 0,000293 | - | 0,000293 | Shareholder of the bank |
| 16. | Prykhodko Nina Mykolaivna | Natural person | NO | Citizenship: Ukraine. Ukraine, Zaporizhzhia Region, City of Zaporizhzhia | 0,000289 | - | 0,000289 | Shareholder of the bank |
| 17. | Husieva Olena Volodymyrivna | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Odesa | 0,000249 | - | 0,000249 | Shareholder of the bank |
| 18. | Hnitko Zilia Mamalimivna | Natural person | NO | Citizenship: Ukraine. Ukraine, Donets Region, City of Kalmiuske | 0,000245 | - | 0,000245 | Shareholder of the bank |
| 19. | Honcharuk Dmytro Vasylovych | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Kyiv | 0,000241 | - | 0,000241 | Shareholder of the bank |
| 20. | Sliusariev Vladyslav Volodymyrovych | Natural person | NO | Citizenship: Ukraine. Ukraine, Donetsk Region, City of Donetsk | 0,000238 | - | 0,000238 | Shareholder of the bank |
| 21. | Lisohorskyi Oleksandr Anatoliiovych | Natural person | NO | Citizenship: Ukraine. Ukraine, City of Kyiv | 0,000202 | - | 0,000202 | Shareholder of the bank |

Head of the Board      _____      Rozhok A.V.
(position of the person authorized by the bank)   (signature)   (last name and initials)

01/24/2022 (month/day/year)      Shumkova N.H.      (044) 364-65-41
(date)      (last name and initials of a prerarer) (preparer's telephone)

 

+1 502-822-6535 | support@rushtranslate.com

**Data on the holders of essential participation in the bank as of January 01, 2022**
Public Stock Company "Joint-Stock Commercial Industrial and Investment Bank"
01001, City of Kyiv, St. Malopidvalna, 8

| No. | Last name, first name and patronymic of a natural person or a full name of a legal entity | Party type | Type of essential participation | Information about the party | Description of the party's relation to the bank |
|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 |
| 1. | State Development Corporation "VEB.RF", Russian Federation | Legal entity | Direct | Russian Federation, 107996, Moscow, Akademika Sakharova Prospekt, 9. Registration number – 1077711000102 | Shareholder of the bank, who owns 99,772644% of the shares of the bank.<br><br>Permit of the National Bank of Ukraine for purchasing by Vnesheconombank essential participation in the bank in the amount of 75,000002% was given according to the decision of the Commission of the National Bank of Ukraine for Issues of Supervision and Regulation of Banking Activity of 09/28/2009 (month/day/year) No. 547.<br><br>State Development Corporation "VEB.RF" was created by the Russian Federation on the grounds of the special Federal Law "About Development Bank". The authorized capital of VEB.RF is not split into shares (shares of the participants), the parties that dispose of the shares of VEB.RF on any grounds are none. |

Head of the Board                    _____              Rozhok A.V.
(position of the person authorized by the bank)   (signature)    (last name and initials)

01/24/2022 (month/day/year)          Shumkova N.H.                (044) 364-65-41
(date)                      (last name and initials of a preparer) (preparer's telephone)

 

## DIAGRAM OF OWNERSHIP STRUCTURE
of the Public Stock Company "Joint-Stock Commercial Industrial and Investment Bank"
as of 01/01/2022 (month/day/year)



| | |
|---|---|
| 0,077856% | Irina Matvienko (Canada) |
| 0,003077% | Shapovalova Tetiana Hryhorivna (Ukraine) |
| 001143% | Chrustaliova Iryna Oleksandrivna (Ukraine) |
| 0,000615% | Vidiakina Daryna Volodymyrivna (Ukraine) |
| 0,000589% | Seriohin Yurii Volodymyrovych (Ukraine) |
| 0,000408% | Smotrytskyi Leonid Feodosiiovych (Ukraine) |
| 0,000375% | Komisarova Nadia Yuriivna (Ukraine), Komisarov Oleksii Oleksandrovych (Ukraine) |
| 0,000368% | Kravchenko Mykhailo Mykhailovych (Ukraine) |
| 0,000354% | Zvyahilsky Yukhym Leonidovych (Ukraine) |
| 0,000333% | Starikova Valentyna Hryhorivna (Ukraine)) |
| 0,000323% | Lizenko Liudmyla Anatoliivna (Ukraine) |
| 0,000314% | Liubymov Ivan Mykhailovych (Ukraine) |
| 0,000297% | Yarova Valentyna Pylypivna (Ukraine) |
| 0,000293% | Dubyna Tetiana Vasylivna (Ukraine) |
| 0,000289% | Prykhodko Nina Mykolaivna (Ukraine) |
| 0,000249% | Husieva Olena Volodymyrivna (Ukraine) |
| 0,000245% | Hnitko Zilia Mamalimivna (Ukraine) |
| 0,000241% | Honcharuk Dmytro Vasylovych (Ukraine) |
| 0,000238% | Sliusariev Vladyslav Volodymyrovych (Ukraine) |
| 0,000202% | Lisohorskyi Oleksandr Anatoliiovych (Ukraine) |

Acting Head of the Board          A.B. Dziubatyi

# Russia's Sberbank to appeal against Ukraine's move to seize its assets

[Reuters](#)    1 minute readMay 12, 202210:53 AM EDTLast Updated 8 months ago



The logo is on display in an office of Sberbank in Saint Petersburg, Russia April 19, 2022. REUTERS/REUTERS PHOTOGRAPHER

May 12 (Reuters) - Russia's top lender Sberbank [(SBER.MM)](#) said on Thursday it was initiating investment arbitration proceedings against Ukraine after its parliament approved a presidential decree allowing for the forced seizure of Sberbank-owned assets in the country.

Ukraine's parliament, or Rada, on Thursday approved President Volodymyr Zelenskiy's decree that allows Ukraine to forcibly seize the assets of

Sberbank-owned International Reserve Bank, news agency Interfax Ukraine reported.

Advertisement · Scroll to continue

The decree also allows the seizure of a subsidiary of Russian state development bank VEB, Prominvestbank.

"Sberbank initiates investment arbitration against Ukraine claiming damages," the bank said in a statement, referring to a 1998 agreement on the mutual protection of investments between the two countries.



**Register for free to Reuters and know the full story**

Reporting by Reuters

Our Standards: The Thomson Reuters Trust Principles.

# Russia Pushes Back On Ukraine's Move To Seize Its Assets

Law360 (May 12, 2022, 3:58 PM EDT) -- Russia's largest financial institution, Sberbank, said Thursday that it will pursue an investor-state claim against Ukraine after the country adopted a decree allowing it to seize Russian assets.

The bank's press office confirmed the news to Law360 on Thursday. Sberbank, which holds about a third of all bank assets in Russia, is majority owned by the Russian government.

"Sberbank is initiating investment arbitration against Ukraine with a claim for damages on the basis of the Agreement Between the Government of the Russian Federation and the Cabinet of Ministers of the Ukraine on the Encouragement and Mutual Protection of Investments, dated Nov. 27, 1998," the bank said in a statement.

The move comes after the Ukrainian Parliament, the Verkhovna Rada, this week adopted a decree called On Compulsory Seizure of Property in the Russian Federation and Its Residents on a vote of 334-0.

VEB.RF, Russia's economic development institution, has also reportedly initiated an investor-state claim. The bank, which describes itself as non-profit, could not immediately be reached for comment on Thursday outside normal business hours in Russia.

Additional details about the decree were not available on the Verkhovna Rada's website, but local news media have reported that its targets include

99.8% of shares in Prominvestbank owned by VEB.RF and 100% of shares in International Reserve Bank owned by Sberbank.

Sberbank did not respond to a request seeking more information about the claim.

According to a copy of the Russia-Ukraine treaty on a website maintained by the United Nations, the two countries have six months to attempt to resolve a dispute by negotiation before it can be submitted to arbitration.

At that point, disputes will be resolved either by "a competent court or an arbitration court of the contracting party, on whose territory the investments were carried out," the Arbitration Institute of the Chamber of Commerce in Stockholm, or through ad hoc arbitration under the "arbitration regulations" of the U.N. Commission for International Trade Law.

Representatives for Ukraine could not immediately be reached for comment on Thursday.

This is not the first time that Russia has had its assets seized since invading Ukraine in February. Last month, Germany announced that it had seized control of Gazprom Germania, a unit of the Russian state-owned energy company Gazprom, until at least Sept. 30.

Russia has itself threatened to nationalize foreign assets in recent months, advancing a bill to nationalize the assets of any company that is more than 25% owned by foreigners from "unfriendly" countries, including the U.S., Canada, the U.K. and those in the European Union, to the Russian State Duma in April.

Additionally, the Kremlin has been found liable multiple times in international arbitration for expropriating Ukrainian assets in Crimea after Moscow annexed the peninsula in 2014.

--Editing by Dave Trumbore.

*For a reprint of this article, please contact* [reprints@law360.com](mailto:reprints@law360.com)*.*